1  EDWARD M. WOLKOWITZ (SBN 68298)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone:  (310) 229-1234
   Facsimile:  (310) 229-1244
5  Email: EMW@LNBYB.COM; JYO@LNBYB.COM

6  Attorneys for Elissa D. Miller,
7  Chapter 7 Trustee

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  LOS ANGELES DIVISION

11

12  In re:                          )  Case No.: 2:16-bk-16363-NB
                                    )
13  LAKE MATHEWS MINERAL            )  Chapter 7
14  PROPERTIES, LTD,                )
                                    )
15                        Debtor.   )  **CHAPTER 7 TRUSTEE'S MOTION FOR**
                                    )  **ORDER:  (A) AUTHORIZING SALE OF**
16                                  )  **ASSETS    OF    THE    DEBTOR'S**
                                    )  **BANKRUPTCY  ESTATE,  FREE  AND**
17                                  )  **CLEAR  OF  LIENS,  CLAIMS  AND**
                                    )  **ENCUMBRANCES;   (B)   APPROVING**
18                                  )  **OVERBID   PROCEDURES;   AND   (C)**
                                    )  **APPROVING     COMPROMISE     OF**
19                                  )  **CONTROVERSY; MEMORANDUM  OF**
                                    )  **POINTS    AND    AUTHORITIES;**
20                                  )  **DECLARATIONS    OF    ELISSA    D.**
                                    )  **MILLER  AND  JULIET  Y.  OH  IN**
21                                  )  **SUPPORT THEREOF**
                                    )
22                                  )
                                    )  Hearing:
23                                  )  DATE:     August 22, 2017
                                    )  TIME:     2:00 p.m.
24                                  )  PLACE:    Courtroom "1545"
                                    )            255 E. Temple Street
25                                  )            Los Angeles, California 90012
                                    )
26                                  )
                                    )
27  _____)

28

                                    1

1

## TABLE OF CONTENTS

2   **MEMORANDUM OF POINTS AND AUTHORITIES** ...................................................**5**

3   **I.**     **STATEMENT OF FACTS**...........................................................................**5**

4           **A.**     **Background** ................................................................................**5**

5
        **B.**     **Trustee's Proposed Sale Of Assets To Purchaser, Subject To Overbid** ......**8**
6

7           **C.**     **The Proposed Overbid Procedures** ................................................**10**

8           **D.**     **Liens And Interests Against The Assets** ........................................**13**

9           **E.**     **Distribution To The Estate** ........................................................**15**

10  **II.**    **GOOD CAUSE EXISTS TO APPROVE THE PROPOSED OVERBID**
        **PROCEDURES** ........................................................................................**15**
11

12  **III.**   **THE PROPOSED SALE IS IN THE BEST INTEREST OF THE ESTATE**.........**16**

13          **A.**     **The Trustee Has Complied With All Applicable Notice Requirements**......**16**

14          **B.**     **The Sale Of The Assets Should Be Approved Because Good Business**
                 **Reasons Exist, The Purchase Price For The Assets Is Fair And**
15                **Reasonable, And The Proposed Sale Is In The Best Interests Of The**
                 **Estate And Creditors** ..................................................................**17**
16

17          **C.**     **The Court Should Approve The Sale Of The Assets, Free And Clear**
                 **Of Liens, Claims And Encumbrances** ............................................**24**
18

19  **IV.**    **TO THE EXTENT THE PROPOSED SALE CONSTITUTES A**
        **SETTLEMENT OF CLAIMS, THE SETTLEMENT IS IN THE BEST**
20      **INTEREST OF THE ESTATE**......................................................................**25**

21  **V.**     **CONCLUSION** ........................................................................................**27**

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Big Shanty Land Corp. v. Comer Properties, Inc.*
61 B.R. 272 (Bankr. N.D. Ga. 1985)...................................................................20

*Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*
94 B.R. 343 (Bankr. E.D. Pa. 1988)...................................................................25

*Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*
722 F.2d 1063 (2d Cir. 1983).............................................................................18

*Fabricators Inc. v. Technical Fabricators, Inc.*
926 F.2d 1458 (5th Cir. 1991)............................................................................22

*In re A & C Properties*
784 F.2d 1377 (9th Cir. 1986)............................................................................26

*In re Abbotts Dairies of Pennsylvania, Inc.*
788 F.2d 143 (3d Cir. 1986)..........................................................................18, 21

*In re Alpha Industries, Inc.*
84 B.R. 703 (Bankr. Mont. 1988) ..................................................................20, 21

*In re Apex Oil Co.*
92 B.R. 847 (Bankr. E.D. Mo. 1988) ..................................................................22

*In re Atlanta Packaging Products, Inc.*
99 B.R. 124 (Bankr. N.D. Ga. 1988)...................................................................15

*In re Blair*
538 F.2d 849 (9th Cir. 1976)..............................................................................26

*In re Canyon Partnership*
55 B.R. 520 (Bankr. S.D. Cal. 1985) ..................................................................20

*In re Del Grosso*
106 B.R. 165 (Bankr. N.D. Ill. 1989)..................................................................23

*In re Delaware and Hudson Ry. Co.*
124 B.R. 169 (D. Del. 1991) ..............................................................................18

*In re Filtercorp, Inc.*
163 F.3d 570 (9th Cir. 1998)..............................................................................22

*In re General Store of Beverly Hills*
11 B.R. 539 (9th Cir. BAP 1981)........................................................................26

*In re Gerwer*
   898 F.2d 730 (9th Cir. 1990)..................................................................24

*In re Harford Sands Inc.*
   372 F.3d 637 (4th Cir. 2004)..................................................................22

*In re Heissenger Resources, Ltd.*
   67 B.R. 378 (C.D. Ill. 1986)..................................................................26

*In re Huntington, Ltd.*
   654 F.2d 578 (9th Cir. 1981)..................................................................18

*In re Industrial Valley Refrig. and Air Cond. Supplies, Inc.*
   77 B.R. 15 (Bankr. E.D. Pa. 1987)..................................................................21

*In re Karpe*
   84 B.R. 926 (Bankr. M.D.Pa. 1988)..................................................................24

*In re The Landing*
   156 B.R. 246 (Bankr. E.D. Mo. 1993)..................................................................18

*In re M Capital Corporation*
   290 B.R. 743 (9th Cir. BAP 2003)..................................................................23

*In re Mama's Original Foods, Inc.*
   234 B.R. 500 (C.D. Cal. 1999)..................................................................18

*In re Marquam Investment Corp.*
   942 F.2d 1462 (9th Cir. 1991)..................................................................22

*In re Martin (Myers v. Martin)*
   91 F.3d 389 (3d Cir. 1996)..................................................................18

*In re MCorp Financial, Inc.*
   160 B.R. 941 (S.D. Tex. 1993)..................................................................23

*In re Qintex Entertainment, Inc.*
   950 F.2d 1492 (9th Cir. 1991)..................................................................18

*In re Rock Indus. Mach. Corp.*
   572 F.2d 1195 (7th Cir. 1978)..................................................................21

*In re Wilde Horse Enterprises, Inc.*
   136 B.R. 830 (Bankr. C.D. Cal. 1991)..................................................18, 20, 21

*Mutual Life Ins. Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*
   36 B.R. 856 (Bankr. W.D. Mo. 1984)..................................................................25

*Walter v. Sunwest Bank (In re Walter)*
   83 B.R. 14 (9th Cir. BAP 1988)..................................................................18, 19

1

**FEDERAL STATUTES**

2

11 U.S.C. § 101 ................................................................................................22

3

11 U.S.C. § 102(1) ...........................................................................................16

4

11 U.S.C. § 363 .............................................................................4, 9, 15, 18

5

11 U.S.C. § 363(b) ....................................................................................... passim

6

11 U.S.C. § 363(b)(1) ...................................................................................16, 21

7

11 U.S.C. § 363(b)(2) .......................................................................................16

8

11 U.S.C. § 363(f) .........................................................................................24, 25

9

**CALIFORNIA STATUTES**

10

11

Cal Bus. & Prof. Code § 17200 ....................................................................8

12

**FEDERAL RULES**

13

Fed. R. Bankr. Proc. 2002 ........................................................................4, 15

14

Fed. R. Bankr. Proc. 2002(a)(2) .................................................................16, 17

15

Fed. R. Bankr. Proc. 2002(c)(1) .................................................................16, 17

16

Fed. R. Bankr. Proc. 2002(i) .......................................................................16, 17

17

Fed. R. Bankr. Proc. 2002(k) ......................................................................16, 17

18

Fed. R. Bankr. Proc. 6004 .......................................................................2, 4, 15

19

Fed. R. Bankr. Proc. 6004(a) ......................................................................16, 17

20

Fed. R. Bankr. Proc. 6004(f) .........................................................................15

21

Fed. R. Bankr. Proc. 6004-1 ....................................................................4, 16, 17

22

Fed. R. Bankr. Proc. 9019 .................................................................2, 4, 25, 27

23

Fed. R. Evid. 201 ...............................................................................................6

24

25

26

27

28

**TO THE HONORABLE NEIL W. BASON, UNITED STATES BANKRUPTCY JUDGE**:

Elissa D. Miller, the duly appointed Chapter 7 Trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Lake Mathews Mineral Properties, Ltd (the "Debtor"), hereby files this motion (the "Motion"), pursuant to 11 U.S.C. § 363(b) and Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure, for an order (A) authorizing the Trustee to sell certain assets of the Estate, as more specifically described in that certain *Asset Purchase Agreement* (the "APA") between the Trustee and PECAS, LLC ("Purchaser"), a true and correct copy of which is attached as **Exhibit "1"** to the Declaration of Elissa D. Miller annexed hereto (the "Miller Declaration"), free and clear of all liens, claims and encumbrances, and pursuant to the terms and conditions set forth in the APA; (B) approving the overbid procedure set forth in the APA and this Motion (the "Overbid Procedures"); and (C) approving the settlement of claims and compromise of controversy provided by the terms of the APA.

The Trustee received an offer from Purchaser to purchase the Estate's right, title and interest in the following assets (collectively, the "Assets"), on an "as is, where is" basis with no representation or warranty as to the condition of the Assets, for cash in the sum of $35,000 (the "Purchase Price") and other consideration as set forth in the APA:

(i)     the Debtor's interest in 25 Class B Membership Units (collectively, the "Membership Interest") under the amended and restated operating agreement of Purchaser (the "Amended Operating Agreement");

(ii)     the Debtor's interest in certain settlement proceeds payable to Purchaser under that certain General Release and Settlement Agreement dated as of April 1, 2014 by and between Purchaser and Equity Trust Company and Robert Woodie (the "Woodie Settlement Proceeds"), which the Debtor is entitled to share based upon the Debtor's Membership Interest in Purchaser;

(iii)     the Debtor's interest in the right to mine on approximately 863 acres, 300 feet below the surface of Lake Mathews, a large reservoir located in Riverside County, California (the "Mining Rights");

(iv)    the Debtor's interest in the real property consisting of approximately 63 acres of land surrounding Lake Mathews (the "63 Acres");

(v)    the cross complaint filed by the Debtor against Purchaser on January 15, 2016 (the "Cross Complaint") in that certain declaratory relief action commenced by Purchaser by the filing of a declaratory relief complaint against the Debtor (the "Complaint") in the Superior Court of the State of California, County of Los Angeles, which action bears the case number BC600724 (the "Rescission Action"), and all claims, causes of action, rights and defenses which have been asserted, could have been asserted, or may be asserted by the Debtor in, which may arise from, and/or which may relate to the Cross Complaint and/or the Complaint; and

(vi)    any and all other rights, interests or claims of any type or character which may now or hereafter be found to exist in favor of or could be asserted by, on behalf of, or for the benefit of the Debtor arising from or related in any way to the Amended Operating Agreement, the Membership Interest, the Woodie Settlement Proceeds, the Mining Rights, the 63 Acres, the Rescission Action, the Cross Complaint, or any other matter involving or related to Purchaser or Purchaser's members, managers, agents, representatives, employees, attorneys, accountants, insurers, successors or assigns (collectively, the "Ancillary Rights").

Pursuant to this Motion, the Trustee seeks authority to sell the Assets to Purchaser, free and clear of liens, claims and encumbrances, subject to overbid, and in accordance with the terms set forth in the APA attached as Exhibit "1" to the Miller Declaration.  The Trustee also seeks Court approval of the Overbid Procedures described in the Motion in connection with the proposed sale of the Assets.  Finally, pursuant to this Motion, the Trustee seeks an order of this Court approving the settlement of claims and compromise of controversy provided by the terms of the APA, including the parties' agreement to dismiss both the Complaint and the Cross Complained filed in the Rescission Action, with prejudice.

The Motion is based upon 11 U.S.C. § 363, Rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure, Local Bankruptcy Rules 2002 and 6004-1, the accompanying Memorandum of Points and Authorities and the Miller Declaration, the entire record of the Debtor's bankruptcy case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at, or prior to, the hearing on the Motion.

**WHEREFORE**, the Trustee respectfully requests that the Court enter an Order:

1.    finding that the notice given by the Trustee in connection with the sale of the Assets and the hearing on the Motion is adequate, sufficient, proper and complies with all applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure;

2.    granting the Motion in its entirety;

3.    approving the Overbid Procedures;

4.    authorizing the Trustee to sell the Assets to Purchaser, or to a successful overbidder, in accordance with the terms set forth in the APA and in the Motion;

5.    authorizing the Trustee to execute and deliver, on behalf of the Estate, any and all documents that may be reasonably necessary to consummate the sale of the Assets;

6.    approving the settlement of claims and compromise of controversy provided by the terms of the APA pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure; and

7.    granting such other and further relief as may be necessary or appropriate under the circumstances.

Dated: August 1, 2017                              ELISSA D. MILLER, CHAPTER 7 TRUSTEE


By: _____
        JULIET Y. OH
        LEVENE, NEALE, BENDER, YOO
        & BRILL L.L.P.
        Attorneys for Elissa D. Miller, Trustee

4

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

**A.      Background.**

1.      On May 13, 2016 (the "Petition Date"), Lake Mathews Mineral Properties, Ltd (the "Debtor"), the debtor herein, filed a Voluntary Petition under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

2.      On November 18, 2016, the Court entered that certain "*Order Approving Appointment Of A Chapter 11 Trustee*" [Doc. No. 112] which, among other things, approved the appointment of Elissa D. Miller as the Chapter 11 trustee of the Debtor's bankruptcy estate (the "Estate").

3.      On January 6, 2017, Ms. Miller filed a motion seeking to convert the Debtor's Chapter 11 bankruptcy case to one under Chapter 7 of the Bankruptcy Code [Doc. No. 122] (the "Motion to Convert").

4.      The Court entered an order granting the Motion to Convert on March 2, 2017 [Doc. No. 153].   Thereafter, Ms. Miller was appointed as the Chapter 7 trustee for the Estate (the "Trustee").

5.      According to the Debtor, the Debtor was formed in 1985 by James Holmes and, at one time prior to the Petition Date, the Debtor owned the right to mine on approximately 863 acres, 300 feet below the surface of Lake Mathews, a large reservoir located in Riverside County, California which is one of the primary sources of water to the Inland Empire and San Diego (the "Mining Rights"), which Mining Rights were originally derived from a stipulation signed in 1937 between the Metropolitan Water District of Southern California (the "MWD") and Lawrence Holmes, who is the father of James Holmes.   The Debtor has asserted that the Mining Rights include the mineral rights underlying the 63 Acres (as defined below), located 300 feet below ground surface and below.

6.      According to the Debtor, at one time prior to the Petition Date, the Debtor also owned surface rights to real property consisting of approximately sixty-three (63) acres of land

1    surrounding Lake Mathews (the "63 Acres").[1]

2    7.    Prior to the Petition Date, on or about January 24, 2013, the Debtor and an entity

3    called PECAS, LLC ("Purchaser") entered into a series of written agreements, pursuant to

4    which the Debtor transferred to Purchaser substantially all of its assets, including all of the

5    Debtor's rights and interests in and to the Mining Rights and the 63 Acres, in exchange for all of

6    the membership interests in Purchaser, and the assumption by Purchaser of all of the Debtor's

7    obligations under that certain judgment filed on August 3, 2012 with the Superior Court of the

8    State of California for the County of Los Angeles ("Superior Court"), in Case Number

9    BC439127 entitled *David Perez et. al v. James, Holmes et. al* (the "Perez Judgment").

10   Purchaser contends that it then amended and restated its operating agreement, creating three

11   classes of membership interests in Purchaser, called Class A, Class B and Class C.  Purchaser

12   contends that the membership interests acquired by the Debtor constituted Class B Membership

13   Interests under the amended and restated operating agreement of Purchaser (the "Amended

14   Operating Agreement"), and that the Debtor owns 25 Class B Membership Units (collectively,

15   the "Membership Interest").  A true and correct copy of the Amended Operating Agreement is

16   attached as Exhibit "A" to the Asset Purchase Agreement between the Trustee and Purchaser

17   (the "APA") attached as **Exhibit "1"** to the Declaration of Elissa D. Miller annexed hereto (the

18   "Miller Declaration").

19   8.    Purchaser contends that the Debtor is entitled to receive 25% of any profits of

20   Purchaser, after paying a preferred return to certain other investors, on the first $50,000,000 of

21   such profits, with an increasing share of profits until such profits exceed $200,000,000, at which

22   point the Debtor would be entitled to receive 70% of any profits over such amount.   The

23   description of the Membership Interest and all rights and obligations thereof is qualified by

24   reference to the Amended Operating Agreement, a true and correct copy of which is attached as

25   an exhibit to the APA, which is attached as Exhibit "1" to the Miller Declaration.

26

27   _____

28   [1] The Trustee respectfully requests that, pursuant to Rule 201 of the Federal Rules of Evidence, the Court
take judicial notice of the Case Status Report filed by the Debtor on June 7, 2016 [Doc. No. 19], p. 11 of 21.

9.     Purchaser contends that, on or about January 24, 2013, Purchaser caused the Perez Judgment to be satisfied in full by delivery of a cashier's check in the amount of $225,000.

10.     On or about December 28, 2012, prior to the transfer of the Debtor's rights and interests in and to the Mining Rights and the 63 Acres to Purchaser, the 63 Acres were sold through a foreclosure sale to Equity Trust Company and an individual named Robert Woodie (together, the "Woodie Entities").

11.     On August 16, 2013, Purchaser filed a complaint against the Woodie Entities in Superior Court, thereby commencing that certain action bearing the case number BC518687 (the "Foreclosure Lawsuit"), pursuant to which Purchaser alleged that the foreclosure sale of the 63 Acres was wrongful, invalid and unlawful due to certain provisions and defects in the related note and deed of trust (all of which allegations the Woodie Entities denied).

12.     Subsequent to the filing of the Foreclosure Lawsuit, Purchaser and the Woodie Entities entered into a General Release and Settlement Agreement dated as of April 1, 2014 which resolved the Foreclosure Lawsuit, and provided, among other things, for Purchaser and the Woodie Entities to share specified portions of the net proceeds from any sale of the 63 Acres and/or any settlement or recovery after litigation with the MWD relating to the 63 Acres (the "Woodie Settlement Proceeds"), which the Debtor is entitled to share based upon the Debtor's Membership Interest in Purchaser.

13.     Prior to the Petition Date, on or about October 8, 2015, the Debtor served Purchaser with a Notice of Rescission (the "Notice of Rescission"), pursuant to which the Debtor sought to rescind the January 24, 2013 agreements that effectuated the transfer of substantially all of the Debtor's assets (including the Debtor's rights and interests in and to the Mining Rights and the 63 Acres) to Purchaser.

14.     As a result of the Notice of Rescission and the assertion of rights by the Debtor in connection therewith, on November 12, 2015, Purchaser filed a complaint for declaratory relief against the Debtor in Superior Court (the "Complaint"), thereby commencing that certain action bearing the case number BC600724 (the "Rescission Action").

15.     On January 15, 2016, the Debtor filed a cross complaint against Purchaser in the Rescission Action (the "Cross Complaint") based upon (i) rescission, (ii) violation of California Business and Professions Code § 17200, and (iii) declaratory relief, among other grounds.  A true and correct copy of the Cross Complaint is attached as **Exhibit "2"** to the Miller Declaration annexed hereto.

16.     Upon the filing of the Debtor's bankruptcy case on the Petition Date (*i.e.*, May 13, 2016), the Rescission Action was stayed.

**B.     Trustee's Proposed Sale Of Assets To Purchaser, Subject To Overbid.**

17.     The Trustee received an offer from Purchaser to purchase the Estate's right, title and interest, if any, in the following assets (collectively, the "Assets"), on an "as is, where is" basis with no representation or warranty as to the condition of the Assets, for cash in the sum of $35,000 (the "Purchase Price"), and certain other consideration, pursuant to the terms and conditions set forth in the APA:

    a.      the Membership Interest;

    b.      the Debtor's interest in the Woodie Settlement Proceeds;

    c.      the Debtor's interest in the Mining Rights;

    d.      the Debtor's interest in the 63 Acres;

    e.      the Cross Complaint filed by the Debtor in the Rescission Action, and all claims, causes of action, rights and defenses which have been asserted, could have been asserted, or may be asserted by the Debtor in, which may arise from, and/or which may relate to the Cross Complaint and/or the Complaint; and

    f.      any and all other rights, interests or claims of any type or character which may now or hereafter be found to exist in favor of or could be asserted by, on behalf of, or for the benefit of the Debtor arising from or related in any way to the Amended Operating Agreement, the Membership Interest, the Woodie Settlement Proceeds, the Mining Rights, the 63 Acres, the Rescission Action, the Cross Complaint, or any other matter involving or related to Purchaser or Purchaser's members, managers, agents, representatives, employees, attorneys, accountants, insurers, successors or assigns

8

(collectively, the "Ancillary Rights").

18.    Subject to Court approval, the Trustee proposes to sell the Assets to Purchaser, free and clear of liens, claims and encumbrances, subject to overbid, and in accordance with the terms and conditions set forth in the APA between the Trustee and Purchaser, a true and correct copy of which is attached as **Exhibit "1"** to the Miller Declaration annexed hereto.  The salient terms of the APA are summarized below[2]:

a.    ***Purchase Price***:  Purchaser shall purchase the Assets for the Purchase Price of $35,000 (subject to overbid), which Purchase Price shall be payable in full, by cashier's check or wire transfer, to the Trustee within three (3) days following the execution of the APA.

b.    ***Deposit:***    The sum of $5,000 from the Purchase Price delivered by Purchaser to the Trustee shall constitute and be deemed a good faith deposit (the "Deposit"), which Deposit shall be deemed non-refundable and forfeited to the Estate if Purchaser is deemed to be the winning bidder at the auction sale of the Assets ("Auction"), if any, but Purchaser fails to timely consummate the sale of the Assets.  In the event that Purchaser is deemed to be the winning bidder but fails to timely consummate the sale of the Assets, the Estate shall be entitled to retain the amount of the Deposit without a further Court order and shall return the balance of the Purchase Price (*i.e.*, $29,750) to Purchaser.

c.    ***Filing of Motion to Approve Sale of Assets and Overbid Procedures:*** As soon as practicable after the execution of the APA, the Trustee shall file a motion pursuant to 11 U.S.C. § 363 seeking the entry of an order of the Court approving the overbid procedures described in the APA (the "Overbid Procedures"), and approving the sale of, and authorizing the Trustee to enter into the APA to sell, the Assets to Purchaser or a successful overbidder (the "Sale Motion").

---

[2] The following is a summary of the salient terms of the APA and is not intended to be a comprehensive recitation of the terms and conditions set forth in the APA.  To the extent there is any conflict between the summary of and the APA, the APA shall control.

d.  ***Sale Subject to Overbid at Auction:***  The sale of the Assets shall be subject to overbid, in accordance with the Overbid Procedures, at an Auction of the Assets to be conducted at the date and time of the hearing on the Sale Motion (the "Sale Hearing"), unless otherwise ordered by the Court.

e.  ***Dismissal of Rescission Action:***  In the event that Purchaser is the winning bidder of the Assets, promptly after the Closing Date of the sale of the Assets, the Trustee and Purchaser shall take steps to dismiss, with prejudice, both the Complaint and Cross Complaint in the Rescission Action.

f.  ***Waiver of Claims By Purchaser:***  In the event that Purchaser is the winning bidder of the Assets, Purchaser shall be deemed to have waived any and all claims that it has asserted or might be able to assert against the Estate, and will not participate in any distributions from the Estate, whether from the proceeds of the sale of the Assets or otherwise.

g.  ***Releases:***  In the event that Purchaser is the winning bidder of the Assets, effective upon the Closing of the sale of the Assets, and except with respect to the rights and obligations arising under the APA, the Trustee and the Estate, on the one hand, and Purchaser, on the other hand, shall provide full mutual releases.

**C.   The Proposed Overbid Procedures.**

19.   While the Trustee is prepared to consummate the proposed sale of the Assets with Purchaser, the Trustee is also interested in obtaining the maximum price for the Assets. Accordingly, the Trustee required that any sale of the Assets be subject to better and higher bids. However, to induce Purchaser to submit a formal "stalking horse" offer to purchase the Assets, Purchaser required that the overbid procedures in connection with the sale of the Assets provide for certain protections for Purchaser.

20.   Based on the foregoing considerations, the Trustee seeks Court approval of the Overbid Procedures described in the APA and summarized below in connection with the proposed sale of the Assets:

a.      ***Overbid Requirements.***  Any party interested in submitting an overbid for the Assets ("Overbid") must, not later than 4:00 p.m. (Pacific time) on the date that is two (2) business days before the Sale Hearing or, if the Auction is scheduled prior to the Sale Hearing, on the date that is two (2) business days before the Auction (the "Overbid Deadline"), deliver such Overbid in writing to counsel for the Trustee (Juliet Y. Oh, Esq., Levene, Neale, Bender, Yoo & Brill L.L.P., 1025 Constellation Blvd., Suite 1700, Los Angeles, CA 90067, Email: JYO@LNBYB.com, Facsimile: (310) 229-1244), in accordance with the requirements set forth in the APA and below:

i.      The purchase price for the Assets in any Overbid must be in the sum of at least $36,000.  Any Overbid must otherwise be substantially on the same terms and conditions set forth in the APA.

ii.      Each party submitting an Overbid must, by the Overbid Deadline: (x) deliver the full amount of the purchase price set forth in the Overbid, in the form of a cashier's check to the Trustee or a wire transfer payment to an account of the Trustee's designation, so that such amount is actually received by the Overbid Deadline; and (y) if applicable, deliver a markup of the APA, which sets forth those amendments and modifications to the APA that such bidder proposes (the "Marked Agreement"), provided that the terms of the Marked Agreement are no less favorable to the Estate than those set forth in the APA with Purchaser, plus a signed clean copy of the Marked Agreement; and (z) written confirmation that such bidder agrees that the sum that is equal to fifteen percent (15%) of the purchase price set forth in such bidder's Overbid shall constitute and be deemed a Deposit, which Deposit shall be deemed non-refundable and forfeited to the Estate if such bidder is deemed to be the winning bidder at the Auction but fails to timely consummate the sale of the Assets (the "Deposit Confirmation").

iii.      In the event that (x) a bidder submitting an Overbid fails to timely deliver the full amount of the purchase price set forth in the Overbid, (y) a bidder submitting an Overbid fails to timely deliver the Deposit Confirmation, and/or (z)

the Trustee determines, in her sole discretion, that the terms set forth in a Marked Agreement submitted by a bidder are less favorable to the Estate than those set forth in the APA with Purchaser, the Trustee may, at her sole discretion, disqualify the applicable bidder from participating in the Auction. In the event that the Trustee exercises her discretion and disqualifies a bidder from participating in the Auction, the Overbid purchase price amount delivered by such bidder (if any) shall be returned to the bidder.

b.    ***Bidding At Auction.***  If at least one qualified bidder who has submitted an Overbid appears at the Auction, the Trustee shall designate what she determines to be the best and highest Overbid received for the Assets to be the leading bid at the Auction. Thereafter, the Trustee shall solicit better and higher bids for the Assets, in bidding increments of at least $1,000, from the qualified bidders participating in the Auction (including Purchaser, if it chooses to participate) until the best and highest bid for the Assets has been determined by the Trustee. Prior to making a bid at the Auction, each qualified bidder (including Purchaser, if it choose to participate) must present to the Trustee and/or her counsel at the Auction cashier's check(s) which in the aggregate total at least the amount of the proposed bid. Upon determination by the Trustee of the best and highest bid for the Assets, the prevailing bidder shall immediately tender to the Trustee at least the full amount of the winning bid at the Auction, in the form of valid and duly issued cashier's check(s) payable to the Trustee.

c.    ***Backup Bidder.***  In the event that there at least one qualified overbidder at the Auction, the qualified bidder who submits the second best/highest bid for the Assets at the Auction may be designated as the backup bidder. In the event that the qualified bidder who submits the second best/highest bid for the Assets at the Auction agrees to act as the backup bidder and the winning bidder does not timely complete the purchase of the Assets, the Trustee shall be authorized to proceed with the sale of the Assets to the backup bidder without further notice, hearing or order of the Court. The purchase price delivered by the backup bidder shall be retained by the Trustee following

the conclusion of the Auction until the earlier to occur of (i) the closing by the winning bidder of the purchase of the Assets or (ii) thirty-five (35) days after the date of entry of the Sale Order, unless the backup bidder has forfeited his/her/its Deposit pursuant to the terms and conditions set forth in the APA.

d. ***Closing of Sale and Forfeiture of Deposits:*** The winning bidder shall have until the first business day that is fifteen (15) days after the date of entry of an order granting the Sale Motion (the "Sale Order") to consummate the sale of the Assets. If the winning bidder fails to do so, the winning bidder will be deemed to have forfeited his/her/its Deposit unless the Court or the Trustee agrees to provide the winning bidder with an extension of time to close the sale. If the winning bidder fails to close and forfeits his/her/its Deposit and a backup bidder was designated at the conclusion of the Auction, the backup bidder will be notified and will then have until the first business day that is fifteen (15) days after the date of such notification to close his/her/its purchase of the Assets or will be deemed to have forfeited his/her/its Deposit unless the Court or the Trustee agrees to provide such backup bidder with an extension of time to close the sale.

**D.    Liens And Interests Against The Assets.**

21. The Trustee is not aware of any valid and properly perfected liens against the Assets.

22. Counsel for the Trustee obtained copies of financing statement(s) recorded against the Debtor with the office of the California Secretary of State. Copies of the foregoing financing statement(s) are attached as **Exhibit "3"** to the Declaration of Juliet Y. Oh annexed hereto (the "Oh Declaration").

23. As reflected in Exhibit "3" to the Oh Declaration, there is only one (1) active filing with respect to the Debtor. Specifically, a financing statement was recorded against the Debtor by an entity called Bridgeport Management, Inc. ("Bridgeport") on October 16, 2013. Such financing statement purports to cover certain specified "gross proceeds...received by or for the account of Debtor" derived from various potential sources. However, the financing statement recorded by Bridgeport does not include any information or documentation regarding

the basis for the security interest and/or lien asserted by Bridgeport.  While the financing statement does reference an agreement between the Debtor and Bridgeport dated April 22, 2010, a copy of such agreement is not attached to the financing statement.

24.    However, a copy of the agreement referenced in the UCC-1 financing statement recorded by Bridgeport is attached to the proof of claim filed by Bridgeport in the Debtor's bankruptcy case.  A true and correct copy of the proof of claim filed by Bridgeport in the Debtor's bankruptcy case on October 7, 2016, which claim is designated as Claim No. 30 in the claims register for the Debtor's case, is attached as **Exhibit "4"** to the Oh Declaration.  The agreement between the Debtor and Bridgeport, which is attached to Bridgeport's proof of claim, does not appear to confer to Bridgeport a security interest or lien against any of the Debtor's assets.

25.    The Debtor listed a number of allegedly secured creditors in its Amended Schedule D filed with the Court on July 6, 2016 ("Amended Schedule D").  A true and correct copy of the Debtor's Amended Schedule D is attached as **Exhibit "5"** to the Miller Declaration annexed hereto.  However, the Trustee has not seen any documentation to establish that the creditors listed in the Debtor's Amended Schedule D are entitled to a security interest in any of the Assets or, even if such creditors are entitled to security interests in any of the Assets (which the Trustee disputes), that such creditors properly perfected their security interests.

26.    There are also a number of alleged creditors who filed proofs of claim in the Debtor's case asserting secured claims against the Estate.  A copy of the claims register for the Debtor's bankruptcy case (as of July 31, 2017) is attached as **Exhibit "6"** to the Miller Declaration.  However, the Trustee has reviewed the proofs of claim filed by the foregoing creditors, and has not seen any documentation to establish that such creditors are entitled to a security interest in any of the Assets or, even if such creditors are entitled to security interests in any of the Assets (which the Trustee disputes), that such creditors properly perfected their security interests.

/ / /

/ / /

1  **E.**    **Distribution To The Estate.**

2      27.    Since there are no commissions or any significant closing costs anticipated to be

3  incurred by the Estate in connection with the sale of the Assets, the Trustee estimates that the

4  proposed sale of the Assets will generate net proceeds in the full amount of the Purchase Price

5  (*i.e.*, at least $35,000).

6                                **II.**

7              **GOOD CAUSE EXISTS TO APPROVE THE PROPOSED**

8                      **OVERBID PROCEDURES**

9      Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

10  Rules") govern the scope of the notice to be provided in the event a debtor elects to sell property

11  of the estate under 11 U.S.C. § 363; however, with respect to the procedures to be adopted in

12  conducting a sale outside the ordinary course, Bankruptcy Rule 6004 provides only that such

13  sale may be by private sale or public auction, and requires only that the trustee provide an

14  itemized list of the property sold together with the prices received upon consummation of the

15  sale.  Fed. R. Bankr. Proc. 6004(f).

16      Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with

17  respect to the procedures to be employed by a trustee in conducting a public or private sale.

18  Nonetheless, as one Court has stated, "[i]t is a well-established principle of bankruptcy law that

19  the objective of bankruptcy rules and the trustee's duty with respect to such sales is to obtain the

20  highest price or greatest overall benefit possible for the estate."  *In re Atlanta Packaging*

21  *Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).    Additionally, courts have long

22  recognized the need for competitive bidding at hearings on private sales; "[c]ompetitive bidding

23  yields higher offers and thus benefits the estate.    Therefore, the objective is 'to maximize

24  bidding, not restrict it.'"  *Id.*

25      The Trustee believes that the proposed Overbid Procedures will maximize the price

26  ultimately obtained for the Assets and still protect the Estate from parties who may wish to bid

27  on the Assets but who are ultimately unable to consummate a purchase of the Assets.    The

28  Overbid Procedures serve numerous legitimate purposes.    Among other things, the Overbid

Procedures will (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate from consideration purchasers who would waste the Estate's time because they would not have the financial ability to consummate a purchase of the Assets; and (iii) ensure that the highest possible price is obtained for the Assets. Accordingly, the Trustee submits that approval of the proposed Overbid Procedures is in the best interests of the Estate and creditors.

Local Bankruptcy Rule 6004-1 provides that a hearing on a motion to establish procedures for the sale of assets may be scheduled on not less than seven (7) days' notice. The notice must describe the proposed procedures, describe the purchase agreement, describe the prior marketing effort and provide that opposition may be filed on or before one (1) day prior to the hearing. LBR 6004-1(b)(2). Copies of the Notice of Motion and Motion, which comply with LBR 6004-1(b)(2), are being served on the Debtor, all of the Debtor's creditors, all parties requesting special notice, and the Office of the United States Trustee, via first-class mail. Notwithstanding the provisions of Local Bankruptcy Rule 6004-1, which allow a hearing on a bidding procedures motion to be scheduled on notice of only seven (7) days, the Trustee is filing and serving the Notice of the Motion with at least twenty-one (21) days' notice before the Sale Hearing.

**III.**

**THE PROPOSED SALE IS IN THE BEST INTEREST OF THE ESTATE**

**A.**      **The Trustee Has Complied With All Applicable Notice Requirements.**

Section 363(b)(1) provides that the Trustee, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 102(1) defines "after notice and a hearing" as after such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances. 11 U.S.C. § 102(1)(A).

Bankruptcy Rule 6004(a) provides, in pertinent part, that notice of a proposed sale not in the ordinary course of business must be given pursuant to Bankruptcy Rules 2002(a)(2), (c)(1), (i) and (k), and, if applicable, in accordance with section 363(b)(2) of the Bankruptcy Code. Fed. R. Bankr. P. 6004(a). Bankruptcy Rule 2002(a)(2) requires at least 21 days' notice by mail

16

1  of a proposed sale of property of the estate other than in the ordinary course of business, unless

2  the Court for cause shown shortens the time or directs another method of giving notice. Fed. R.

3  Bankr. P. 2002(a)(2). Bankruptcy Rule 2002(c)(1) requires that the notice of a proposed sale

4  include the date, time and place of any public sale, the terms and conditions of any private sale,

5  and the time fixed for filing objections. It also provides that the notice of sale or property is

6  sufficient if it generally describes the property. Fed. R. Bankr. P. 2002(c)(1). Bankruptcy Rule

7  2002(k) requires that the notice be given to the United States Trustee. Fed. R. Bankr. P.

8  2002(k).

9      In addition, Local Bankruptcy Rule 6004-1 requires that the Notice contain the

10 information specified in Local Bankruptcy Rule 6004-1(c)(3) and that an additional copy of the

11 Notice be submitted to the Clerk of the Bankruptcy Court together with a Form 6004-2 at the

12 time of filing for purposes of publication. L.B.R. 6004-1(c)(3) and (f).

13     The Trustee has complied with all of the above provisions of the Bankruptcy Code, the

14 Bankruptcy Rules and the Local Bankruptcy Rules. The Trustee has complied with Bankruptcy

15 Rules 6004(a) and 2002(a)(2), (c)(1), (i) and (k), as well as Local Bankruptcy Rule 6004-

16 1(c)(3), because the notice of the Motion that has been filed contemporaneously herewith (the

17 "Notice") includes all of the required information, including, without limitation, the date, time

18 and place of the sale and the deadline for objecting thereto, and has been served on the United

19 States Trustee, the Debtors, all of the Debtors' known creditors, and all parties requesting

20 special notice. The Trustee has also complied with the requirements of Local Bankruptcy Rule

21 6004-1(f) because the Trustee has filed the Notice and Form 6004-2 with the Clerk of the

22 Bankruptcy Court for purposes of publication.

23 **B.    The Sale Of The Assets Should Be Approved Because Good Business Reasons**

24 **Exist, The Purchase Price For The Assets Is Fair And Reasonable, And The**

25 **Proposed Sale Is In The Best Interests Of The Estate And Creditors.**

26     11 U.S.C. § 363(b) provides that a trustee "after notice and a hearing, may use, sell or

27 lease, other than in the ordinary course of business, property of the estate." To approve a use,

28 sale or lease of property other than in the ordinary course of business, the court must find "some

articulated business justification." *See, e.g., In re Martin (Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) citing *In re Schipper (Fulton State Bank v. Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision).

In the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best interest of the estate, and a business justification exists for authorizing the sale. *In re Huntington, Ltd.*, 654 F.2d 578 (9th Cir. 1981); *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19-20 (9th Cir. BAP 1988). The Ninth Circuit has also held that section 363 allows the sale of substantially all assets of a debtor's bankruptcy estate after notice and a hearing. *In re Qintex Entertainment, Inc.*, 950 F.2d 1492 (9th Cir. 1991).

As a general matter, a Court considering a motion to approve a sale under Section 363(b) should determine from the evidence presented before it that a "good business reason" exists to grant such a motion. *In re Lionel Corp.*, 722 F.2d at 1071. In addition, the Court must further find it is in the best interest of the estate. To make this determination, a Court should consider whether:

      (1)    the sale is fair and reasonable, *i.e.*, the price to be paid is adequate;

      (2)    the property has been given adequate marketing;

      (3)    the sale is in good faith, *i.e.*, there is an absence of any lucrative deals with insiders, and

      (4)    adequate notice has been provided to creditors.

*In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991); *In re The Landing*, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993); *In re Mama's Original Foods, Inc.,* 234 B.R. 500, 502-505 (C.D. Cal. 1999). The Trustee submits that the proposed sale of the Assets, pursuant to the terms of the APA, satisfies each of these requirements.

### a.    *Sound Business Purpose*.

The Ninth Circuit Bankruptcy Appellate Panel in *In re Walter, supra*, 83 B.R. at 19, has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b).  The facts pertaining to the sale at issue here amply substantiate the Trustee's business decision that the contemplated sale of the Assets, pursuant to the terms of the APA, serves the best interests of the Estate and merits the approval of this Court.

The proposed sale of the Assets will generate what the Trustee believes are unencumbered funds of **at least $35,000** for the benefit of the Estate.

On the other hand, if the Trustee is not able to consummate a sale of the Assets to Purchaser (or a successful overbidder) as proposed herein, the Trustee will likely be forced to abandon the Assets altogether, given the costs associated with administering the Assets.  For example, the Assets include claims as set forth in the Cross Complaint filed by the Debtor in the Rescission Action.  The costs of pursuing the Cross Complaint would undoubtedly be high, given the complex factual contentions involved in the Rescission Action, and would require the Trustee to simultaneously defend against the Complaint filed by Purchaser in the Rescission Action, all with very little likelihood of any affirmative recovery for the Estate (even if the Trustee were to prevail in such litigation).  The Estate currently has no resources with which to pursue the Cross Complaint and/or defend against the Complaint filed by Purchaser in the Rescission Action, even if the Trustee were so inclined.  Furthermore, the Estate currently has no direct interest in the Mining Rights and 63 Acres at this time, as the interest in those Assets can only be realized if the Trustee prevails in the Rescission Action.  While the Estate does currently have an interest in the Membership Interest in Purchaser and an interest in a portion of the Woodie Settlement Proceeds (which interest derives from the Debtor's Membership Interest in Purchaser), it appears very unlikely that such Assets will result in the recovery of any cash in the near future (if ever).  Given the foregoing circumstances and the risks and costs associated with any litigation, as well as the fact that the litigation of the Rescission Action will likely not result in any affirmative recovery for the Estate, the Trustee submits that the proposed sale of

1   the Assets, which will result in the recovery of at least $35,000 in unencumbered cash for the

2   Estate, is overwhelmingly in the best interests of the Estate and therefore represents a sound

3   exercise of the Trustee's business judgment.

4           **b.    _Fair and Reasonable Price._**

5           In order for a sale to be approved under Section 363(b), the purchase price must be fair

6   and reasonable. *See generally, In re Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985).

7   The trustee is given substantial discretion in this regard. *Id.* In addition, Courts have broad

8   discretion with respect to matters under section 363(b). *See Big Shanty Land Corp. v. Comer

9   Properties, Inc.*, 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985). In any sale of estate assets, the

10  ultimate purpose is to obtain the highest price for the property sold. *Wilde Horse Enterprises,

11  Inc.*, 136 B.R. at 841 (*citing In re Chung King, Inc.*, 753 F.2d 547 (7th Cir. 1985)), *In re Alpha

12  Industries, Inc.*, 84 B.R. 703, 705 (Bankr. Mont. 1988).

13          As noted above, the Assets which are proposed to be sold to Purchaser include certain

14  litigation rights related to the Rescission Action. Given the fact that the Trustee's pursuit of the

15  Debtor's Cross Complaint in the Rescission Action (even if successful) is not likely to result in

16  any affirmative cash recovery for the Estate, the Trustee believes that the proposed Purchase

17  Price of $35,000 is more than fair and reasonable for such litigation rights and the other Assets.

18  In the event that the proposed sale of the Assets to Purchaser (or a successful overbidder) cannot

19  be consummated, due to the nature of the Assets and the lack of any resources available in the

20  Estate to pursue the litigation claims discussed above, the Trustee is prepared to immediately

21  abandon the Assets and designate the Debtor's bankruptcy case as a "no asset" case. The

22  Trustee believes that the only feasible way to monetize the Assets for the benefit of creditors is

23  to sell the Assets to Purchaser or a successful overbidder.

24          Although the Trustee believes that the Purchase Price proposed by Purchaser is fair and

25  reasonable under the circumstances, in an effort to maximize the price obtained for the Assets,

26  the Trustee is seeking approval of the Overbid Procedures, which are intended to foster

27  competitive bidding among any serious potential purchasers while eliminating from

28  consideration purchasers who would waste the Estate's time because they would ultimately not

1  be able to consummate a purchase of the Assets.  The Trustee believes that the proposed sale

2  and auction of the Assets, in accordance with the Overbid Procedures, will result in obtaining

3  the highest and best price for the Assets, which, by definition, represents the fair market value

4  of the Assets.

5      c.    **_Adequate Marketing_.**

6      The Trustee believes that, given the nature of the Assets, the only parties who will have

7  any interest in acquiring the Assets are Purchaser, the principals of the Debtor, and alleged

8  creditors of the Debtor who have asserted that they have secured claims against the Assets.

9  Given what the Trustee believes is a very limited market for the Assets, the Trustee does not

10 believe that an extensive marketing effort is required or warranted in connection with the

11 proposed sale of the Assets.  However, in an effort to maximize the value obtained for the

12 Assets, the Trustee is inviting overbids for the Assets, in accordance with the proposed Overbid

13 Procedures.  Based on the foregoing, the Trustee submits that the Assets have been adequately

14 marketed.

15     d.    **_Good Faith_.**

16     When a bankruptcy court authorizes a sale of assets pursuant to 11 U.S.C. § 363(b)(1), it

17 is required to make a finding with respect to the "good faith" of the purchaser.  *In re Abbotts*

18 *Dairies*, 788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1) will not be employed

19 to circumvent creditor protections.  *Id.* at 150.  Good faith" encompasses fair value, and further

20 speaks to the integrity of the transaction.  *In re Wilde Horse Enterprises*, 136 B.R. at 842.

21     With respect to the Trustee's conduct in conjunction with the proposed sale of the

22 Assets, the good faith requirement "focuses principally on the element of special treatment of

23 the Debtor's insiders in the sale transaction."  *See In re Industrial Valley Refrig. and Air Cond.*

24 *Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).  With respect to Purchaser's conduct, this

25 Court should consider whether there is any evidence of "fraud, collusion between the purchaser

26 and other bidders or the [debtor], or an attempt to take grossly unfair advantage of other

27 bidders."  *In re Abbotts Dairies*, 788 F.2d at 147, *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195,

28 1198 (7th Cir. 1978); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. at 842; *In re Alpha*

1  *Industries, Inc.*, 84 B.R. at 706.  In short, "[l]ack of good faith is generally determined by

2  fraudulent conduct during the sale proceedings." *In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr.

3  E.D. Mo. 1988), *citing In re Exennium, Inc.*, 715 F.2d 1401, 1404-05 (9th Cir. 1983).

4      In *In re Filtercorp, Inc.*, 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the

5  following test for determining whether a buyer is a good faith purchaser:

6
7      A good faith buyer "is one who buys 'in good faith' and 'for
        value.'"  [citations omitted.]  [L]ack of good faith is [typically]
        shown by 'fraud, collusion between the purchaser and other
8       bidders or the trustee, or an attempt to take grossly unfair
        advantage of other bidders.'"  [citations omitted.]
9

10  *Filtercorp*, 163 F.3d at 577.  The Ninth Circuit made clear in *Filtercorp* that this standard for

11  determining good faith is applicable even when the buyer is an insider.

12      Moreover, when the proposed buyer is an insider of a debtor, Courts generally subject

13  any proposed transaction to "strict scrutiny."  In such circumstances, "the burden is on the

14  insider 'not only to prove the good faith of the transaction but also to show its inherent fairness

15  from the viewpoint of the corporation and those interested therein.'" *In re Marquam Investment*

16  *Corp.*, 942 F.2d 1462, 1465 (9th Cir. 1991), *citing Pepper v. Litton*, 308 U.S. 295, 306 (1939).

17  The Ninth Circuit has stated that "[t]he essence of the [good faith] test is whether or not under

18  all the circumstances the transaction carries the earmarks of an arm's length bargain.  If it does

19  not, equity will set it aside." *In re Marquam Investment Corp.*, *supra* at 1465; *see also In re*

20  *Harford Sands Inc.*, 372 F.3d 637, 641 (4th Cir. 2004); *Fabricators Inc. v. Technical*

21  *Fabricators, Inc.*, 926 F.2d 1458 (5th Cir. 1991).

22      In the present case, the Debtor owns the Membership Interest (*i.e.*, 25 Class B

23  Membership Units) in Purchaser.  The Trustee does not believe that, by virtue of such

24  Membership Interest, the Debtor owns, controls, or holds with power to vote, 20% or more of

25  the outstanding voting securities of Purchaser.  Accordingly, the Trustee does not believe that

26  Purchaser is an "affiliate" of the Debtor, as that term is defined in 11 U.S.C. § 101(2), or an

27  "insider" of the Debtor, as that term is defined in 11 U.S.C. § 101(31).  However, if the Court

28  should determine that the Purchaser is an affiliate, and therefore an insider, of the Debtor, the

1  Trustee submits that the proposed sale of the Assets to Purchaser meets the standard of

2  heightened scrutiny for insider transactions.

3      The negotiation and execution of the APA were conducted in good faith and at arms'

4  length by the Trustee and Purchaser, with the assistance of separate counsel.  The Trustee

5  submits that there has been no fraud or collusion in connection with the proposed sale of the

6  Assets – the Trustee has sought competitive bids for the Assets from those who are most likely

7  to be interested in purchasing the Assets.  No offer to purchase the Assets received by the

8  Trustee has been ignored, and the Trustee has taken reasonable steps to try to obtain the highest

9  price possible for the Assets.  The Trustee is not aware of, and there is certainly no evidence of,

10 any fraud or collusion between Purchaser and other bidders or the Debtor, nor is there any

11 evidence of an attempt by Purchaser to take grossly unfair advantage of other bidders.  In fact,

12 the proposed Overbid Procedures for the sale of the Assets, which provide for overbidding on

13 (and the potential Auction of) the Assets, are specifically aimed at maximizing the purchase

14 price ultimately paid for the Assets.  The Trustee therefore submits that approval of the

15 proposed sale of the Assets to Purchaser (or to a successful overbidder) is being sought in good

16 faith, and can withstand the strict scrutiny applicable to insider transactions, should the Court

17 determine that the proposed sale of the Assets to Purchaser constitutes an "insider" transaction.

18     Moreover, although the proponent of a sale has the initial burden of proving good faith,

19 once the proponent has presented evidence to the court to support a *prima facie* finding of good

20 faith, a party questioning the good faith of a sale must provide more than argument – such party

21 must provide evidence inconsistent with good faith that is sufficient to overcome evidence of

22 good faith.  *See, In re M Capital Corporation*, 290 B.R. 743, 747-48 (9th Cir. BAP 2003); *see*

23 *also, In re Del Grosso*, 106 B.R. 165, 168 (Bankr. N.D. Ill. 1989) (in the context of a settlement,

24 "[o]nce there is a showing that the settlement should be approved, the burden then shifts to the

25 objecting party who cannot oppose the settlement by merely demanding more proof.  'To allow

26 the objectors to disrupt the settlement on the basis of nothing more than their unsupported

27 suppositions would completely thwart the settlement process...' (citation omitted)"); *In re*

28 *MCorp Financial, Inc.*, 160 B.R. 941, 954-55 (S.D. Tex. 1993) (mere fact that debtors had

1  previously opposed settlement did not demonstrate that the settlement was proposed in bad

2  faith; parties arguing bad faith should offer evidence of such bad faith).

3        Here, the Trustee has provided evidence, pursuant to the Miller Declaration annexed

4  hereto, to show that the sale of the Assets to Purchaser has been negotiated at arms' length and

5  has been proposed in good faith.  Accordingly, absent any evidence that the sale of the Assets

6  was negotiated in bad faith or not at arms' length, the Court should conclude that the Trustee

7  and Purchaser have acted, and are continuing to act, in good faith with respect to the sale of the

8  Assets.

9         ***e.     Accurate and Reasonable Notice.***

10        The purpose of the notice is to provide an opportunity for objections and hearing before

11  the Court if there are objections.  *In re Karpe*, 84 B.R. 926, 930 (Bankr. M.D.Pa. 1988).  A

12  notice is sufficient if it includes the terms and conditions of the sale and if it states the time for

13  filing objections.  *Id.*

14        As set forth in detail in Section III.A of this Motion, the Trustee has complied with all of

15  the applicable notice provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local

16  Bankruptcy Rules.  Thus, the Trustee submits that the notice of the Motion (and proposed sale

17  of the Assets) should be deemed adequate, accurate and reasonable by the Court.

18  **C.    The Court Should Approve The Sale Of The Assets, Free And Clear Of Liens,**

19        **Claims And Encumbrances.**

20        The Bankruptcy Court has the power to authorize the sale of property free and clear of

21  liens or interests.  *See* 11 U.S.C. § 363(f); *In re Gerwer*, 898 F.2d 730, 733 (9th Cir. 1990).

22        Section 363(f) of the Bankruptcy Code permits a sale of property "free and clear of any

23  interest in such property of an entity other than the estate" if <u>any one</u> of the following five

24  conditions is met:

25            (1)      applicable nonbankruptcy law permits sale of such

26                    property free and clear of such interest;

27            (2)      such entity consents;

28

(3)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)   such interest is in bona fide dispute; or

(5)   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Section 363(f) is written in the disjunctive; thus, satisfaction of any one of the five conditions is sufficient to sell property free and clear of liens.  *See e.g., Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988); *Mutual Life Ins. Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*, 36 B.R. 856, 858 (Bankr. W.D. Mo. 1984).

Here, the Trustee contends that any and all liens asserted against the Assets by allegedly secured creditors of the Debtor, whether such creditors were listed by the Debtor in Amended Schedule D or filed proofs of claim in the Debtor's bankruptcy case alleging secured claims against the Debtor, are subject to bona fide dispute.  As noted above, the Trustee has not seen any documentation to establish that such allegedly secured creditors are entitled to a security interest in any of the Assets or, even if such creditors are entitled to security interests in any of the Assets (which the Trustee disputes), the Trustee has not seen any documentation to establish that such creditors properly perfected their security interests.  Based on the foregoing, the Trustee respectfully submits that 11 U.S.C. § 363(f)(4) is satisfied, and that it is therefore appropriate in the instant case to authorize the sale of the Assets, free and clear of liens, claims and encumbrances.

## IV.

## TO THE EXTENT THE PROPOSED SALE CONSTITUTES A SETTLEMENT OF CLAIMS, THE SETTLEMENT IS IN THE BEST INTEREST OF THE ESTATE

Bankruptcy Rule 9019 states that "the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).  The "may" language of Bankruptcy Rule 9019 indicates that the approval or disapproval of a proposed settlement lies within the sound discretion of the Court.

The proposed sale of the Assets pursuant to the APA provides for the dismissal of the Complaint and Cross Complaint in the Rescission Action with prejudice, and full and mutual releases by and between the Trustee and the Estate, on the one hand, and Purchaser, on the other hand, in the event that Purchaser is the winning buyer of the Assets. To the extent that such provisions render the proposed sale of the Assets a settlement of claims, the Trustee hereby requests that such settlement be approved.

It is well-established that, as a matter of public policy, settlements are favored over continued litigation. *See, e.g., In re A & C Properties*, 784 F.2d 1377 (9th Cir. 1986); *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976); *In re Heissenger Resources, Ltd.*, 67 B.R. 378, 382 (C.D. Ill. 1986). The focus of inquiry in reviewing and approving compromises is whether the settlement is reasonable under the particular circumstances of the case. *See In re General Store of Beverly Hills*, 11 B.R. 539 (9th Cir. BAP 1981). Among the factors to be considered in determining whether a settlement is fair, equitable, and reasonable are the following:

       (a)   the probability of success in the litigation;

       (b)   any impediments to collection;

       (c)   the complexity, expense, inconvenience and delay of litigation; and

       (d)   the interest of creditors with deference to their reasonable opinions.

*See A & C Properties*, 784 F.2d at 1381.

An analysis of the foregoing factors demonstrates that the terms of the proposed sale of the Assets, as set forth in the APA, which includes provisions for the dismissal of the Complaint and the Debtor's Cross Complaint in the Rescission Action and full and mutual releases by the Trustee and Estate, on the one hand, and Purchaser, on the other hand, in the event that Purchaser is the winning buyer of the Assets, are fair and equitable, and well within the range of reasonableness. Given the inherent risks involved in any litigation, there is no guarantee that the Trustee would prevail if she elected, and had the resources necessary, to pursue the Cross Complaint filed by the Debtor in the Rescission Action. In addition, given the fact that the Trustee's pursuit of the Cross Complaint (even if successful) will not likely result in any affirmative cash recovery for the Estate as it primarily seeks declaratory relief (but will result in

1  the Trustee incurring significant litigation costs), the Trustee believes that the proposed sale of

2  the Assets in accordance with the terms and conditions set forth in the APA, which will result in

3  the Estate's recovery of **at least $35,000** of unencumbered cash, is overwhelmingly in the best

4  interests of creditors.  Since the Cross Complaint does not primarily seek, and therefore will not

5  likely result in, any affirmative recovery for the Estate, the "impediments to collection" factor is

6  not relevant herein.  Given the risks and costs involved in litigating the Rescission Action, the

7  fact that the Rescission Action (and specifically, the Cross Complaint filed by the Debtor

8  therein) will not likely result in any affirmative recovery for the Estate in any case, and the fact

9  that the proposed sale of the Assets will result in the Estate's immediate receipt of at least

10 $35,000 of unencumbered cash, the Trustee submits that the proposed sale of the Assets, and

11 any settlement of claims contemplated thereby, yield the best possible result for the Estate and

12 should be approved.

13                                             **V.**

14                                      **CONCLUSION**

15         **WHEREFORE**, the Trustee respectfully requests that the Court enter an Order:

16         1.       finding that the notice given by the Trustee in connection with the sale of the

17 Assets and the hearing on the Motion is adequate, sufficient, proper and complies with all

18 applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure;

19         2.       granting the Motion in its entirety;

20         3.       approving the Overbid Procedures;

21         4.       authorizing the Trustee to sell the Assets to Purchaser, or to a successful

22 overbidder, in accordance with the terms set forth in the APA and in the Motion;

23         5.       authorizing the Trustee to execute and deliver, on behalf of the Estate, any and

24 all documents that may be reasonably necessary to consummate the sale of the Assets;

25         6.       approving the settlement of claims and compromise of controversy provided by

26 the terms of the APA pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure; and

27 / / /

28 / / /

7.     granting such other and further relief as may be necessary or appropriate under the circumstances.

Dated:  August 1, 2017                    ELISSA D. MILLER, CHAPTER 7 TRUSTEE

By:_____
                        JULIET Y. OH
                        LEVENE, NEALE, BENDER, YOO
                            & BRILL L.L.P.
                        Attorneys for Elissa D. Miller, Trustee

# DECLARATION OF ELISSA D. MILLER

I, Elissa D. Miller, declare as follows:

1.    I am the duly-appointed, qualified, and acting Chapter 7 Trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Lake Mathews Mineral Properties, Ltd, the debtor herein (the "Debtor"). I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.    I submit this declaration in support of my motion (the "Motion") for an order (A) authorizing me, as Trustee, to sell substantially all of the assets of the Estate, as more specifically described in that certain *Asset Purchase Agreement* (the "APA") between PECAS, LLC ("Purchaser") and me, a true and correct copy of which is attached as **Exhibit "1"** hereto, free and clear of all liens, claims and encumbrances, and pursuant to the terms and conditions set forth in the APA; (B) approving the overbid procedure set forth in the APA and the Motion (the "Overbid Procedures"); and (C) approving the settlement of claims and compromise of controversy provided by the terms of the APA. I have reviewed the Motion and, to the best of my knowledge, all of the facts set forth therein are true and accurate. All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Motion.

3.    I received an offer from Purchaser to purchase the Estate's right, title and interest, if any, in the Assets described in the APA and in the Motion, on an "as is, where is" basis with no representation or warranty as to the condition of the Assets, for cash in the sum of $35,000 (the "Purchase Price"), and certain other consideration, pursuant to the terms and conditions set forth in the APA.

4.    Pursuant to the Motion, I propose to sell the Assets (as that term is defined in the Motion and the APA) to Purchaser, free and clear of liens, claims and encumbrances, subject to overbid, and in accordance with the terms and conditions set forth in the APA.

5.    Among the Assets proposed to be sold to Purchaser (or a successful overbidder) are the claims asserted by the Debtor in a cross complaint filed by the Debtor against Purchaser in the Rescission Action on January 15, 2016, prior to the commencement of the Debtor's bankruptcy case (the "Cross Complaint"), based upon (i) rescission, (ii) violation of California

Business and Professions Code § 17200, and (iii) declaratory relief, among other grounds. A true and correct copy of the Cross Complaint is attached as **Exhibit "2"** hereto.

6. I am not aware of any valid and properly perfected liens against the Assets.

7. On July 6, 2016, the Debtor filed amendments to certain of its Schedules of Assets and Liabilities filed with the Court. A true and correct copy of the Debtor's Amended Schedule D is attached as **Exhibit "5"** hereto. The Debtor listed a number of allegedly secured creditors in its Amended Schedule D. However, I have not seen any documentation to establish that the creditors listed in the Debtor's Amended Schedule D are entitled to a security interest in any of the Assets or, even if such creditors are entitled to security interests in any of the Assets (which the Trustee disputes), that such creditors properly perfected their security interests.

8. There are also a number of alleged creditors who filed proofs of claim in the Debtor's case asserting secured claims against the Estate. A copy of the claims register for the Debtor's bankruptcy case (as of July 31, 2017) is attached as **Exhibit "6"** hereto. However, I have reviewed the proofs of claim filed by the foregoing creditors, and have not seen any documentation to establish that such creditors are entitled to a security interest in any of the Assets or, even if such creditors are entitled to security interests in any of the Assets (which the Trustee disputes), that such creditors properly perfected their security interests.

9. Based on the foregoing, I contend that any and all liens asserted against the Assets by allegedly secured creditors of the Debtor, whether such creditors were listed by the Debtor in Amended Schedule D or filed proofs of claim in the Debtor's bankruptcy case alleging secured claims against the Debtor, are subject to bona fide dispute.

10. There are no commissions or any significant closing costs anticipated to be incurred by the Estate in connection with the sale of the Assets. Accordingly, I estimate that the proposed sale of the Assets will generate unencumbered net proceeds in the full amount of the Purchase Price (*i.e.*, at least $35,000).

11. While I am prepared to consummate the proposed sale of the Assets with Purchaser, I am also interested in obtaining the maximum price for the Assets. Accordingly, I required that any sale of the Assets be subject to better and higher bids. However, to induce

Purchaser to submit a formal "stalking horse" offer to purchase the Assets, Purchaser required that the overbid procedures in connection with the sale of the Assets provide for certain protections for Purchaser. Accordingly, pursuant to the Motion, I am seeking Court approval of the Overbid Procedures described in the APA and summarized in the Motion.

12.    I believe that the proposed Overbid Procedures will maximize the price ultimately obtained for the Assets and still protect the Estate from parties who may wish to bid on the Assets but who are ultimately unable to consummate a purchase of the Assets. Among other things, I believe the Overbid Procedures will (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate from consideration purchasers who would waste the Estate's time because they would not have the financial ability to consummate a purchase of the Assets; and (iii) ensure that the highest possible price is obtained for the Assets.

13.    I believe a sound business purpose exists for approving the proposed sale of the Assets to Purchaser (or a successful overbidder), as it will result in the Estate's receipt of unencumbered cash in the sum of at least $35,000. On the other hand, if I am not able to consummate a sale of the Assets to Purchaser (or a successful overbidder), I will be forced to abandon the Assets altogether, given the costs associated with administering the Assets. For example, the Assets include claims as set forth in the Cross Complaint filed by the Debtor in the Rescission Action. The costs of pursuing the Cross Complaint would undoubtedly be high, given the complex factual contentions involved in the Rescission Action, and would require me to simultaneously defend against the Complaint filed by Purchaser in the Rescission Action, all with very little likelihood of any affirmative recovery for the Estate (even if I were to prevail in such litigation). The Estate currently has no resources with which to pursue the Cross Complaint and/or defend against the Complaint filed by Purchaser in the Rescission Action, even if I were so inclined. Furthermore, the Estate currently has no direct interest in the Mining Rights and 63 Acres at this time, as the interest in those Assets can only be realized if I prevail in the Rescission Action. While the Estate does currently have an interest in the Membership Interest in Purchaser and an interest in a portion of the Woodie Settlement Proceeds (which interest derives from the Debtor's Membership Interest in Purchaser), it appears very unlikely to

1   me that such Assets will result in the recovery of any cash by the Estate in the near future (if

2   ever).

3          14.    The Assets which are proposed to be sold to Purchaser include certain litigation

4   rights related to the Rescission Action.  Given the fact that my pursuit of the Debtor's Cross

5   Complaint in the Rescission Action (even if successful) is not likely to result in any affirmative

6   cash recovery for the Estate, I believe that the proposed Purchase Price of $35,000 is more than

7   fair and reasonable for such litigation rights and the other Assets, particularly where, as here,

8   the Assets are proposed to be sold subject to overbid.

9          15.    In the event that the proposed sale of the Assets to Purchaser (or a successful

10  overbidder) cannot be consummated, due to the nature of the Assets and the lack of any

11  resources available in the Estate to pursue the litigation claims discussed above, I am prepared

12  to immediately abandon the Assets and designate the Debtor's bankruptcy case as a "no asset"

13  case.  I believe that the only feasible way to monetize the Assets for the benefit of creditors is to

14  sell the Assets to Purchaser or a successful overbidder.

15         16.    I believe that, given the nature of the Assets, the only parties who will have any

16  interest in acquiring the Assets are Purchaser, the principals of the Debtor, and alleged creditors

17  of the Debtor who have asserted that they have secured claims against the Assets.  Given what I

18  believe is a very limited market for the Assets, I do not believe that an extensive marketing

19  effort is required or warranted in connection with the proposed sale of the Assets.  However, in

20  an effort to maximize the value obtained for the Assets, I am inviting overbids for the Assets, in

21  accordance with the proposed Overbid Procedures.

22         17.    While I do not believe that Purchaser is an "affiliate" of the Debtor, as that term

23  is defined in 11 U.S.C. § 101(2), or an "insider" of the Debtor, as that term is defined in 11

24  U.S.C. § 101(31), should the Court determine otherwise, I believe that the proposed sale of the

25  Assets to Purchaser nevertheless meets the standard of heightened scrutiny for insider

26  transactions.

27  ///

28  ///

32

18.     The negotiation and execution of the APA were conducted in good faith and at arms' length by Purchaser and me, with the assistance of separate counsel.  There has been no fraud or collusion in connection with the proposed sale of the Assets – I sought competitive bids for the Assets from those who are most likely to be interested in purchasing the Assets.  No offer to purchase the Assets received by me has been ignored, and I have taken reasonable steps to try to obtain the highest price possible for the Assets.  I am not aware of, and there is certainly no evidence of, any fraud or collusion between Purchaser and other bidders or the Debtor, nor is there any evidence of an attempt by Purchaser to take grossly unfair advantage of other bidders.  In fact, the proposed Overbid Procedures for the sale of the Assets, which provide for overbidding on (and the potential Auction of) the Assets, are specifically aimed at maximizing the purchase price ultimately paid for the Assets.  I therefore believe that approval of the proposed sale of the Assets to Purchaser (or to a successful overbidder) is being sought in good faith.

19.     The proposed sale of the Assets pursuant to the APA provides for the dismissal of the Complaint and Cross Complaint in the Rescission Action with prejudice, and full and mutual releases by and between the Estate and me (as Trustee), on the one hand, and Purchaser, on the other hand, in the event that Purchaser is the winning buyer of the Assets.  To the extent that such provisions render the proposed sale of the Assets a settlement of claims, I respectfully submit that such settlement is fair and equitable, is well within the range of reasonableness, and should therefore be approved by the Court.

20.     Given the inherent risks involved in any litigation, there is no guarantee that I would prevail if I elected, and the Estate had the resources necessary, to pursue the Cross Complaint filed by the Debtor in the Rescission Action.

/ / /

/ / /

/ / /

/ / /

/ / /

1    21.    In addition, given the fact that my pursuit of the Cross Complaint (even if

2 successful) will not likely result in any affirmative cash recovery for the Estate as it primarily

3 seeks declaratory relief (but will result in incurring significant litigation costs), I believe that the

4 proposed sale of the Assets in accordance with the terms and conditions set forth in the APA,

5 which will result in the Estate's recovery of at least $35,000 of unencumbered cash, is in the

6 best interests of creditors.

7    I declare and verify under penalty of perjury under the law of the United States of

8 America that the foregoing is true and correct to the best of my knowledge.

9    Executed on this 1st day of August, 2017, at Los Angeles, California.

10

11    _____

         ELISSA D. MILLER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF JULIET Y. OH

I, Juliet Y. Oh, hereby declare as follows:

1.     I have personal knowledge of the facts set forth herein, and, if called as a witness, could and would testify competently with respect thereto.

2.     I am a partner of Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"), bankruptcy counsel to Elissa D. Miller, the Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of Lake Mathews Mineral Properties, Ltd, the debtor herein (the "Debtor"). I am licensed to practice law in the State of California and before this Court.

3.     I am informed and believe that the Debtor is a corporation incorporated in the State of California.

4.     On August 1, 2017, I obtained copies of financing statements recorded against the Debtor with the office of the California Secretary of State. Copies of the foregoing financing statements are attached as **Exhibit "3"** hereto.

5.     As reflected in Exhibit "3" hereto, there is only one (1) active filing with respect to the Debtor. Specifically, a financing statement (filing number 2013-7382522770) was recorded against the Debtor by an entity called Bridgeport Management, Inc. ("Bridgeport") on October 16, 2013. Such financing statement purports to cover certain specified "gross proceeds…received by or for the account of Debtor" derived from various potential sources. However, the financing statement recorded by Bridgeport does not include any information or documentation regarding the basis for the security interest and/or lien asserted by Bridgeport. While the financing statement does reference an agreement between the Debtor and Bridgeport dated April 22, 2010, a copy of such agreement is not attached to the financing statement.

6.     However, a copy of the agreement referenced in the UCC-1 financing statement recorded by Bridgeport is attached to the proof of claim filed by Bridgeport in the Debtor's bankruptcy case. A true and correct copy of the proof of claim filed by Bridgeport in the Debtor's bankruptcy case on October 7, 2016, which claim is designated as Claim No. 30 in the claims register for the Debtor's case, is attached as **Exhibit "4"** hereto.

7.    The foregoing is provided for information purposes only.  Nothing contained herein is intended to be, and nothing contained herein shall be, construed or interpreted as the provision of any legal opinion by the declarant or LNBYB, or acknowledgement by the Trustee, regarding the validity, priority and extent of any liens asserted by any of the Debtor's creditors against the Debtor or otherwise.  The rights of the Trustee, the Debtor and all of the Debtor's creditors which respect to the claims, liens and interests asserted by such creditors are fully preserved.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of August, 2017 at Los Angeles, California.

_____
JULIET Y. OH

# EXHIBIT "1"

[Asset Purchase Agreement]

# ASSET PURCHASE AGREEMENT

The parties to this Asset Purchase Agreement (the "Agreement") are PECAS, LLC ("Purchaser") and Elissa D. Miller, the Chapter 7 Trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Lake Mathews Mineral Properties, Ltd (hereinafter, the "Debtor"). The Purchaser and the Trustee are collectively referred to hereinafter as the "Parties," and individually, as a "Party."

WHEREAS, on May 13, 2016 (the "Petition Date"), the Debtor filed a Voluntary Petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The case is pending before the United States Bankruptcy Court for the Central District of California ("Court") and is titled *In re Lake Mathews Mineral Properties, LTD*, Case No. 2:16-bk-16363-NB.

WHEREAS, on November 18, 2016, the Court entered an order approving the appointment of the Trustee as the Chapter 11 Trustee in the Debtor's bankruptcy case.

WHEREAS, on January 6, 2017, the Trustee filed a motion seeking to convert the Debtor's Chapter 11 bankruptcy case to one under Chapter 7 of the Bankruptcy Code, which motion was granted by the Court pursuant to its written order entered on March 2, 2017.

WHEREAS, the Debtor contends that, at one time prior to the Petition Date, it owned the right to mine on approximately 863 acres, 300 feet below the surface of Lake Mathews, a large reservoir located in Riverside County, California which is one of the primary sources of water to the Inland Empire and San Diego (the "Mining Rights"), which Mining Rights were originally derived from a stipulation signed in 1937 between the Metropolitan Water District of Southern California (the "MWD") and Lawrence Holmes, who is the father of James Holmes, the Debtor's founder. The Debtor has asserted that the Mining Rights include the mineral rights underlying the 63 Acres (as defined below), located 300 feet below ground surface and below.

WHEREAS, the Debtor contends that, at one time prior to the Petition Date, it owned surface rights to real property consisting of approximately sixty-three (63) acres of land surrounding Lake Mathews (the "63 Acres").

WHEREAS, prior to the Petition Date, on or about January 24, 2013, the Debtor and Purchaser entered into a series of written agreements, pursuant to which the Debtor transferred to Purchaser substantially all of its assets, including all of the Debtor's rights and interests in and to the Mining Rights and the 63 Acres, in exchange for all of the membership interests in Purchaser, and the assumption by Purchaser of all of the Debtor's obligations under that certain judgment filed on August 3, 2012 with the Superior Court of the State of California for the County of Los Angeles, Central District, in Case No. BC 439127 entitled *David Perez et. al v. James, Holmes et. al* (the "Perez Judgment"). Purchaser contends that it then amended and restated its operating agreement, creating three classes of membership interests in Purchaser, called Class A, Class B and Class C. Purchaser contends that the membership interests owned

by the Debtor constituted Class B Membership Interests under the amended and restated operating agreement of Purchaser, and that the Debtor owns 25 Class B Membership Units (collectively, the "Membership Interest"), pursuant to which Purchaser contends that the Debtor is entitled to receive 25% of any profits of Purchaser, after paying a preferred return to certain other investors, on the first $50,000,000 of such profits, with an increasing share of profits until such profits exceed $200,000,000, at which point the Debtor would be entitled to receive 70% of any profits over such amount.  The description of the Membership Interest and all rights and obligations thereof is qualified by reference to the PECAS, LLC Amended and Restated Operating Agreement (the "Amended Operating Agreement"), a true and correct copy of which is attached as **Exhibit "A"** hereto.

WHEREAS, Purchaser contends that, on or about January 24, 2013, Purchaser caused the Perez Judgment to be satisfied in full by delivery of a cashier's check in the amount of $225,000.

WHEREAS, on or about December 28, 2012, prior to the transfer of the Debtor's rights and interests in and to the Mining Rights and the 63 Acres to Purchaser, the 63 Acres were sold through a foreclosure sale to Equity Trust Company and an individual named Robert Woodie (together, the "Woodie Entities").

WHEREAS, on August 16, 2013, Purchaser filed a complaint against the Woodie Entities in the Superior Court of the State of California, County of Los Angeles ("Superior Court"), thereby commencing that certain action bearing the case number BC518687 (the "Foreclosure Lawsuit"), pursuant to which Purchaser alleged that the foreclosure sale of the 63 Acres was wrongful, invalid and unlawful due to certain provisions and defects in the related note and deed of trust (all of which allegations the Woodie Entities denied).

WHEREAS, subsequent to the filing of the Foreclosure Lawsuit, Purchaser and the Woodie Entities entered into a General Release and Settlement Agreement dated as of April 1, 2014 which resolved the Foreclosure Lawsuit and provided, among other things, for Purchaser and the Woodie Entities to share specified portions of the net proceeds from any sale of the 63 Acres and/or any settlement or recovery after litigation with the MWD relating to the 63 Acres (the "Woodie Settlement Proceeds"), which the Debtor is entitled to share based upon the Debtor's Membership Interest in Purchaser.

WHEREAS, prior to the Petition Date, on or about October 8, 2015, the Debtor served Purchaser with a Notice of Rescission (the "Notice of Rescission"), pursuant to which the Debtor sought to rescind the January 24, 2013 agreements that effectuated the transfer of substantially all of the Debtor's assets (including the Debtor's rights and interests in and to the Mining Rights and the 63 Acres) to Purchaser.

WHEREAS, as a result of the Notice of Rescission and the assertion of rights by the Debtor in connection therewith, on November 12, 2015, Purchaser filed a complaint for declaratory relief against the Debtor in the Superior Court (the "Complaint"), thereby commencing that certain action bearing the case number BC600724 (the "Rescission Action").

WHEREAS, on January 15, 2016, the Debtor filed a cross complaint against Purchaser in the Rescission Action (the "Cross Complaint") based upon (i) rescission, (ii) violation of California Business and Professions Code § 17200, and (iii) declaratory relief, among other grounds.

WHEREAS, the Rescission Action was stayed upon the filing of the Debtor's bankruptcy case on the Petition Date.

WHEREAS, Purchaser wishes to purchase, and the Trustee wishes to sell to Purchaser, the Estate's right, title and interest in certain assets of the Estate, subject to overbid, in accordance with the terms and conditions of this Agreement, and pursuant to 11 U.S.C. § 363.

NOW THEREFORE, in consideration of the mutual promises and conditions contained herein, and for valuable consideration, the adequacy and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    PROPERTY:  Purchaser or its assigns shall purchase all of the Estate's right, title and interest, if any, in the following assets (collectively, the "Property"), in "as is, where is" condition, with no representation or warranty:

  a.    the Membership Interest;

  b.    the Debtor's interest in the Woodie Settlement Proceeds;

  c.    the Debtor's interest in the Mining Rights;

  d.    the Debtor's interest in the 63 Acres;

  e.    the Cross Complaint filed by the Debtor in the Rescission Action, and all claims, causes of action, rights and defenses which have been asserted, could have been asserted, or may be asserted by the Debtor in, which may arise from, and/or which may relate to the Cross Complaint and/or the Complaint; and

  f.    any and all other rights, interests or claims of any type or character which may now or hereafter be found to exist in favor of or could be asserted by, on behalf of, or for the benefit of the Debtor arising from or related in any way to the Amended Operating Agreement, the Membership Interest, the Woodie Settlement Proceeds, the Mining Rights, the 63 Acres, the Rescission Action, the Cross-Complaint, or any other matter involving or related to Purchaser or Purchaser's members, managers, agents, representatives, employees, attorneys, accountants, insurers, successors or assigns (collectively, the "Ancillary Rights").

2.    PURCHASE PRICE PAYMENT:  Purchaser shall purchase the Property for cash in the sum of Thirty-Five Thousand Dollars ($35,000) ("Purchase Price"). The Purchase Price shall be payable in full, by cashier's check delivered to the Trustee or a wire transfer payment made to an account of the Trustee's designation, within three (3) days following the execution of this Agreement by the Trustee and Purchaser.

3.      DEPOSIT:   The sum of Five Thousand Two Hundred Fifty Dollars ($5,250) from the Purchase Price delivered by Purchaser upon the execution of this Agreement shall constitute and be deemed a good faith deposit (the "Deposit"), which Deposit shall be deemed non-refundable and forfeited to the Estate if Purchaser is deemed to be the winning bidder at the auction sale of the Property conducted by the Trustee (the "Auction"), if any, but Purchaser fails to timely consummate the sale of the Property.   In the event that Purchaser is deemed to be the winning bidder but fails to timely consummate the sale of the Property, the Estate shall be entitled to retain the amount of the Deposit without a further Court order and shall return the balance of the Purchase Price (*i.e.*, $29,750) to Purchaser.

4.      OVERBID PROCEDURES:   The sale of the Property shall be subject to overbid in accordance with the following bidding procedures ("Bidding Procedures"), subject to the approval of the Court:

a.      *Sale Motion.*   As soon as practicable after the execution of this Agreement by the Parties, the Trustee shall file with the Court a motion pursuant to 11 U.S.C. § 363 (the "Sale Motion") seeking the entry of an order of the Court approving the Bidding Procedures and approving the sale of, and authorizing the Trustee to enter into this Agreement to sell, the Property to Purchaser or a successful overbidder (the "Sale Order").

b.      *Auction.*   The Auction shall take place at the time and date of the hearing on the Sale Motion (the "Sale Hearing"), unless otherwise ordered by the Court.

c.      *Overbid Deadline And Requirements.*   Any party interested in submitting an overbid on the Property ("Overbid") must, not later than 4:00 p.m. (Pacific time) on the date that is two (2) business days before the Sale Hearing or, if the Auction is scheduled prior to the Sale Hearing, on the date that is two (2) business days before the Auction (the "Overbid Deadline"), deliver such Overbid in writing to counsel for the Trustee, Juliet Y. Oh, Esq., Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation  Blvd.,  Suite  1700,  Los  Angeles,  California  90067,  Email: JYO@LNBYB.com, Facsimile: (310) 229-1244, in accordance with the requirements set forth below:

i.      The purchase price for the Property in any Overbid must be in the sum of at least Thirty-Six Thousand Dollars ($36,000).   Any Overbid must otherwise be on the same terms and conditions set forth in this Agreement.

ii.      Each bidder submitting an Overbid must, by the Overbid Deadline:  deliver the full amount of the purchase price set forth in the Overbid, in the form of a cashier's check to the Trustee or a wire transfer payment to an account of the Trustee's designation, so that such amount is actually received by the Overbid Deadline; (ii) if applicable, deliver a markup of this Agreement, which sets forth those amendments and modifications to the Agreement that such bidder proposes (the "Marked Agreement"), provided that the terms of the Marked Agreement are no less favorable to the Estate than those set forth in this

Agreement with Purchaser, plus a signed clean copy of the Marked Agreement; and (iii) written confirmation that such bidder agrees that the sum that is equal to fifteen percent (15%) of the purchase price set forth in such bidder's Overbid shall constitute and be deemed a Deposit, which Deposit shall be deemed non-refundable and forfeited to the Estate if such bidder is deemed to be the winning bidder at the Auction but fails to timely consummate the sale of the Property (the "Deposit Confirmation").

       iii.      In the event that (i) a bidder submitting an Overbid fails to timely deliver the full amount of the purchase price set forth in the Overbid, (ii) a bidder submitting an Overbid fails to timely deliver the Deposit Confirmation, and/or (iii) the Trustee determines, in her sole discretion, that the terms set forth in a Marked Agreement submitted by a bidder are less favorable to the Estate than those set forth in this Agreement with Purchaser, the Trustee may, at her sole discretion, disqualify the applicable bidder from participating in the Auction. In the event that the Trustee exercises her discretion and disqualifies a bidder from participating in the Auction, the Overbid purchase price amount delivered by such bidder (if any) shall be returned to the bidder.

       d.    *Bidding At Auction.*  If at least one qualified bidder who has submitted an Overbid appears at the Auction, the Trustee shall designate what she determines to be the best and highest Overbid received for the Property to be the leading bid at the Auction. Thereafter, the Trustee shall solicit better and higher bids for the Property, in bidding increments of at least $1,000, from the qualified bidders participating in the Auction (including Purchaser, if it chooses to participate) until the best and highest bid for the Property has been determined by the Trustee. Prior to making a bid at the Auction, each qualified bidder (including Purchaser, if it choose to participate) must present to the Trustee and/or her counsel at the Auction cashier's check(s) which in the aggregate total at least the amount of the proposed bid. Upon determination by the Trustee of the best and highest bid for the Property, the prevailing bidder shall immediately tender to the Trustee at least the full amount of the winning bid at the Auction, in the form of valid and duly issued cashier's check(s) payable to "Elissa D. Miller, Chapter 7 Trustee of the Bankruptcy Estate of Lake Mathews Mineral Properties, Ltd."

       e.    *Backup Bidder.*  The qualified bidder who submits the second best/highest bid for the Property at the Auction may be designated as the backup bidder. In the event that the qualified bidder who submits the second best/highest bid for the Property at the Auction agrees to act as the backup bidder and the winning bidder does not timely complete the purchase of the Property, the Trustee shall be authorized to proceed with the sale of the Property to the backup bidder without further notice, hearing or order of the Court. If a qualified bidder agrees to act as the backup bidder and is so designated at the conclusion of the Auction, the Trustee shall retain the amount of the purchase price delivered by such backup bidder following the conclusion of the Auction until the earlier to occur of (i) the closing by the winning bidder of his/her/its purchase of the Property, or (ii) thirty-five (35) days after the date of entry of the Sale Order, unless

the backup bidder has forfeited his/her/its Deposit pursuant to the terms and conditions set forth herein.

        f.    *Closing Of Sale And Forfeiture Of Deposits.*  The winning bidder will have until the first business day that is fifteen (15) days after the date of entry of the Sale Order to consummate the sale of the Property.  If the winning bidder fails to do so, the winning bidder will be deemed to have forfeited his/her/its Deposit unless the Court or the Trustee agrees to provide the winning bidder with an extension of time to close the sale.  If the winning bidder fails to close and forfeits his/her/its Deposit and a backup bidder was designated at the conclusion of the Auction, the backup bidder will be notified and will then have until the first business day that is fifteen (15) days after the date of such notification to close his/her/its purchase of the Property or will be deemed to have forfeited his/her/its Deposit unless the Court or the Trustee agrees to provide such backup bidder with an extension of time to close the sale.

        5.    <u>TRANSFER OF TITLE</u>. Upon entry of a final order approving this Agreement, the Trustee shall execute and deliver such document(s) reasonably requested by Purchaser, in forms provided by Purchaser and reasonably acceptable to the Trustee.  Title to the Property will be delivered to Purchaser on the Closing Date on an "AS IS, WHERE IS" basis with no representation or warranty as to the condition of the Property.

        6.    <u>CLOSING DATE</u>.  The closing of the sale of the Property ("<u>Closing</u>") shall be consummated at 10:00 a.m. (Pacific time), at the offices of LNBYB, 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067, on the first business day that is fifteen (15) days after the date of entry of the Sale Order, or on such other date/time or at such other place as is mutually agreed upon by the Parties ("<u>Closing Date</u>").  The Closing shall be effective for economic and accounting purposes as of 5:00 p.m. (Pacific time) on the Closing Date.  The Closing may happen electronically if agreed to by the Parties.

        7.    <u>DISMISSAL OF RESCISSION ACTION</u>.  In the event that Purchaser is the winning bidder of the Property, promptly after the Closing Date of the sale of the Property, the Parties shall cooperate with each other and take steps to dismiss, with prejudice, both the Complaint and Cross Complaint in the Rescission Action.

        8.    <u>WAIVER OF CLAIMS BY PURCHASER AND AGREEMENT NOT TO PARTICIPATE IN DISTRIBUTIONS FROM ESTATE</u>.  In the event that Purchaser is the winning bidder of the Property, Purchaser shall be deemed to have waived any and all claims that it has asserted or might be able to assert against the Estate, and will not participate in any distributions from the Estate, whether from the proceeds of the sale of the Property or otherwise.

        9.    <u>RELEASES</u>.  In the event that Purchaser is the winning bidder of the Property, effective upon the Closing of the sale of the Property, and except with respect to the rights and obligations arising under this Agreement, the Parties hereto do hereby fully, finally and forever release and discharge each other, their officers, directors, members, managers, contractors, subcontractors, agents, attorneys and employees, from any and all claims, rights, liabilities, indemnities, debts, liens, demands, obligations, promises, representations, expenses,

attorneys' fees, damages, losses, costs, actions, and causes of action of any kind or nature whatsoever, known or unknown, related to or arising out of the Rescission Action and/or the Debtor's bankruptcy case.  It is understood and agreed that this release extends to all past, present and future claims by the Parties, of every kind, nature and description whatsoever, known or unknown, suspected or unsuspected, related to or arising out of the Rescission Action and/or the Debtor's bankruptcy case.  In this regard, the Parties hereto acknowledge that they are familiar with and expressly waive every protection and right that they may have under California Civil Code Section 1542, related to or arising out of the Rescission Action and/or the Debtor's bankruptcy case, which states as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

Notwithstanding the foregoing, the releases set forth herein shall not apply to the obligations of the Parties under this Agreement, and shall have no effect upon any documents or acts necessary to accomplish the terms and intent of this Agreement.

10.    <u>APPROVAL BY THE COURT</u>: The effectiveness of this Agreement is subject to the Court's approval of this Agreement by entry of the Sale Order.

11.    <u>TERMINATION</u>.  Without further written approval by Purchaser, to the extent this Agreement is not approved by an order entered by the Court on or before December 31, 2017, this Agreement shall expire and automatically terminate in accordance with its terms, unless extended by written consent of the Parties.

12.    <u>REPRESENTATIONS AND WARRANTIES</u>: Each of the Parties to this Agreement represents, warrants, and agrees as to itself as follows:

a.    Each Party hereto represents that he, she or it has full authority and capacity to execute this Agreement on its own behalf.

b.    Neither Party (nor any officer, agent, employee, representative, or attorney of or for any party) has made any agreement, statement, representation or promise to any other Party regarding any fact relied upon in entering into this Agreement, and each Party does not rely upon any agreement, statement, representation or promise of any other Party (or of any officer, agent, employee, representative, or attorney for the other Party), in executing this Agreement, or in making the settlement provided for herein, except as expressly stated in this Agreement.

c.    Each Party to this Agreement has made such investigation of the facts pertaining to this Agreement and of all the matters pertaining thereto as it deems necessary.

d.    Each Party has read this Agreement and understands the contents hereof.

e.    In entering into this Agreement, each Party assumes the risk of any misrepresentation, concealment or mistake.  If any Party should subsequently discover that any fact relied upon by it in entering into this Agreement was untrue, or that any fact was concealed from it, or that its understanding of the facts or of the law was incorrect, such Party shall not be entitled to any relief in connection therewith, including, without limitation on the generality of the foregoing, any alleged right or claim to set aside or rescind this Agreement.  This Agreement is intended to be and is final and binding between the Parties hereto, regardless of any claims of misrepresentation, promise made without the intention to performing, concealment of fact, mistake of fact or law, or of any other circumstance whatsoever.

f.    The Parties will execute all such further and additional documents as shall be reasonable, convenient, necessary or desirable to carry out the provisions of this Agreement.

g.    Each term of this Agreement is contractual and not merely a recital.

13.    <u>MISCELLANEOUS</u>

a.    This Agreement shall be deemed to have been executed and delivered within the State of California, and the rights and obligations of the Parties hereunder shall be construed and enforced in accordance with, and governed by, the laws of the State of California.

b.    This Agreement is the entire Agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written agreements and discussions.  This Agreement may be amended only by an agreement in writing.

c.    Each Party has cooperated in the drafting and preparation of this Agreement.  Hence, in any construction to be made of this Agreement, the same shall not be construed against any Party.

d.    In the event of litigation relating to this Agreement, the prevailing Party shall be entitled to reasonable attorneys' fees.

e.    This Agreement may be executed in counterparts, and when each Party has signed and delivered at least one such counterpart, each counterpart (including facsimile signatures) shall be deemed an original, and, when taken together with other signed counterparts, shall constitute one Agreement, which shall be binding upon and effective as to both Parties.

f.      The Parties hereto agree that the United States Bankruptcy Court for the Central District of California shall have sole and exclusive jurisdiction, sitting without a jury, to hear and determine all disputes that arise under or relate to this Agreement so long as the Debtor's bankruptcy case remains open.

g.      If any of the provisions of this Agreement are held by the court of competent jurisdiction to be invalid, void or otherwise unenforceable, the remaining provisions shall nonetheless continue in full force and effect without being impaired or invalidated in any way.

*[Remainder of page left intentionally blank]*

This Agreement, consisting of [__] pages, is made and entered into as of July ___, 2017.

LAKE MATHEWS MINERAL PROPERTIES, LTD

By: _____

Name: ELISSA D. MILLER

Title:   Chapter 7 Trustee of the Bankruptcy
         Estate of Lake Mathews Mineral Properties, LTD

PECAS, LLC
 By: Poseidon Capital, LLC, its Managing Member


         By: _____
         Name: Reid Breitman
         Title:   Manager

This Agreement, consisting of [__] pages, is made and entered into as of July ___, 2017.

LAKE MATHEWS MINERAL PROPERTIES, LTD

By: _____

Name: ELISSA D. MILLER

Title:   Chapter 7 Trustee of the Bankruptcy
Estate of Lake Mathews Mineral Properties, LTD


PECAS, LLC
  By: Poseidon Capital, LLC, its Managing Member

By: _____

Name: Reid Breitman

Title:   Manager

# EXHIBIT "A"

[PECAS, LLC Amended And Restated Operating Agreement]

AMENDED AND RESTATED
OPERATING AGREEMENT FOR
PECAS, LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT is entered into as of January 25, 2013 by and among PECAS, LLC, a Delaware limited liability company ("Company"), Lake Mathews Mineral Properties, Ltd., a California limited partnership ("LMMP" or "Initial Member"), as Initial Member, James D. Holmes, a resident of the State of California ("Original Manager"), as Original Manager, Lake Mathews Holdings, LLC, a Delaware limited liability company ("Additional Member"), as Additional Member, George Smith Partners, Inc., a California corporation ("GSP"), as Class C Unit holder (being issued concurrent with the execution of this Agreement) and Poseidon Capital, LLC, a California limited liability company ("Manager") as the new Manager hereunder

R E C I T A L S

A.      The Initial Member previously formed the Company as a limited liability company under and pursuant to the provisions of the Delaware Limited Liability Company Act by filing the Certificate of Formation the Delaware California Secretary of State

B.      The Company, the Initial Member and the Original Manager desire to provide for the admission of Additional Member as a Member of the Company to hold 69 Class A Units, and for New Manager to become the Manager of the Company and holder of one Class A Unit, for GSP to be admitted as a new owner of an Economic Interest holding five Class C Units, to amend and restate the operating agreement of the Company to provide for such admissions and for the resignation of the Original Manager concurrent with the execution of this Agreement, and the reclassification of the Original Member's Membership Interests to 25 Class B Units.

C.      The Members and Manager enter into this Agreement to amend and restate all prior operating agreements of the Company and to provide for the governance of the Company and the conduct of its business, and to specify the Members' respective rights and obligations.

NOW THEREFORE, the Members, the New Manager and the Original Manager hereby agree as follows:

A G R E E M E N T

ARTICLE I: DEFINITIONS

Capitalized terms used in this Agreement have the meanings specified in this Article or elsewhere in this Agreement and when not so defined shall have the meanings set forth in Delaware Limited Liability Company Act Section 18-101.

1.1. "Act" means the Delaware Limited Liability Company Act (Delaware Code "18-101 thru 18-1109), including amendments from time to time.

1.2. "Additional Member" means and refers to a Member who has been admitted as a Member to the Company, other than the Initial Member.

1.3. . "Adjusted Capital Contribution" is defined in Article IV, Section 4.6(b).

1

1.4. "Adjusted Capital Account Deficit" is defined in Article IV, Section 4.3(a).

1.5. "Affiliate" of a Person means any of the following:

(a) spouse or any relative of such Person or relative of a spouse if such relative lives in the home of the Person;

(b) a trust or estate in which such Person or relative of such Person collectively owns 10% or more of the total beneficial interest or serves as trustee, executor or in any similar capacity;

(c) any corporation or other organization or legal entity (other than the Company) in which such Person or any Person described above is collectively the beneficial owner of 10% or more of any class of equity security or 10% or more of a total equity interest; and

(d) any Person or entity who directly or indirectly, alone or with any Person described above, through one or more intermediaries, controls, or is controlled by, or under common control with such Person.

The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through membership, ownership of voting securities, by contract, or otherwise.

1.6. "Agreement" means this amended and restated operating agreement, as originally executed, and as amended from time to time.

1.7. "Assignee" means a person who has acquired a Member's Economic Interest in the Company, by way of a Transfer in accordance with the terms of this Agreement, but who has not become a Member.

1.8. "Assigning Member" means a Member who by means of a Transfer has transferred an Economic Interest in the Company to an Assignee.

1.9. "Authorized Units" means 70,000 Class A Units, 25,000 Class B Units and 5,000 Class C Units, which amount may be increased from time to time pursuant to a Vote or the written consent of a Majority of the Class A Members.

1.10. "Available Cash" means all net revenues from the Company's operations, including net proceeds from all sales, refinancings, and other dispositions of Company property that the Manager, in the Manager's sole and absolute discretion, deems in excess of the amount reasonably necessary for the operating requirements of the Company and the anticipated or planned capital expenditures of the Company including debt reduction and Reserves.

1.2. "Book Depreciation" is defined in Article IV, Section 4.3(b).

1.3. "Capital Account" means, with respect to any Member, the account reflecting the capital interest of the Member in the Company, consisting of the Member's initial Capital Contribution maintained and adjusted in accordance with Article III, Section 3.3.

1.43. "Capital Contribution" means, with respect to any Member, the amount of money and the Fair Market Value of any property (other than money) contributed to the Company (net of liabilities secured by

2

such contributed property that the Company is considered to assume or take "subject to" under IRC Section 752) in consideration of Units, a Capital Account and/or a Percentage Interest held by such Member.  A Capital Contribution shall not be deemed a loan.

1.5.  "Capital Event" means a sale or disposition of any of the Company's capital assets, the receipt of insurance and other proceeds derived from the involuntary conversion of Company property, the receipt of proceeds from a refinancing of Company property, or a similar event with respect to Company property or assets.

1.65.  "Certificate of Formation" is defined in LLC Code Section 18-101(2).

1.7.  "Code" or "IRC" means the Internal Revenue Code of 1986, as amended, and any successor provision.

1.8.  "Company" means the company named in Article II, Section 2.2 of this Agreement.

1.9.  "Company Minimum Gain" is defined in Article IV, Section 4.3(c).

1.10.  "Economic Interest" means a Person's right to share in the income, gains, losses, deductions, credit or similar items of, and to receive distributions from, the Company, but does not include any other rights of a Member, including the right to vote or to participate in management.

1.20.  "Encumber" means the act of creating or purporting to create an Encumbrance, whether or not perfected under applicable law.

1.11.  "Encumbrance" means, with respect to any Membership Interest, or any element thereof, a mortgage, pledge, security interest, lien, proxy coupled with an interest (other than as contemplated in this Agreement), option, or preferential right to purchase.

1.12.  "Fair Market Value" means, with respect to any item of property of the Company, the item's adjusted basis for federal income tax purposes, except as follows:

(a) The Fair Market Value of any property contributed by a Member to the Company shall be the value of such property, as mutually agreed by the contributing Member and the Company;

(b) The Fair Market Value of any item of Company property distributed to any Member shall be the value of such item of property on the date of distribution as mutually agreed by the distributee Member and the Company;

(c) The Fair Market Value of Company property shall be subject to the adjustments specified in Article IV, Section 4.11; and

(d) The Fair Market Value for purposes of Article VIII, Section 8.8, shall be as determined in that section.

1.13.  "Initial Members" means those Persons whose names are set forth or specifically referred to in the first sentence of this Agreement as an Initial Member.  A reference to an "Initial Member" means any of the Initial Members.

3

1.14. "Involuntary Transfer" means, with respect to any Membership Interest, or any element thereof, any Transfer or Encumbrance, whether by operation of law, pursuant to court order, foreclosure of a security interest, execution of a judgment or other legal process, or otherwise, including a purported transfer to or from a trustee in bankruptcy, receiver, or assignee for the benefit of creditors.

1.15. "LLC Code" means the Delaware Limited Liability Act.

1.16. "Losses" has the meaning set forth in Article IV, Section 4.2.

1.17. "Majority of Members" means a Member or Members whose Voting Interests represent more than fifty percent (50%) of the Voting Interests of all the Members.

1.18. "Manager" or "Managers" means the Person(s) named as such in Article II or the Person(s) who from time to time succeed any Person as a Manager and who, in either case, is (are) serving at the relevant time as a Manager.

1.19. "Member" means an Initial Member, an Additional Member or a Person who otherwise acquires a Membership Interest, as permitted under this Agreement, and who remains a Member.

1.30. "Member Nonrecourse Debt" is defined in Article IV, Section 4.3(d).

1.20. "Member Nonrecourse Debt Minimum Gain" is defined in Article IV, Section 4.3(e).

1.21. "Member Nonrecourse Deductions" is defined in Article IV, Section 4.3(f).

1.22. "Membership Interest" means a Member's rights in the Company, collectively, including the Member's Economic Interest, any right to Vote or participate in management, and any right to information concerning the business and affairs of the Company. Three classes of Membership Interest exist in the Company, Class A Units, Class B Units and Class C Units. Holders of Class A Units have the right to a Preferred Return, a preferred right to the return of their Adjusted Capital Contribution, and a Voting Interest. Holders of Class B Units have no right to a Preferred Return, no preferred right to the return of their Adjusted Capital Contribution (if any), no right to Vote and no right to participate in the management of the Company, and have no right to information concerning the business and affairs of the Company other than rights specifically granted to them under the Act or this Agreement. Holders of Class C Units only have an Economic Interest in the Company and are not members of the Company. Holders of Class C Units have no right to a Preferred Return, no preferred right to the return of their Adjusted Capital Contribution (if any), no right to Vote and no right to participate in the management of the Company, and have no right to information concerning the business and affairs of the Company other than rights specifically granted to them under the Act.

1.23. "Non-Manager Member" or "Non-Manager Members" means a Member or Members that are not the Manager.

1.24. "Nonrecourse Deductions" is defined in Article IV, Section 4.3(g).

1.25. "Nonrecourse Liability" is defined in Article IV, Section 4.3(h).

1.26. "Notice" means a written notice required or permitted under this Agreement. A notice shall be deemed given or sent when deposited, as first class or certified mail or for overnight delivery, postage and fees prepaid, in the United States mails; when delivered to Federal Express, United Parcel Service, DHL World Wide Express, or Airborne Express, for overnight delivery, charges prepaid or charged to the sender's

account; when personally delivered to the recipient; when transmitted by electronic means including email, or facsimile transmission where such transmission is electronically confirmed as having been successfully transmitted; or when delivered to the home or office of a recipient in the care of a person whom the sender has reason to believe will promptly communicate the notice to the recipient.

1.27. "Percent of the Members" means the specified total of Voting Interests of all the Members.

1.28. "Percentage Interest" means, with respect to a Member, a fraction, expressed as a percentage, the numerator of which is the total number of Units owned by such Member and the denominator of which is the total number of Units owned by all Members (including, without limitation, such Member) as of the time in question.

1.40. "Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

1.41. "Preferred Return" means a cumulative, return equal to ten and no/100 percent (10.00%) per annum, compounded monthly, on the average daily balance of a Member's Adjusted Capital Contribution for the period commencing on date of admission of the Member, and continuing thereafter until the Member's Adjusted Capital Contribution has been reduced to zero.

1.29. "Profits" and "Losses" are defined in Article IV, Section 4.2.

1.30. "Proxy" means a written authorization signed or an electronic transmission authorized by a Member or the Member's attorney-in-fact giving another Person the power to exercise the rights of that Member to Vote. "Signed," for the purpose of this section, means the placing of the Member's name on the Proxy (whether by manual signature, typewriting, telegraphic or electronic transmission, or otherwise) by the Member or Member's attorney-in-fact. A Proxy may not be transmitted orally.

1.31. "Purpose" is defined in Article II, Section 2.5.

1.32. "Regulations" ("Reg") means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as such Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

1.33. "Reserves" means the aggregate of reserve accounts that the Manager, in the Manager's sole and absolute discretion, deems reasonably necessary to meet accrued or contingent liabilities of the Company, reasonably anticipated operating expenses, working capital requirements and such other goals and requirements as the Manager may designate, in the Manager's sole and absolute discretion.

1.34. "Successor in Interest" means an Assignee, a successor of a Person by merger or otherwise by operation of law, or a transferee of all or substantially all of the business or assets of a Person.

1.35. "Super-Majority of Members" means a Member or Members whose Voting Interests represent more than sixty-seven percent (67%) of the Voting Interests of all the Members.

1.36. "Tax Item" means each item of income, gain, loss, deduction, or credit, or item thereof, of the Company.

1.50. "Tax Matters Member" means such Person as may be designated under Article VI, Section 6.5.

5

1.37. "Transfer" means, with respect to a Membership Interest or any element of a Membership Interest, any sale, assignment, gift, Involuntary Transfer, Encumbrance, or other disposition of such a Membership Interest or any element of such Membership Interest, directly or indirectly, other than an Encumbrance that is expressly permitted under this Agreement.

1.38. "Triggering Event" is defined in Article VIII, Section 8.4.

1.39. "Unit" means the Interest of a Member or Economic Interest Holder in the Company. Subject to the right to specify additional classes based upon a Vote of holders of Class A Units, three separate classes of Units exist, Class A Units, Class B Units and Class C Units. The rights, preferences and privileges of holders of Class A Units, Class B Units and Class C Units, respectively, are set forth in this Article I, Articles III, IV, VII and IX below.

1.40. "Vote" means a written consent or approval, a ballot cast at a meeting, or a voice vote.

1.41. "Voting Interest" means, with respect to a Member, the right to Vote or participate in management and any right to information concerning the business and affairs of the Company provided under the Act, except as limited by the provisions of this Agreement. Only Members holding of Class A Units have a Voting Interest, and that Voting Interest shall be directly proportional to the number of Class A Units held by such Member and the number of Class A Units issued to all Members, as they may exist from time to time.

## ARTICLE II: CERTIFICATE OF FORMATION

2.1. The Original Manager or its predecessor has caused a Certificate of Formation, in the form attached to this Agreement as Exhibit "A", to be filed with the Delaware Secretary of State.

2.2. The name of the Company shall be:

### "PECAS, LLC".

2.3. The principal executive office of the Company shall be: 17606 Camino De Yatasto, Pacific Palisades, California 90272, or such other place or places as may be determined by the Manager from time to time.

2.4. The initial registered office for the Company in the State of Delaware is Corporation Service Corporation, 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware, 19808. The Manager may from time to time change the Company's agent(s) for service of process and/or registered office in any State where one exists or designate new or additional agent(s) for service of process and/or registered offices in any State where the Manager determines that the Company needs to qualify to do business.

2.5. The Company's purpose is to engage in Mining Operations (as defined below), and any and all general business activities related or incidental thereto permitted by law, and to own, manage and operate the Land (as defined below), as well as any other lawful business activity relating to the Land (the "Purpose") and such other purposes as the Manager may determine as being desirable for the Company; provided that the Company shall not conduct any banking, insurance or trust company business. Following any such expansion of the Purpose of the Company, the term "Purpose" shall be deemed to include such additional purpose. The term "Mining Operations" means with respect to the Land (as defined below), whether carried out by Company, an affiliate of the Company, or a third party under license from or contract with Company or an

affiliate of the Company: (i) drilling of exploratory holes; ( ii) construction of above or below ground improvements related to the business of exploration, extraction and sale of minerals or water from the Land; ( iii) construction or acquisition of facilities equipment and any other property or assets related to such exploration, extraction or sale whether or not located on the Land; or (iv) any other material activity which would commonly in the mining industry be deemed the conduct of mining operations including, but not limited to the acquisition, giving, granting and execution by Company of any and all contracts, permits, approvals, consents, agreements, entitlements, easements, rights of way, and licenses related, directly or indirectly, in any manner with the foregoing. The term "Land" means and refers to all of the real property and mineral rights that have been or are being conveyed to the Company pursuant to the terms and conditions of that certain Asset Purchase Agreement dated as of January 23, 2013 by and between the Company as Buyer and LMMP as Seller (the "Purchase Agreement").

2.6.  The Members intend the Company to be a limited liability company under the Act. No Manager or Member shall take any action inconsistent with the express intent of the parties to this Agreement.

2.7.  The term of existence of the Company shall commence on the effective date of filing of Certificate of Formation with the Delaware Secretary of State, and shall continue until December 31, 2041, unless sooner terminated by the provisions of this Agreement or as provided by law.

2.8.  The names and addresses of the Initial Member and the Additional Member are as set forth in Exhibit "B" attached hereto and incorporated by this reference herein.

2.9.  Poseidon Capital, LLC, a California limited liability company is the Manager of the Company. The address of the Managers is 17606 Camino De Yatasto, Pacific Palisades, California 90272.

2.10  The Initial Member's Membership Interest is hereby converted and/or reclassified into 25 Class B Units.

## ARTICLE III: CAPITAL AND CAPITAL CONTRIBUTIONS

3.1.  Each Member shall contribute, or has contributed, to the capital of the Company as the Member's initial Capital Contribution the money and property specified in Exhibit "C" attached hereto and incorporated by this reference herein, in exchange for the Units to be purchased by such Member, as also specified in attached Exhibit "C". The initial Fair Market Value of each item of contributed property (net of liabilities secured by such property) that the Company is considered to assume or to take "subject to" under IRC Section 752, is also set forth in Exhibit "C," together with the description and amount of these liabilities (if any). If a Member fails to make the initial Capital Contributions specified in this section as of February 28, 2013, that Member's entire Membership Interest shall terminate, and that Member shall indemnify, defend, and hold the Company and the other Members harmless from any loss, cost, or expense, including reasonable attorney fees caused by the failure to make the initial Capital Contribution.

3.2.  The Manager may determine from time to time that Capital Contributions (derived from the sale of additional Units, borrowing unsecured debt, or debt secured by any or all of the Company's assets, or sale of assets) in addition to the Members' initial Capital Contributions are needed to enable the Company to conduct its business. On making a determination that Capital Contributions derived from the sale of additional Units is required or desirable, the Manager shall have the right, power and authority to sell additional Class A Units on any terms the Manager deems desirable or appropriate given the Company's financial condition and prospects. Notwithstanding anything otherwise provided for herein, the number of Offered Units may not exceed the excess, if any, of the Authorized Units as of the date of the Offering Notice

7

over the total of all issued Units as of that time. No Member may voluntarily make any additional Capital Contribution without the consent of the Manager.

3.3. Intentionally omitted.

3.4. An individual Capital Account for each Member shall be maintained and adjusted in accordance with the following provisions:

(a) A Member's Capital Account shall be increased by that Member's Capital Contributions, that Member's share of Profits, and any items in the nature of income or gain that are specially allocated to that Member pursuant to Article IV;

(b) A Member's Capital Account shall be increased by the amount of any Company liabilities assumed by that Member subject to and in accordance with the provisions of Reg '1.704-1(b)(2)(iv)(c);

(c) A Member's Capital Account shall be decreased by (a) the amount of cash distributed to that Member; (b) the Fair Market Value of any property of the Company so distributed, net of liabilities secured by such distributed property that the distributee Member is considered to assume or to be subject to under IRC Section 752; and (c) the amount of any items in the nature of expenses or losses that are specially allocated to that Member pursuant to Article IV;

(d) A Member's Capital Account shall be reduced by the Member's share of any expenditures of the Company described in IRC Section 705(a)(2)(B) or which are treated as IRC Section 705(a)(2)(B) expenditures pursuant to Reg Section 1.704-1(b)(2)(iv)(i) (including syndication expenses and losses nondeductible under IRC Sections 267(a)(1) or 707(b));

(e) If any Economic Interest (or portion thereof) is transferred, the transferee of such Economic Interest or portion shall succeed to the transferor's Capital Account attributable to such interest or portion;

(f) The principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note shall not be included in the Capital Account of any Person until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Reg Section 1.704-1(b)(2)(iv)(d)(2); and

(g) Each Member's Capital Account shall be increased or decreased as necessary to reflect a revaluation of the Company's property assets in accordance with the requirements of Reg Sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g), including the special rules under Reg Section 1.701-1(b)(4), as applicable. The provisions of this Agreement respecting the maintenance of Capital Accounts are intended to comply with Reg Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with those Regulations.

3.5. A Member shall not be entitled to withdraw any part of the Member's Capital Contribution or to receive any distributions, whether of money or property, from the Company except as provided in this Agreement.

3.6. No interest shall be paid on Capital Contributions or on the balance of a Member's Capital Account.

3.7. A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the Company except as otherwise provided in the Act or in this Agreement.

8

3.8. Except as otherwise expressly provided in this Agreement, no Member shall have priority over any other Member with respect to the return of a Capital Contribution or distributions or allocations of income, gain, losses, deductions, credits, or items thereof.

## ARTICLE IV: ALLOCATIONS AND DISTRIBUTIONS

4.1. The Profits and Losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, to the Members as follows:

Profits shall be allocated to the Members in the following order of priority:

    (a)    First, to each Member who is a Class A Unit holder (with respect to such Class A Units), an amount that, when added to all prior allocations to such Member with respect to such Member's Preferred Return, is sufficient to cause such Member to have been allocated its full Preferred Return;

    (b)    Second, for all Profits of the Company in excess of the amounts allocated pursuant to clause (a) above (i.e. aggregate Profits from the date of the Company's formation over aggregate Losses from the date of the Company's formation), up to and including $50,000,000, 70% to the holders of Class A Units, pro rata in accordance with their respective interests, 25% to holders of Class B Units, pro rata in accordance with their respective interests, and 5% to holders of Class C Units, pro rata in accordance with their respective interests;

    (c)    Third, for all Profits of the Company in excess of the amounts allocated pursuant to clause (a) above (i.e. aggregate Profits from the date of the Company's formation over aggregate Losses from the date of the Company's formation) which exceed total allocated Profits of $50,000,000, up to and including $100,000,000, 65% to the holders of Class A Units, pro rata in accordance with their respective interests, 30% to holders of Class B Units, pro rata in accordance with their respective interests, and 5% to holders of Class C Units, pro rata in accordance with their respective interests;

    (d)    Fourth for all Profits of the Company in excess of the amounts allocated pursuant to clause (a) above (i.e. aggregate Profits from the date of the Company's formation over aggregate Losses from the date of the Company's formation) which exceed total allocated Profits of $100,000,000, up to and including $200,000,000, 45% to the holders of Class A Units, pro rata in accordance with their respective interests, 50% to holders of Class B Units, pro rata in accordance with their respective interests, and 5% to holders of Class C Units, pro rata in accordance with their respective interests;

    (e)    Fifth, for all Profits of the Company in excess of the amounts allocated pursuant to clause (a) above (i.e. aggregate Profits from the date of the Company's formation over aggregate Losses from the date of the Company's formation) which exceed total allocated Profits of $200,000,000, 25% to the holders of Class A Units, pro rata in accordance with their respective interests, 70% to holders of Class B Units, pro rata in accordance with their respective interests, and 5% to holders of Class C Units, pro rata in accordance with their respective interests.

Losses (other than losses resulting from a Capital Event) shall be allocated to the Members with positive Capital Accounts, in proportion to their positive Capital Account balances, until no Member has a positive Capital

9

Account. Thereafter, Losses shall be allocated among the Members in accordance with each Member's respective Percentage Interest.

4.2 As used in this Agreement, "Profits and Losses" means, for each fiscal year or other period specified in this Agreement, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with IRC Section 703(a), including all Tax Items required to be stated separately pursuant to IRC Section 703(a)(1), with the following adjustments:

(a) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(b) Any expenditures of the Company described in IRC Section 705(a)(2)(B) or treated as IRC Section 705(a)(2)(B) expenditures pursuant to Reg Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or shall increase such loss; and

(c) Notwithstanding the foregoing provisions of this Section 4.2, any items of income, gain, loss, or deduction that are specially allocated shall not be taken into account in computing Profits or Losses under Section 4.1.

4.3.  The following definitions shall apply with respect to this Article IV:

(a) "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year of the Company, after such Member's Capital Account has been adjusted as follows: (1) the Member's Capital Account shall be increased by the amount of such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain; and (2) the Member's Capital Account shall be decreased by the amount of the items described in Reg Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6);

This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Reg Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently with that Regulation.

(b) "Book Depreciation" means, with respect to any item of Company property for a given fiscal year, a percentage of depreciation or other cost recovery deduction allowable for federal income tax purposes for such item during that fiscal year equal to the result (expressed as a percentage) obtained by dividing (1) the Fair Market Value of that item at the beginning of the fiscal year (or the acquisition date during the fiscal year), by (2) the adjusted tax basis of the item at the beginning of the fiscal year (or the acquisition date during the fiscal year). If the adjusted tax basis of an item is zero, the Manager may determine Book Depreciation, provided that it does so in a reasonable and consistent manner.

(c) "Company Minimum Gain" has the meaning set forth in Reg Section 1.704-2(d)(1);

(d) "Member Nonrecourse Debt" is defined in Reg Section 1.704-2(b)(4);

(e) "Member Nonrecourse Debt Minimum Gain" for a fiscal year of the Company means the net increase in Minimum Gain attributable to Member Nonrecourse Debt, determined as set forth in Reg Section 1.704-2(i)(2);

(f) "Member Nonrecourse Deductions" has the meaning set forth in Reg Section 1.704-2(i)(2); For any fiscal year of the Company, the amount of Member Nonrecourse Deductions with respect to a Member

10

Nonrecourse Debt equals the net increase during that fiscal year in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt during that fiscal year, reduced (but not below zero) by the amount of any distributions during such year to the Member bearing the economic risk of loss for such Member Nonrecourse Debt if such distributions are both from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, all as determined according to the provisions of Reg Section 1.704-2(i)(2). In determining Member Nonrecourse Deductions, the ordering rules of Reg Section 1.704-2(j) shall be followed;

(g) "Nonrecourse Deductions" has the meaning set forth in Reg Section 1.704-2(c). The amount of Nonrecourse Deductions for a Company fiscal year equals the net increase in the amount of Company Minimum Gain during that fiscal year, reduced (but not below zero) by the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain; and

(h) "Nonrecourse Liability" is defined in Reg Section 1.752-1(a)(2).

4.4.  The following special allocations shall be made in the following order:

(a) Company Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain during a fiscal year, each Member shall be allocated, before any other allocation under this section, items of Company income and gain for such fiscal year equal to such Member's share of the net decrease in Company Minimum Gain as determined in accordance with Reg Section 1.704-2(g)(2);

(b) Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Member Nonrecourse Debt Minimum Gain during a fiscal year, any Member with a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt as of the beginning of such fiscal year shall be allocated items of Company income and gain for such year (and, if necessary, subsequent years) equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. A Member's share of net decrease in Member Nonrecourse Debt Minimum Gain shall be determined pursuant to Reg Section 1.704-2(g)(2). A Member shall not be subject to the foregoing chargeback to the extent permitted under Reg Section 1.704-2(i)(4); and

(c) Qualified Income Offset. If any Member unexpectedly receives an adjustment, allocation, or distribution described in Reg Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), such Member shall be allocated items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income and gain for such fiscal year) in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustment, allocation, or distribution.

4.5.  Member Nonrecourse Deductions for any fiscal year of the Company shall be allocated to the Members in the same proportion as Profits are allocated under Section 4.1, provided that any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears (or is deemed to bear) the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Reg Section 1.704-2(i)(2).

4.6.  In any fiscal year of the Company, Profits in excess of Losses of the Company resulting from a Capital Event in that Fiscal Year shall be allocated to the Members in the following order:

(a)    First, to Members whose Adjusted Capital Contributions are in excess of their Capital Accounts, in proportion to those excesses, until all of those excesses have been eliminated. "Adjusted Capital Contributions" means, with respect to each Member, the excess, if any, of

11

such Member's aggregate Capital Contribution over all prior distributions to the Member that are characterized as returns of Capital Contributions;

(b)    Second, to each Member holding Class A Units (with respect to such Class A Units), an amount that, when added to all prior allocations to such Member with respect to such Member's Preferred Return, is sufficient to cause such Member to have been allocated its full Preferred Return;

(c)    Third, in the priority provided for therein, and without duplication of allocations made in those clauses, the amounts to be allocated pursuant to clauses (b), (c), (d) and (e) of Section 4.1 above.

4.7.  In any fiscal year of the Company, Losses in excess of Profits of the Company in that fiscal year shall be allocated to the Members with positive Capital Accounts, in proportion to their positive Capital Account balances, until no Member has a positive Capital Account. Thereafter, among the Members in accordance with each Member's respective Percentage Interest. For this purpose, Capital Accounts shall be reduced by the adjustments set forth in Reg Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

4.8.  Any unrealized appreciation or unrealized depreciation in the values of Company property distributed in kind to Members shall be deemed to be Profits or Losses realized by the Company immediately prior to the distribution of the property and such Profits or Losses shall be allocated to the Capital Accounts in the same proportions as Profits are allocated under Section 4.1. Any property so distributed shall be treated as a distribution to the Members to the extent of the Fair Market Value of the property, less the amount of any liability secured by the property. Nothing contained in this Agreement is intended to treat or cause such distributions to be treated as sales for value. For the purposes of this Section 4.8, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the Fair Market Value of such property and the Company's adjusted basis, without regard to any Section 754 election, for such property.

4.9.  Any item of income, gain, loss, or deduction with respect to any property (other than cash) that has been contributed by a Member to the capital of the Company, or that has been revalued pursuant to the provisions of Article III, Section 3.3(g), and that is required or permitted to be allocated to such Member for income tax purposes under IRC Section 704(c) in order to take into account the variation between the tax basis of such property and its Fair Market Value at the time of its contribution, shall be allocated solely for income tax purposes in the manner required or permitted under IRC Section 704(c) using the "traditional" method described in Reg Section 1.704-3(b), except that any other method allowable under applicable Regulations may be used for any contribution of property with respect to which there is agreement among the contributing Member and the Members.

4.10.  In the case of a Transfer of an Economic Interest during any fiscal year of the Company, the Assigning Member and Assignee shall each be allocated Profits or Losses based on the number of days each held the Economic Interest during that fiscal year. Unless the Assigning Member and Assignee agree to a different proration and advise the Members of the agreed proration before the date of the Transfer, Profits or Losses from a Capital Event during that fiscal year shall be allocated to the holder of the Interest on the day such Capital Event occurred. If an Assignee makes a subsequent Assignment, said Assignee shall be considered an "Assigning Member" with respect to the subsequent Assignee for purposes of the aforesaid allocations.

4.11.  (a) The Fair Market Value of all Company property shall be adjusted as of the following times: (1) the acquisition of an interest or additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (2) the distribution of money or other property

12

(other than a de minimis amount) by the Company to a Member as consideration for an Economic Interest in the Company, and (3) the liquidation of the Company within the meaning of Reg Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments under clauses (1) and (2) above shall be made only in the event of a revaluation of Company property under Article III, Section 3.4(g) in accordance with Reg Section 1.704-1(b)(2)(iv)(f); and

     (b) The Fair Market Value of Company property shall be increased or decreased to reflect adjustments to the adjusted tax basis of such property pursuant to IRC Section 732, IRC Section 733, or IRC Section 743, subject to the limitations imposed by IRC Section 755 and Reg Section 1.704-1(b)(2)(iv)(m).

     (c) If the Fair Market Value of an item of property has been determined or adjusted pursuant to Article I, Section 22 or Paragraph (a) or (b) of this Section 4.11, such Fair Market Value shall be adjusted by the Book Depreciation, if any, taken into account with respect to such property for purposes of computing Profits and Losses.

     4.12. It is the intent of the Members that each Member's allocated share of Company Tax Items be determined in accordance with this Agreement to the fullest extent permitted by IRC Sections 704(b) and 704(c). Notwithstanding anything to the contrary contained in this Agreement, if the Company is advised that, as a result of the adoption of new or amended regulations pursuant to IRC Sections 704(b) and 704(c), or the issuance of authorized interpretations, the allocations provided in this Agreement are unlikely to be respected for federal income tax purposes, the Manager is hereby granted the power to amend the allocation provisions of this Agreement, on advice of accountants and legal counsel, to the minimum extent necessary to cause such allocation provisions to be respected for federal income tax purposes; provided that such amendment does not have any significant impact on the actual tax liability of a Member or distributions to which a Member would otherwise be entitled.

     4.13. All Available Cash, other than revenues or proceeds from a Capital Event or the dissolution of the Company, shall, as and when determined by the Manager, be distributed among the Members in the following order of priority:

     (a)    First, to each Member holding Class A Units (with respect to such Class A Units), an amount that, when added to all prior distributions to such Member with respect to such Member's Preferred Return, is sufficient to cause such Member to have received its full Preferred Return;

     (b)    Second, an amount that is sufficient to cause the Adjusted Capital Contribution of Members holding Class A Units to be reduced to zero;

     (c)    Third, until aggregate distributions to all Unit Holders in excess of the aggregate amounts distributed pursuant to clauses (a) and (b) above equals or exceeds $50,000,000, 70% to the holders of Class A Units, pro rata in accordance with their respective interests, 25% to holders of Class B Units, pro rata in accordance with their respective interests, and 5% to holders of Class C Units, pro rata in accordance with their respective interests;

     (d)    Fourth, for all aggregate distributions to all Unit Holders in excess of the aggregate amounts distributed pursuant to clauses (a) and (b) above which are in excess of $50,000,000, up to $100,000,000, 65% of such distributions to the holders of Class A Units, pro rata in accordance with their respective interests, 30% of such distributions to holders of Class B Units, pro rata in accordance with their respective interests, and 5% of such distributions to holders of Class C Units, pro rata in accordance with their respective interests;

13

(e)    Fifth, for all aggregate distributions to all Unit Holders in excess of the aggregate amounts distributed pursuant to clauses (a) and (b) above, which are in excess of $100,000,000, up to $200,000,000, 45% of such distributions to the holders of Class A Units, pro rata in accordance with their respective interests, 50% of such distributions to holders of Class B Units, pro rata in accordance with their respective interests, and 5% of such distributions to holders of Class C Units, pro rata in accordance with their respective interests;

(f)    Sixth, for all aggregate distributions to all Unit Holders in excess of the aggregate amounts distributed pursuant to clauses (a) and (b) above, which are in excess of $200,000,000, 25% to the holders of Class A Units, pro rata in accordance with their respective interests, 70% to holders of Class B Units, pro rata in accordance with their respective interests, and 5% to holders of Class C Units, pro rata in accordance with their respective interests;

The parties intend that each calendar year the distribution of Available Cash shall be subject to the Manager's sole and absolute discretion. The parties further acknowledge that since Available Cash does not include cash that the Manager may accumulate for purposes of making additional acquisitions of property or to fund expansion of the Company's business, it is conceivable that during periods in which the Company maintains large amounts of cash or cash equivalents, no Available Cash may exist. The parties acknowledge that no assurances can be given with respect to when or whether said cash will be available for distributions to the Members.

4.14.  All Available Cash resulting from a Capital Event, including, without limitation, the proceeds of any refinancing of any Company property (as distinguished from normal business operations or the dissolution of the Company), shall be distributed as and when determined by the Manager in the same order and proportion as set forth in Section 4.13.

4.15.  If the proceeds from a sale or other disposition of an item of Company property consist of property other than cash, the value of that property shall be as determined by the Manager. If such noncash proceeds are subsequently reduced to cash, such cash shall be taken into account by the Manager in determining Available Cash and the Manager shall determine whether such cash has resulted from operations or from a Capital Event.

4.16.  Notwithstanding any other provisions of this Agreement to the contrary, when there is a distribution in liquidation of the Company, or when any Member's interest is liquidated, all items of income and loss first shall be allocated to the Members' Capital Accounts under this Article IV, and other credits and deductions to the Members' Capital Accounts shall be made before the final distribution is made. The final distribution to the Members shall be made as provided in Article IX, Section 9.2(d) of this Agreement. The provisions of this Section 4.16 and Article IX, Section 9.2(d) shall be construed in accordance with the requirements of Reg Section 1.704-1(b)(2)(ii)(b)(2).

4.17  In the event that the Manager determines that it is necessary or desirable for tax purposes for it to obtain a Capital Account in an amount that is sufficient to give the Manager a Capital Account that equals its Percentage Interest multiplied by the sum of all Member Capital Accounts, then the Manager shall have the right to contribute such amount as its Capital Contribution, which contribution may be made in cash or by delivering a promissory note to the Company (which may or may not bear interest), provided that, if such contribution is made by promissory note, the Manager will have no right to a Preferred Return with respect to such Capital Contribution until, and to the extent that, the principal amount of such promissory note has been paid to the Company in cash.

## ARTICLE V: MANAGEMENT

5.1. The business of the Company shall be managed by the Manager named in Article II, Section 2.9, or a successor Manager selected in the manner provided in Section 5.2 below. Except as otherwise set forth in this Agreement, all decisions concerning the management of the Company's business shall be made by the Manager.

5.2. The Manager shall serve until the earlier of (1) the Manager's resignation, retirement, death, or disability; (2) the Manager's removal by the Members pursuant to Section 5.3 below; or (3) the expiration of the term of existence of the Company provided for in Section 2.7 above, as it may be extended from time to time, in the Manager's discretion. Notwithstanding the foregoing, the Manager shall have all the rights and powers of the Manager to wind-up the affairs of the Company following the expiration of the term of existence of the Company. A new Manager shall be appointed by the Member or Members whose Voting Interests represent more than 70% of the Voting Interests of all the Members, on the occurrence of any of the foregoing events.

5.3. The Manager designated in Section 2.9 above shall have a term that expires upon the expiration of the term of existence of the Company provided for in Section 2.7 above, as it may be extended from time to time, and shall serve until the time provided for in Section 5.2 above, but shall have all the rights and powers of the Manager to wind-up the affairs of the Company following the expiration of the term of existence of the Company. A Manager who is not also a Member may be removed with or without cause at any time by action of a Majority of Members. The Manager named in Section 2.9 above may be removed only on the Super-Majority Vote of Members having a Voting Interest and the execution and filing of a Certificate of Amendment of the Certificate of Formation of the Company in conformity with LLC Code Section 18-202, if necessary, to make any amendment to the Certificate of Formation that may be required to cause the Certificate of Formation to be consistent with such removal.

5.4. The Manager, a member of which shall be the President of the Company (if the Company has a President, which determination shall be made by the Manager in its sole and absolute discretion), shall have the powers and duties described in Section 5.8 hereof and such other powers and duties as may be prescribed in this Agreement or by the Members. Notwithstanding the foregoing, the Manager shall not take any of the following actions on behalf of the Company unless the Member or Members whose Voting Interests represent a Majority of Members have consented to the taking of such action:

    (a)    Any act that would make it impossible to carry on the ordinary business of the Company;

    (b)    Any act in contravention of this Agreement; or

    (c)    A change in the nature of the principal business of the Company.

5.5. If more than one Manager exists, actions of the Managers shall be taken at meetings or as otherwise provided in this Section 5.5 by a majority. No regular meetings of the Managers need be held. The President or any Manager may call a meeting of the Managers by giving Notice of the time and place of the meeting at least 48 hours prior to the time of the holding of the meeting. The Notice need not specify the purpose of the meeting, nor the location if the meeting is to be held at the principal executive office of the Company.

    (a)    A majority of Managers shall constitute a quorum for the transaction of business at any meeting of the Managers.

(b)     The transactions of the Managers at any meeting, however called or Noticed, or wherever held, shall be as valid as though transacted at a meeting duly held after call and Notice if a quorum is present and if, either before or after the meeting, each Manager not present signs a written waiver of Notice or a consent to the holding of such meeting or an approval of the minutes of such meeting.

(c)     Any action required or permitted to be taken by the Managers under this Agreement may be taken without a meeting if all of the Managers individually or collectively consent in writing to such action.

(d)     Managers may participate in the meeting through the use of a conference telephone or similar communications equipment, provided that all Managers participating in the meeting can hear one another.

(e)     The President (or if no President exists, an individual designated by the majority of the Managers) shall keep or cause to be kept with the books and records of the Company full and accurate minutes of all meetings, Notices and waivers of Notices of meetings, and all written consents to actions of the Managers.

5.6. It is acknowledged that the Manager has other business interests to which the Manager devotes part of the Manager's time. The Manager shall devote such time to the conduct of the business of the Company as the Manager, in the Manager's own good faith and discretion, deems necessary. Any Member (including, without limitation, any Manager) or any of its Affiliates may engage independently or with others in other business ventures of every nature and description. Neither the Company nor any Member shall have any rights by virtue of this Agreement or the relationship created hereby in or to such other ventures or activities or to the income or proceeds derived therefrom.

5.7. The Manager shall be entitled to such compensation for the Manager's services as is approved by a Vote of a Majority of Members having a Voting Interest, and to reimbursement for all expenses reasonably incurred by the Manager in the performance of the Manager's duties. Notwithstanding anything herein to the contrary, the Manager is authorized to retain the law firm of Corporate Legal Services, LLP to provide legal services to the Company at such firm's standard hourly rates or on other reasonable terms. Reid Breitman, President of the Company and managing member of the Manager, is an attorney, and is the owner of Corporate Legal Services, LLP.

5.8. The Company may have a President. The President may be the chief executive officer of the Company and shall not have any rights to the general supervision of the business and affairs of the Company greater than that of a Manager. The President shall preside at all meetings of Members and of Managers. The Manager may provide for additional officers of the Company, may alter the powers and duties of the President, and shall establish the powers and duties of all other officers and the compensation of all Company officers. The President, if there is one, shall attend any Meetings of Members called pursuant to Section 7.1 below. In addition, the Manager may, but without obligation to do so, retain another individual or entity to run the day to day operations of the Company's business; provided, however, that "policy" and other major decisions shall be made by the Manager.

5.8.1. Subject to the consent of the Members (or of a specified percentage thereof) where required by this Agreement, the Manager shall have the exclusive right and authority to manage and control the business of the Company and is hereby authorized to take any action and to do anything it deems necessary or desirable, in the Manager's sole and absolute discretion, to achieve the purposes of the Company in accordance with the provisions of this Agreement and applicable law. Without in any way limiting the generality of the foregoing, the Manager for, and in the name and on behalf of, the Company is hereby specifically authorized:

16

(a)     to acquire, hold, encumber, sell (whether or not in the ordinary course of business), dispose of, lease, manage, finance, donate, hypothecate and otherwise deal with property of the Company, at such price and upon such terms as it deems to be in the best interests of the Company;

(b)     to acquire  by purchase or otherwise, hold, develop, improve, maintain, operate, lease, finance, encumber, manage, sell, dispose of, and otherwise deal with property of the Company;

(c)     to acquire by purchase, lease, exchange or otherwise, any other real or personal property;

(d)     to execute any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the acquisition, holding, operating, management, financing, pledge, hypothecation, granting of security interests in, sale, transfer, conveyance, exchange and distribution of any real or personal property of the Company (whether or not in the ordinary course of business);

(e)     to borrow money and issue evidences of indebtedness, and to secure the same by pledge or other lien on any assets of the Company;

(f)     to execute, in furtherance of any or all of the purposes of the Company, any certificate, promissory note, security agreement, bill of sale, contract or other instrument purporting to convey or encumber any or all of the assets of the Company;

(g)     to prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting the assets of the Company, and in connection therewith execute any extensions or renewals or encumbrances on any or all of the assets of the Company;

(h)     to care for and distribute funds to the Members by way of cash, income, return of capital, or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company or this Agreement;

(i)     to employ agents, employees, managers, accountants, attorneys, consultants and other Persons necessary or appropriate to carry out the business and operations of the Company, and to pay fees, expenses, salaries, wages and other compensation to such Persons;

(j)     to pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend or compromise, upon such terms as it may determine and upon such evidence as it may deem sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Company;

(k)     to cause the Company to make or revoke any of the elections referred to in Sections 108, 709, 754 and 1017 of the Code or any other or similar provisions enacted in lieu thereof, or to make any and all other elections for federal, state and local tax purposes, including, without limitation, any election, if permitted by applicable law, including (1) to extend the statute of limitations for assessment of tax deficiencies against Members with respect to adjustments to the Company's federal, state or local tax returns; and (2) to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in their capacity as Members, and to execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company or the Members;

17

(l)     to amend the allocation provisions under Article IV hereof to the minimum extent necessary so that such allocations satisfy the requirements of IRC Section 704(b) and Regulations promulgated thereunder so as to give effect to the plan of allocating Profits, Losses, income, expense, tax credits and distributions set forth in Articles IV above and Section 5.7 above;

(m)     to sell additional Units in the Company (subject to the provisions of Article III above) through a private placement either directly or indirectly through a Person licensed to sell securities, to employ such licensed Person to sell additional Units, and to admit the purchasers of those Units as Additional Members to the Company pursuant to the provisions of this Agreement and to amend Exhibit "C" hereof to reflect such admission;

(n)     to establish and maintain Reserves for such purposes and in such amounts as it deems appropriate from time to time;

(o)     to invest Reserves and other cash of the Company in short term investments (i.e. investments having either a maturity of less than one year or investments the securities of which are traded in a recognized public market), or long term investments;

(p)     to engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Company property and liabilities to the Manager) necessary or incidental to, or in connection with, or incidental to the accomplishment of the purposes of the Company;

(q)     to expend Company capital, assets and income in the exercise of any of its rights or powers hereunder;

(r)     to invest and reinvest such Company assets that are not then required in the Company's business;

(s)     to pay or reimburse any Person for costs, expenses or losses incurred in connection with any aspect of the Company or its business;

(t)     to contract with and compensate itself or its Affiliates for the performance of services or the furnishing of goods to or on behalf of the Company, provided that such services and compensation are either provided for in (or approved pursuant to) Section 5.7 or are on terms substantially similar to or not less favorable to the terms that the Company would receive if it had contracted with a Person other than the Manager or one of its Affiliates;

(u)     to bring and defend (and settle or not settle) actions at law or in equity; to confess any judgment against the Company; or to file a petition in bankruptcy or the enter into of an arrangement among creditors, and to settle or compromise any claim, right or cause of action in favor of the Company, brought by the Company, or brought against the Company, by or against any third party;

(v)     to lend money or extend credit on behalf of the Company;

(w)     to lend funds to the Company, provided that such loan may only be made on a short-term basis (not to exceed 5 years, but which may be renewed for additional periods if the Company is unable to refinance or repay such loans within such time) and provided further that the Company may not pay in connection therewith (1) interest or other financing charges or fees in excess of the maximum amount permitted by law, or (2) any prepayment charge or penalty;

18

(x)     to withhold income taxes as required by, and to otherwise comply with and take actions necessary as a result of, provisions of the Code (or comparable provisions of law in any state or other jurisdiction in which the Company does business) requiring withholding; and

(y)     to acquire other properties on behalf of the Company, either for cash or in exchange for Company property (in exchanges qualifying under Section 1031 of the Code or otherwise), to form subsidiary limited liability companies or other entities to facilitate such acquisitions or for such other purposes as the Manager may determine are in the best interest of the Company, and to distribute to the Members interests in such subsidiaries, all in the Manager's sole discretion.

5.8.2.  Any Person dealing with the Company or the Manager may rely upon a certificate signed by the Manager as to:

(i)  the identity of the Manager, any officer of the Company or any Member;

(ii)  the Persons who are authorized to execute and deliver any instrument or document of or on behalf of the Company;

(iii)  the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Manager or in any other manner are germane to the affairs of the Company; or

(iv)  any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member.

5.8.3.  No Member (except one who may also be a Manager, and then only in its capacity as a Manager) shall participate in or have any control over the Company business or have any authority or right to act for or bind the Company.

5.9.  The Manager shall cause all assets of the Company, whether real or personal, to be held in the name of the Company.

5.10.  All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company, at such locations as shall be determined by the Manager. Withdrawal from such accounts shall require only the signature of the Manager or such other person or persons as the Manager may designate.

## ARTICLE VI: ACCOUNTS AND ACCOUNTING

6.1.  Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and at such other locations as the Manager shall determine from time to time and shall be open to inspection and copying on reasonable Notice by any Member or the Member's authorized representatives during normal business hours. The costs of such inspection and copying shall be borne by the Member requesting the same.

6.2.  Financial books and records of the Company shall be kept on the cash method of accounting, which shall be the method of accounting followed by the Company for federal income tax purposes. The financial statements of the Company shall be appropriate and adequate for the Company's business and for

19

carrying out the provisions of this Agreement. The fiscal year of the Company shall be January 1 through December 31.

6.3. At all times during the term of existence of the Company, and beyond that term if the Manager deems it necessary, the Company shall keep or cause to be kept the books of account referred to in Section 6.2, together with:

(a)     A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution and the share in Profits and Losses and/or Units of each Member;

(b)     A current list of the full name and business or residence address of each Manager;

(c)     A copy of the Certificate of Formation, as amended;

(d)     Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six most recent taxable years;

(e)     An original executed copy or counterparts of this Agreement, as amended;

(f)     Any powers of attorney under which the Certificate of Formation or any amendments to said certificate were executed;

(g)     Financial statements of the Company for the six most recent fiscal years; and

(h)     The books and Records of the Company as they relate to the Company's internal affairs for the current and past four fiscal years.

If the Manager deems that any of the foregoing items shall be kept beyond the term of existence of the Company, the repository of said items shall be as designated by the Manager.

6.4. Within 90 days after the end of each taxable year of the Company the Manager shall send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

6.5. The Manager shall have the right to designate a Tax Matters Member/Partner ("Tax Matters Member") of the Company pursuant to IRC Section 6231(a)(7).

6.6. The Tax Matters Member is hereby authorized to do the following:

(a)     Keep the Members informed of administrative and judicial proceedings for the adjustment of Company items (as defined in IRC Section 6231(a)(3)) at the Company level, as required under IRC Section 6223(g) and the implementing Regulations;

(b)     Enter into settlement agreements under IRC Section 6224(c)(3) and applicable Regulations with the Internal Revenue Service or the Secretary of the Treasury (the "Secretary") with respect to any tax audit or judicial review, in which agreement the Tax Matters Member may expressly state that such agreement shall bind the other Members, except that such settlement agreement shall not bind any Member who (within the time prescribed under the Code and Regulations) files a statement with the Secretary

20

providing that the Tax Matters Member shall not have the authority to enter into a settlement agreement on behalf of such Member;

(c)     On receipt of a Notice of a final Company administrative adjustment, to file a petition for readjustment of the Company items with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC Section 6226(a) and applicable Regulations;

(d)     File requests for administrative adjustment of Company items on Company tax returns under IRC Section 6227(b) and applicable Regulations; and, to the extent such requests are not allowed in full, file a petition for adjustment with the Tax Court, the District Court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Federal Claims, all as contemplated under IRC Section 6228(a); and

(e)     To take any other action on behalf of the Members or the Company in connection with any administrative or judicial tax proceeding to the extent permitted by law or regulations, including retaining tax advisers (at the expense of the Company) to whom the Tax Matters Member may delegate such rights and duties as deemed necessary and appropriate.

## ARTICLE VII: MEMBERSHIP MEETINGS, VOTING

7.1.    There shall initially be only three classes of membership, "Class A Units", "Class B Units" and "Class C Units", which shall have the following rights and preferences:

(i)     Class A Units. Holders of Class A Units shall (with respect to those Units) have all of the rights, preferences and privileges of a Member, including, without limitation, a Voting Interest and an Economic Interest, which Economic Interest includes, without limitation, a right to a Preferred Return; and

(ii)    Class B Units. Holders of Class B Units shall constitute Economic Interests only, and, subject to the limitations and requirements set forth in Article IV above and Article IX below, shall collectively have a 30% Percentage Interest in the Company. Holders of Class B Units shall have no right to Vote and no right to participate in the management of the Company, or to information concerning the business and affairs of the Company other than rights specifically granted to them under the Act or this Agreement; and

(iii)   Class C Units. Holders of Class C Interests have no right to Vote, a 5% Percentage Interest, no Voting Interest, no right to participate in the management of the Company, and no right to information concerning the business and affairs of the Company other than rights specifically granted to them under the Act. The sole right of Class C Units is the right to the distributions and allocations set forth in Article IV above and Article IX below. With the exception of their Economic Interest, including, without limitation, the right to distributions and allocations set forth in Article IV above and Article IX below, holders of Class C Units shall have no rights of a Member hereunder.

A Super-Majority of Class A Unit holders shall have the right and power to appoint, remove, and replace officers of the Company and the right to Vote on all other matters with respect to which this Agreement or the Act requires or permits such Member action. Each Class A Unit holder shall Vote in proportion to the Class A Unit holder's Voting Interest as of the governing record date, determined in accordance with Section 7.2. If a Member having a Voting Interest has assigned all or part of the Member's Economic Interest to a person who has not been admitted as a Member, the Assigning Member shall Vote in proportion to the Voting Interest that the Assigning Member would have had, if the assignment had not been made. Notwithstanding the foregoing:

(a)    any of the following shall only require the approval of the Manager (which approval must be unanimous if more than one Manager exists), which may be granted or withheld in its sole and absolute discretion:

(i) the Transfer of a Membership Interest and the admission of the Assignee as a Member of the Company; or

(ii) a compromise of the obligation of a Member to make a Capital Contribution under Article III.

(b)    any of the following shall only require the Vote of the Member or Members whose Voting Interests represent more than 50% of the Voting Interests of all the Members:

(i)    A decision to continue the business of the Company after any event mentioned in Article IX, Section 9.1, provided that the requirements of that section are satisfied; or

(ii)    Any amendment of the Certificate of Formation or this Agreement that has been approved by the Manager.

7.2.  The record date for determining the Members entitled to receive Notice of any meeting, to Vote, to receive any distribution, or to exercise any right in respect of any other lawful action, shall be the date set by the Manager; provided that such record date shall not be more than 60, or less than ten calendar days prior to the date of the meeting and not more than 60 calendar days prior to any other action. In the absence of any action setting a record date, the record date shall be: (i) for determining Members entitled to notice of or to vote at a meeting of Members, the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held, (ii) for determining Members entitled to give consent to a Company action in writing without a meeting, the day on which the first written consent is given, and (iii) for determining Members for any other purpose, at the close of business on the day on which the Manager adopts the resolution relating thereto, or the 60th day prior to the date of the other action, whichever is later. The determination of Members of record entitled to notice of or to Vote at a meeting of Members shall apply to any adjournment of the meeting unless a Manager or the Members who called the meeting fix a new record date for the adjourned meeting, but the Manager or the Members who called the meeting shall fix a new record date if the meeting is adjourned for more than 45 days from the date set for the original meeting.

7.3.  The Company may, but shall not be required, to issue certificates evidencing Membership Interests ("Membership Interest Certificates") to Members of the Company. Once Membership Interest Certificates have been issued, they shall continue to be issued as necessary to reflect current Membership Interests held by Members. Membership Interest Certificates shall be in such form as may be approved by the Manager, shall be manually signed by such persons as the Manager may designate, and shall bear conspicuous legends evidencing the restrictions on Transfer and the purchase rights of the Company and

22

Members set forth in Article VIII. All issuances, reissuances, exchanges, and other transactions in Membership Interests involving Members shall be recorded in a permanent ledger as part of the books and records of the Company.

7.4. Meetings of the Members may be called at any time by the Manager, or by Members representing more than 30 percent of the Voting Interests of the Members for the purpose of addressing any matters on which the Members may Vote. If a meeting of the Members is called by the Members, Notice of the call shall be delivered to the Manager. Meetings may be held at the principal executive office of the Company or at such other location in Los Angeles County, California as may be designated by the Manager. Following the call of a meeting, the Manager shall give Notice of the meeting not less than ten, or more than 60 calendar days prior to the date of the meeting to all Members entitled to Vote at the meeting. The Notice shall state the place, date, and hour of the meeting and the general nature of business to be transacted. No other business may be transacted at the meeting. A quorum at any meeting of Members shall consist of the Member or Members whose Voting Interests represent more than 50% of the Voting Interests of all the Members, represented in person or by Proxy. The Members present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of a sufficient number of Members to leave less than a quorum, if the action taken, other than adjournment, is approved by the requisite Percentage of Members as specified in this Agreement or the Act.

7.5. A meeting of Members at which a quorum is present may be adjourned to another time or place and any business which might have been transacted at the original meeting may be transacted at the adjourned meeting. If a quorum is not present at an original meeting, that meeting may be adjourned by the Vote of a majority of Voting Interests represented either in person or by Proxy. Notice of the adjourned meeting at which a quorum is present need not be given to Members entitled to Notice if the time and place of the adjourned meeting are announced at the meeting at which the adjournment is taken, unless (a) the adjournment is for more than 45 days, or (b) after the adjournment, a new record date is fixed for the adjourned meeting. In the situations described in clauses (a) and (b), Notice of the adjourned meeting shall be given to each Member of record entitled to Vote at the adjourned meeting.

7.6. The transactions of any meeting of Members, however called and Noticed, and wherever held, shall be as valid as though consummated at a meeting duly held after regular call and Notice, if (a) a quorum is present at that meeting, either in person or by Proxy, and (b) either before or after the meeting, each of the persons entitled to Vote, not present in person or by Proxy, signs either a written waiver of Notice, a consent to the holding of the meeting, or an approval of the minutes of the meeting. Attendance of a Member at a meeting shall constitute waiver of Notice, unless that Member objects, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be described in the Notice of the meeting and not so included, if the objection is expressly made at the meeting.

7.7. At all meetings of Members, a Member may Vote in person or by Proxy. Such Proxy shall be filed with the Manager before or at the time of the meeting, and may be filed by facsimile transmission to the Manager at the principal executive office of the Company or such other address as may be established by the Manager for such purposes.

7.8. Members may participate in a meeting through use of conference telephone or similar communications equipment, provided that all Members participating in such meeting can hear one another. Such participation shall be deemed attendance at the meeting.

7.9. Any action that may be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by Members having not less than the minimum

number of Votes that would be necessary to authorize or take that action at a meeting at which all Members entitled to Vote thereon were present and voted. If the Members are requested to consent to a matter without a meeting, each Member shall be given Notice of the matter to be voted upon in the manner described in Section 7.4. Any action taken without a meeting shall be effective when the required minimum number of Votes have been received. Prompt Notice of the action taken shall be given to all Members who have not consented to the action.

7.10. No Member acting solely in the capacity of a Member is an agent of the Company, nor can any Member acting solely in the capacity of a Member bind the Company or execute any instrument on behalf of the Company. Accordingly, each Member shall indemnify, defend, and save harmless each other Member and the Company from and against any and all loss, cost, expense, liability or damage arising from or out of any claim based upon any action by such Member in contravention of the first sentence of this Section 7.10.

## ARTICLE VIII: TRANSFERS OF MEMBERSHIP INTERESTS

8.1. A Member may withdraw from the Company at any time by giving Notice of withdrawal to the Manager at least 180 calendar days before the effective date of withdrawal. Withdrawal shall not release a Member from any obligations and liabilities under this Agreement accrued or incurred before the effective date of withdrawal. A withdrawing Member shall divest the Member's entire Membership Interest before the effective date of withdrawal in accordance and subject to the provisions of this Article VIII.

8.2. Except as expressly provided in this Agreement, a Member shall not Transfer any part of the Member's Membership Interest in the Company, whether now owned or later acquired, unless (a) the Membership Interest to be transferred, when added to the total of all other Membership Interests transferred in the preceding 12 months, will not cause the termination of the Company under the Code, and (b) the Manager approves (which approval must be unanimous if more than one Manager exists) the transferee's admission to the Company as a Member upon such Transfer. Except as expressly provided in this Agreement, a Member shall not Transfer any part of the Member's Membership Interest in the Company without satisfying the requirements of Section 8.3 below. No Member may Encumber or permit or suffer any Encumbrance of all or any part of the Member's Membership Interest in the Company unless such Encumbrance has been approved in writing by the Manager. Such approval may be granted or withheld in the Manager's sole discretion. Any such Transfer or Encumbrance of a Membership Interest without such approval shall be void. Notwithstanding any other provision of this Agreement to the contrary, a Member who is a natural person may transfer all or any portion of his or her Membership Interest to any revocable trust created for the benefit of the Member, or any combination between or among the Member, the Member's spouse, and the Member's issue; provided that the Member retains a beneficial interest in the trust and all of the Voting Interest included in such Membership Interest. A Transfer of a Member's beneficial interest in such trust, or failure to retain such Voting Interest, shall be deemed a Transfer of a Membership Interest. A Transfer of a Membership Interest to a Member's spouse, and/or issue that directly or indirectly results from the death or incapacity of such Member shall not be deemed to be a Transfer if such surviving spouse and issue only become Assignees of such Member's Membership Interest, which may be effected either before or after such death or disability. Written confirmation by such spouse and issue that they are only Assignees and have no voting rights shall satisfy the condition of the immediately preceding sentence, whether confirmed within a reasonable time after such death or disability or upon request of the Company, which request must be made by the Company prior to the first Vote following such death or disability.

8.3. If a Member wishes to transfer any or all of the Member's Membership Interest in the Company pursuant to a Bona Fide Offer (as defined below), the Member shall give Notice to the Manager at least 60 days in advance of the proposed sale or Transfer, indicating the terms of the Bona Fide Offer and the identity

of the offeror. The Company and the other Members shall have the option to purchase the Membership Interest proposed to be transferred at the price and on the terms provided in this Agreement. If the price for the Membership Interest is other than cash, the Fair Market Value in dollars of the price shall be as established in good faith by the Company. For purposes of this Agreement, "Bona Fide Offer" means an offer in writing setting forth all relevant terms and conditions of purchase from an offeror who is ready, willing, and able to consummate the purchase and who is not an Affiliate of the selling Member, and who provides to the Manager upon request reasonable proof of sufficient funds to close such transaction. For 60 days after the Notice is given, the Company shall have the right to purchase the Membership Interest offered, on the terms stated in the Notice, for the lesser of (a) the price stated in the Notice (or the cash price plus the dollar value of noncash consideration, as the case may be) and (b) the price determined to be the "Fair Market Value" under the appraisal procedures set forth in Section 8.8.

If the Company does not exercise the right to purchase all of the Membership Interest, then, with respect to the portion of the Membership Interest that the Company does not elect to purchase, that right shall be given to the other Members for an additional 30-day period, beginning on the day that the Company's right to purchase expires. Each of the other Members shall have the right to purchase, on the same terms, a part of the interest of the offering Member in the proportion that the Member's Percentage Interest bears to the total Percentage Interests of all of the Members who choose to participate in the purchase; provided, however, that the Company and the participating Members may not, in the aggregate, purchase less than the entire interest to be sold by the offering Member, and provided further that holders of the class of Units being sold shall have the right to purchase such Units in priority to Members holding other classes of Units.

If the Company and the other Members do not exercise their rights to purchase all of the Membership Interest, after written Notice by the Company of its and the other Member's election not to purchase the offered Units, or after expiration of the Company's and the Member's rights to purchase the offered units, but within 120 days from the date the Notice is given and on the terms and conditions stated in the Notice, the offering Member may sell or exchange that Membership Interest to the offeror named in the Notice. Unless the requirements of Section 8.2 are met, the offeror under this section shall become an Assignee, and shall be entitled to receive only the share of Profits, Losses or other compensation by way of income and the return of Capital Contribution to which the assigning Member would have been entitled. Any Assignee of a Membership Interest in the Company shall hold such Membership Interest in the Company subject to all of the provisions of this Agreement.

8.4. On the happening of any of the following events ("Triggering Events") with respect to a Member, the Company and the other Members shall have the option to purchase the Membership Interest in the Company of such Member (the "Selling Member") at the price and on the terms provided in Section 8.8 of this Agreement:

(a)    The bankruptcy, or withdrawal of a Member, or the winding up and dissolution of a corporate Member, or a change in the individuals or entities that directly or indirectly control a corporate member, or merger or other corporate reorganization of a corporate Member as a result of which the corporate Member does not survive as an entity; provided (if applicable to such bankruptcy, withdrawal, dissolution or reorganization) that the remaining Members have elected to continue the business of the Company as provided in Article IX, Section 9.1(a).

(b)    The failure of a Member to make the Member's required Capital Contribution pursuant to the provisions of Article III of this Agreement.

(c)    The occurrence of any other event that is, or that would cause, a Transfer in contravention of this Agreement.

Each such Member agrees to promptly give Notice of a Triggering Event to the Manager.

8.5.  Notwithstanding any other provisions of this Agreement:

(a)    If, in connection with the divorce or dissolution of the marriage of a Member, any court issues a decree or order that transfers, confirms, or awards a Membership Interest, or any portion thereof, to that Member's spouse (an "Award"), then, notwithstanding that such transfer would constitute an unpermitted Transfer under this Agreement, that Member shall have the right to purchase from his or her former spouse the Membership Interest, or portion thereof, that was so transferred, and such former spouse shall sell the Membership Interest or portion thereof to that Member at the price set forth below in Section 8.8 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the court award (for purposes of this paragraph, the "Expiration Date"), the Company and the other Members shall have the option to purchase from the former spouse the Membership Interest or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual Notice of the Award.

(b)    If, by reason of the death of a spouse of a Member, any portion of a Membership Interest is transferred to a transferee other than (1) that Member or (2) a trust created for the benefit of that Member (or for the benefit of that Member and any combination between or among the Member and the Member's issue) in which the Member is the sole Trustee and the Member, as Trustee or individually possesses all of the Voting Interest included in that Membership Interest, then the Member shall have the right to purchase the Membership Interest or portion thereof from the estate or other successor of his or her deceased spouse or transferee of such deceased spouse, and the estate, successor, or transferee shall sell the Membership Interest or portion thereof at the price set forth in Section 8.8 of this Agreement. If the Member has failed to consummate the purchase within 180 days after the date of death (for purposes of this paragraph, the "Expiration Date"), the Company and the other Members shall have the option to purchase from the estate or other successor of the deceased spouse the Membership Interest or portion thereof pursuant to Section 8.6 of this Agreement; provided that the option period shall commence on the later of (1) the day following the Expiration Date, or (2) the date of actual Notice of the death.

8.6.  On the receipt of Notice by the Manager as contemplated by Sections 8.1, 8.3, and 8.5, and on receipt of actual Notice of any Triggering Event as determined in good faith by the Members, the Company shall have the option, for a period ending 60 calendar days following the determination of the purchase price as provided in Section 8.8, to purchase the Membership Interest in the Company to which the option relates, at the price and on the terms set forth in Section 8.8 of this Agreement, and the other Members, pro rata in accordance with their prior Membership Interests in the Company, shall then have the option, for a period of 30 days thereafter, to purchase the Membership Interest in the Company not purchased by the Company, on the same terms and conditions as apply to the Company. If all other Members do not elect to purchase the entire remaining Membership Interest in the Company, then the Members electing to purchase shall have the right, pro rata in accordance with their prior Membership Interest in the Company, to purchase the additional Membership Interest in the Company available for purchase. If the Company and the other Members do not exercise their rights to purchase all of the Membership Interest with respect to a proposed Transfer under Section 8.4 above, the offering Member may, within 120 days from the date the Notice is given and on the terms and conditions stated in the Notice, sell or exchange that Membership Interest to the offeror named in the Notice. Unless the requirements of Section 8.2 are met, the offeror under this section shall become an Assignee, and shall be entitled to receive only the share of Profits or other compensation by way of income and the return of Capital Contribution to which the assigning Member would have been entitled. The Assignee of the Membership Interest in the Company that is not purchased shall hold such Membership Interest in the Company subject to all of the provisions of this Agreement.

26

8.7. Neither the Member whose interest is subject to purchase under this Article, nor such Member's Affiliate, shall participate in any Vote or discussion of any matter pertaining to the disposition of the Member's Membership Interest in the Company under this Agreement.

8.8. The purchase price of the Membership Interest that is the subject of an option under Section 8.6 or any other section herein shall be the "Fair Market Value" of the interest as determined under this Section 8.8. "Fair Market Value" means the cash price that a willing buyer would pay to a willing seller when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts on the date the option is first exercisable (the "Option Date"). Each of the selling and purchasing parties shall use his, her, or its best efforts to mutually agree upon the Fair Market Value. If the parties are unable to so agree within 30 days of the Option Date, the selling party and the purchasing party(ies) shall each appoint, within 40 days of the Option Date, one appraiser. The two appraisers shall within a period of five additional days, agree upon and appoint an additional appraiser. Each of the three appraisers shall, within 60 days after the appointment of the third appraiser, determine the Fair Market Value of the Membership Interest in writing and submit their reports to all the parties. The appraisers shall determine the Fair Market Value of a Membership Interest by calculating the amount that the selling party(ies) would receive in dissolution of the Company if all property and assets owned by the Company were sold for their fair market value (subject to normal marketing costs, commissions, closing costs that would be incurred upon sale, and all monetary liens, encumbrances, and other charges against said property and/or assets were paid). The Fair Market Value shall be determined by disregarding the appraiser's valuation that diverges the greatest from each of the other two appraisers' valuations, and the arithmetic mean of the remaining two appraisers' valuations shall be the Fair Market Value. The selling party and the purchasing party(ies) shall each pay for the services of the appraiser selected by them, plus one half of the fee charged by the third appraiser, and one half of all other costs relating to the determination of Fair Market Value. The option purchase price as so determined shall be payable in cash. Notwithstanding anything herein to the contrary, the time period in which a party may exercise any right to purchase a Membership Interest shall be extended by the a number of days equal to the number of days following a notice of such right, or a Triggering Event, which is in excess of ten calendar days, during which the parties have not agreed upon the purchase price, or during which the purchase price has not been determined by appraisal hereunder.

8.9. Except as expressly permitted under Section 8.2, a prospective transferee (other than an existing Member) of a Membership Interest may be admitted as a Member with respect to such Membership Interest (a "Substituted Member") only (a) if the Manager approves of the prospective transferee's admission as a Member, and (b) on such prospective transferee executing a counterpart of this Agreement as a party hereto. Any prospective transferee of a Membership Interest shall be deemed an Assignee, and, therefore, the owner of only an Economic Interest until such prospective transferee has been admitted as a Substituted Member. Except as otherwise permitted in the Act, any such Assignee shall be entitled only to receive allocations and distributions under this Agreement with respect to such Membership Interest and shall have no right to Vote or exercise any rights of a Member until such Assignee has been admitted as a Substituted Member. Until the Assignee becomes a Substituted Member, the Assigning Member will continue to be a Member and to have the power to exercise any rights and powers of a Member under this Agreement, including the right to Vote in proportion to the Voting Interest that the Assigning Member would have had in the event that the assignment had not been made.

8.10. Any person admitted to the Company as a Substituted Member shall be subject to all the provisions of this Agreement that apply to the Member from whom the Membership Interest was assigned, provided, however, that the assigning Member shall not be released from liabilities as a Member solely as a result of the assignment, both with respect to obligations to the Company and to third parties, incurred prior to the assignment.

8.11. The Manager, in its sole and absolute discretion, shall have the right to waive any rights to purchase Membership Interests set forth in this Article VIII, in its sole and absolute discretion, and such waiver may have the effect of terminating other Member's purchase rights hereunder.

**8.12. THE INITIAL SALE OF MEMBERSHIP INTERESTS IN THE COMPANY TO THE INITIAL MEMBERS HAS NOT BEEN QUALIFIED OR REGISTERED UNDER THE SECURITIES LAWS OF ANY STATE, INCLUDING CALIFORNIA, OR REGISTERED UNDER THE SECURITIES ACT OF 1933, IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION PROVISIONS OF THOSE LAWS. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, MEMBERSHIP INTERESTS MAY NOT BE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAW UNLESS, IN THE OPINION OF LEGAL COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION OR REGISTRATION IS NOT REQUIRED. THE MEMBER WHO DESIRES TO TRANSFER A MEMBERSHIP INTEREST SHALL BE RESPONSIBLE FOR ALL LEGAL FEES INCURRED BY THE COMPANY IN CONNECTION WITH SAID OPINION.**

## ARTICLE IX: DISSOLUTION AND WINDING UP

9.1. The Company shall be dissolved upon the first to occur of the following events:

(a)    The death, incapacity, bankruptcy, withdrawal, or dissolution of any Manager, provided, however, that the remaining Members may by the Vote of one or more Members holding more than 50% of the current interests in (i) current Profits (as measured by the percentage of profits allocated to such Member(s) during the most recent complete fiscal year in which the Company reported Profits) and (ii) the capital interests of the Company (as measured by their Capital Account balance(s) as of the end of the most recent fiscal year of the Company), within 90 days of the happening of that event Vote to continue the business of the Company, in which case, the Company shall not dissolve. If the remaining Members fail to so Vote, the remaining Members shall wind up the Company. For purposes of this Paragraph (a), the Percentage Interest of the Manager shall not be taken into account;

(b)    The expiration of the term of existence of the Company;

(c)    The written agreement by a Majority of Members to dissolve the Company;

(d)    The sale or other disposition of all or substantially all of the Company's assets; or

(e)    Entry of a decree of judicial dissolution under LLC Code Section 18-802.

9.2. On the dissolution of the Company, the Company shall engage in no further business other than that necessary to wind up the business and affairs of the Company. The Managers who have not wrongfully dissolved the Company or, if there is no such Manager, the Members, shall wind up the affairs of the Company. The Persons winding up the affairs of the Company shall give Notice of the commencement of winding up by mail to all known creditors and claimants against the Company whose addresses appear in the records of the Company. After paying or adequately providing for the payment of all known debts of the Company (except debts owing to Members), the remaining assets of the Company shall be distributed or applied in the following order:

(a)    To pay the expenses of liquidation.

28

PECAS, LLC
Amended and Restated Operating Agreement

(b)    To the establishment of reasonable reserves by the Manager for contingent liabilities or obligations of the Company.  Upon the Manager's determination that such reserves are no longer necessary, said reserves shall be distributed as provided in this Section 9.2.

(c)    To repay outstanding loans owned to Members.  If there are insufficient funds to pay such loans in full, each Member shall be repaid in the ratio that the Member's loan, together with interest accrued and unpaid thereon, bears to the total of all such loans from Members, including all interest accrued and unpaid thereon.  Such repayment shall first be credited to accrued and unpaid interest due and the remainder shall be credited to principal.

(d)    Among the Members with Positive Capital Account Balances as provided in Article IV, Section 4.14, after giving effect to the allocations required under Section 4.16.

9.3.    Each Member shall look solely to the assets of the Company for the return of the Member's investment, and if the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the investment of each Member, such Member shall have no recourse against any other Members or the Manager for indemnification, contribution, or reimbursement, except as specifically provided in this Agreement.


ARTICLE X: INDEMNIFICATION, ARBITRATION, MEDIATION AND EXCULPATION

10.1.  Indemnification.

(a)    To the fullest extent permitted by law as it currently exists and to such greater extent as applicable law hereafter may permit, but subject to the limitations expressly provided in this Agreement, the Company shall indemnify any Person who was or is a party or is threatened to be made a party to, or otherwise requires representation of counsel in connection with, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company) by reason of the fact that such Person (i) is or was a Manager or an officer of the Company, or, (ii) while serving as a Manager or officer of the Company, is or was serving as a Tax Matters Member or, at the request of the Company, as a director, officer, tax matters partner, employee, partner, manager, fiduciary or trustee of any other Person, or (iii) any other employee or agent of Company provided that such indemnification has been approved by the Manager (each an "Indemnitee") or by reason of any action alleged to have been taken or omitted in such capacity, against losses, expenses (including attorneys' fees), judgments, fines, damages, penalties, interest, liabilities and amounts paid in settlement actually and reasonably incurred by the Person in connection with such action, suit or proceeding if the Person acted in good faith and in a manner the Person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such Person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which the Person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the Person's conduct was unlawful.

(b)    To the fullest extent permitted by law, but subject to the limitations expressly provided in this Agreement, the Company shall indemnify any Person who was or is a party or is threatened to be made a party to, or otherwise requires representation of counsel in connection with, any threatened, pending or completed action, suit or proceeding, by or in the right of the Company to procure a judgment in

29

PECAS, LLC
Amended and Restated Operating Agreement

its favor by reason of the fact that such Person was serving as an Indemnitee, or by reason of any action alleged to have been taken or omitted in such capacity, against losses, expenses (including attorneys' fees), judgments, fines, damages, penalties, interest, liabilities and amounts paid in settlement actually and reasonably incurred by the Person in connection with such action, suit or proceeding if the Person acted in good faith and in a manner the Person reasonably believed to be in or not opposed to the best interests of the Company and except that no indemnification shall be made in respect of any claim, issue or matter as to which such Person shall have been adjudged to be liable to the Company unless and only to the extent that the Delaware Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Person is fairly and reasonably entitled to indemnity for such expenses which the Delaware Court of Chancery or such other court shall deem proper.

(c)    To the extent an Indemnitee has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in <u>Section 10.1(a)</u> or <u>Section 10.1(b)</u>, or in the defense of any claim, issue or matter therein, such Person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such Person in connection therewith.

(d)    Any indemnification under <u>Section 10.1(a)</u> or <u>Section 10.1(b)</u> (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the Indemnitee is proper in the circumstances because the Person has met the applicable standard of conduct set forth in such section. Such determination shall be made, with respect to a Person who is a Manager or officer of the Company at the time of such determination, (i) by a majority vote of any other Manager who are not parties to such action, suit or proceeding, even though less than a quorum, (ii) if no such Manager exists, or if the Manager so directs, by independent legal counsel in an opinion of counsel, or (iii) by a Majority of the the Members with a Voting Interest.

(e)    Expenses (including attorneys' fees) incurred by an Indemnitee in defending any action, suit or proceeding referred to in <u>Section 10.1(a)</u> or <u>Section 10.1(b)</u> shall be paid by the Company in advance of the final disposition of such action, suit or proceeding and in advance of any determination that such Indemnitee is not entitled to be indemnified, upon receipt of an undertaking by or on behalf of such Indemnitee to repay such amount if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (a "Final Adjudication") that such Person is not entitled to be indemnified by the Company as authorized in this <u>Section 10.1</u>.

(f)    The indemnification, advancement of expenses and other provisions of this <u>Section 10.1</u> shall be in addition to any other rights to which an Indemnitee may be entitled under any agreement, pursuant to any vote of the holders of a Majority of the Members, as a matter of law or otherwise, both as to actions in the Indemnitee's capacity as an Indemnitee and as to actions in any other capacity, and shall continue as to an Indemnitee who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of the Indemnitee.

(g)    The Company may purchase and maintain insurance, on behalf of its Manager and officers, and such other Persons as the Manager shall determine, against any liability that may be asserted against or expense that may be incurred by such Person in connection with the Company's activities or such Person's activities on behalf of the Company, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.

(h)    For purposes of the definition of Indemnitee in <u>Section 10.1(a)</u>, the Company shall be deemed to have requested a Person to serve as fiduciary of an employee benefit plan whenever the performance by such Person of his duties to the Company also imposes duties on, or otherwise involves services by, such Person to the plan or participants or beneficiaries of the plan; excise taxes assessed on an

30

Indemnitee with respect to an employee benefit plan pursuant to applicable law shall constitute "fines" within the meaning of Section 10.1(a); and action taken or omitted by such Person with respect to any employee benefit plan in the performance of such Person's duties for a purpose reasonably believed by him to be in the interest of the participants and beneficiaries of the plan shall be deemed to be for a purpose that is in, or not opposed to, the best interests of the Company.

(i)    Any indemnification pursuant to this Section 10.1 shall be made only out of the assets of the Company, it being agreed that the Members shall not be personally liable for such indemnification and shall have no obligation to contribute or loan any monies or property to the Company to enable it to effectuate such indemnification.

(j)    An Indemnitee shall not be denied indemnification in whole or in part under this Section 10.1 because the Indemnitee had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by the terms of this Agreement.

(k)    If a claim under Section 10.1 of this Agreement is not paid in full by the Company within 60 days after a written claim has been received by the Company, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the Indemnitee may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim. If successful in whole or in part in any such suit, or in a suit brought by the Company to recover an advancement of expenses pursuant to the terms of an undertaking, the Indemnitee shall be entitled to be paid also the reasonable expenses of prosecuting or defending such suit. In (i) any suit brought by the Indemnitee to enforce a right to indemnification hereunder (but not in a suit brought by the Indemnitee to enforce a right to an advancement of expenses) it shall be a defense that, and (ii) in any suit brought by the Company to recover an advancement of expenses pursuant to the terms of an undertaking, the Company shall be entitled to recover such expenses upon a Final Adjudication that, the Indemnitee has not met any applicable standard for indemnification set forth in this Agreement. Neither the failure of the Company (including its Manager and officers who are not parties to such action, independent legal counsel, or its Members) to have made a determination prior to the commencement of such suit that indemnification of the Indemnitee is proper in the circumstances because the Indemnitee has met the applicable standard of conduct set forth in this Agreement, nor an actual determination by the Company (including its Manager and officers who are not parties to such action, independent legal counsel, or its Members) that the Indemnitee has not met the applicable standard of conduct shall create a presumption that the Indemnitee has not met the applicable standard of conduct, or, in the case of such a suit brought by the Indemnitee, be a defense to such suit. In any suit brought by the Indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Company to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified or to such advancement of expenses, under this Section 10.1 or otherwise shall be on the Company.

(l)    The Company may indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (whether or not an action by or in the right of the Company) by reason of the fact that the Person is or was an employee (other than an officer) or agent of the Company, or, while serving as an employee (other than an officer) or agent of the Company is or was serving at the request of the Company as a director, officer, employee, partner, fiduciary, trustee or agent of a subsidiary or another Person to the extent (i) permitted by the laws of the State of Delaware as from time to time in effect, and (ii) authorized by the Manager. The Company may, to the extent permitted by Delaware law and authorized by the Manager, pay expenses (including attorneys' fees) reasonably incurred by any such employee or agent in defending any civil, criminal, administrative or investigative action, suit or proceeding in advance of the final disposition of such action, suit or proceeding, upon such terms and conditions as the Manager

31

determines. The provisions of this Section 10.1(l) shall not constitute a contract right for any such employee or agent.

(m)    The indemnification, advancement of expenses and other provisions of this Section 10.1 are for the benefit of the Indemnitees, their heirs, successors, assigns and administrators and shall not be deemed to create any rights for the benefit of any other Persons.

(n)    Except to the extent otherwise provided in Section 10.1(l), the right to be indemnified and to receive advancement of expenses in this Section 10.1 shall be a contract right. No amendment, modification or repeal of this Section 10.1 or any provision hereof shall in any manner terminate, reduce or impair the right of any past, present or future Indemnitee to be indemnified by the Company, nor the obligations of the Company to indemnify any such Indemnitee under and in accordance with the provisions of this Section 10.1 as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

(o)    The Board Members, acting alone and without the approval of any Member, in the event of any amendment to Section 145 of the Delaware General Corporation Law ("DGCL") or the amendment or addition of any other provision of the DGCL relating to indemnification by Delaware corporations of Persons of the type referenced in this Section 10.1, may amend this Agreement to, entirely or in part, reflect such amendment or addition in the indemnification provisions of this Agreement.

10.2.    Arbitration and Mediation. In the event a dispute arises between the parties in connection with this Agreement, before resorting to any other legal remedy, the parties shall attempt in good faith to resolve such dispute promptly by negotiation between the parties or their designated representative. If the parties are unable to resolve the dispute by negotiation within 10 business days, then before resorting to any other legal remedy, the parties shall attempt in good faith to resolve such dispute by mediation in accordance with the commercial mediation rules of the American Arbitration Association ("AAA"). The mediation shall be conducted by a mediator selected by mutual agreement of the parties. If the parties are unable to agree upon a mediator within 10 days of the initiation of mediation, either party may request that the AAA appoint a mediator with experience in commercial disputes. Whether or not a mediation is terminated through settlement, a termination declaration by a party, or a declaration by the mediator that further efforts are no longer worthwhile, the cost of mediation shall be borne so that the demanding party and the other party share such costs equally. In the event that any party to mediation desires to be represented, that party shall bear any costs associated with such representation. No party hereto may terminate a mediation unless the mediation has been ongoing for at least forty-five (45) days and that party has given each other party hereto, and the mediator, at least ten (10) business days prior written notice of that party's intention to terminate such mediation. Subject to the requirements of the immediately preceding sentence, if the matter has not been resolved by mediation within sixty (60) days of the commencement of such procedure (which period may be extended by mutual agreement), either party may terminate mediation and invoke arbitration by providing notice to the other party. If either party invokes arbitration, the dispute shall be settled by binding arbitration in accordance with the commercial arbitration rules of the AAA, by one (1) arbitrator selected by mutual agreement of the parties. If the parties are unable to agree upon an arbitrator within 20 days after the date on which arbitration is invoked, either party may request appointment of an arbitrator by the AAA. Judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The place of arbitration shall be Los Angeles County, California. The statute of limitations that governs any matter submitted to mediation pursuant to this section shall be tolled during the period that commences on the date that the mediation notice is sent by one party to the other and ends when the mediation is terminated. Nothing contained in this section shall be interpreted to prevent a party from filing a cross complaint or counter suit against another party. Nothing provided for in this section shall prohibit or limit the right of any party to

32

pursue injunctive relief, any other relief to preserve the status quo or the enforcement of an award of arbitrators in any court or for the right of any party to exercise self-help remedies such as setoff, foreclosure against or sale of any real or personal property collateral or security, or to obtain provisional or ancillary remedies from a court of competent jurisdiction before, after, or during the pendency of any arbitration or other proceeding. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to mediation or arbitration if any other party contests such action for judicial relief. The parties shall continue to observe and perform their obligations hereunder during the mediation proceedings and any arbitration proceeding, pending the final outcome thereof.

    10.3   <u>Exculpation</u>.

    (a)   Notwithstanding anything to the contrary set forth in this Agreement, no Manager or officer of the Company shall be liable to the Company or to the Members or to any holder of Units for monetary damages for breach of fiduciary duty as a Manager or officer of the Company, except

    (i)   for a breach of such Person's duty of loyalty to the Company or the Members (as such duty has been limited under the terms of this Agreement);

    (ii)   for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; or

    (iii)   for any transaction from which such Person derived an improper personal benefit.

    If the DGCL is amended after the date of this Agreement to authorize Delaware corporations to further eliminate or limit the personal liability of directors of Delaware corporations beyond that permitted under Section 102(b)(7) of the DGCL, then the liability of a Manager or officer of the Company to the Company or the Unit holders, in addition to the personal liability limitation provided herein, shall be further limited to the fullest extent permitted under the DGCL as so amended.

    (b)   Subject to the obligations and duties of the Manager set forth in this Article X, the Manager may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its agents, and the Manager shall not be responsible for any misconduct or negligence on the part of any such agent appointed by the Manager in good faith.

    (c)   To the extent that, at law or in equity, an Indemnitee has duties (including fiduciary duties) and liabilities relating thereto to the Company or to the Members, the Manager and any other Indemnitee acting in connection with the Company's business or affairs shall not be liable to the Company or to any Member for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict or eliminate or otherwise modify the duties (including fiduciary duties) and liabilities of an Indemnitee otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Indemnitee.

    (d)   Any amendment, modification or repeal of this <u>Section 10.3</u> or any provision hereof shall be prospective only and shall not in any way affect the limitations on the liability of any Indemnitee under this <u>Section 10.3</u> as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

ARTICLE XI: ATTORNEY-IN-FACT AND AGENT

11.1. Each Member, by execution of this Agreement, by executing a subscription agreement to purchase a class of Units, or by acquiring its Membership Interest subject to the terms and conditions of this Agreement, irrevocably constitutes and appoints the Manager, with full power of substitution in the premises, as such Member's true and lawful attorney-in-fact and agent, with full power and authority in such Member's name, place, and stead to execute, acknowledge, deliver, swear to, file or record in any appropriate public office any documents necessary or appropriate to carry out the provisions of this Agreement including, but not limited to: (a) any certificate or other instrument (including counterparts of this Agreement), and any amendment thereof, which the Manager deems necessary, desirable, or appropriate to form, qualify or continue the Company as a limited liability company in the State of Delaware or to transact business as such in any jurisdiction in which the Company conducts business, or in which formation, qualification or continuation is, in the opinion of the Manager, necessary or desirable to protect the limited liability of the Members; (b) any amendment to this Agreement adopted in accordance with its terms, and all instruments which the Manager deems appropriate to reflect a change or modification of the Company in accordance with the terms of this Agreement; (c) any certificate or amendment to the Company's Certificate of Formation or to any certificate or other instrument that may be necessary, desirable, or appropriate to reflect an amendment approved or made in accordance with the provisions of this Agreement; (d) any certificates, instruments or conveyances that the Manager deems to be necessary, desirable, or appropriate to implement the provisions of this Agreement or to reflect the dissolution and winding up of the Company; and (e) any certificates necessary to comply with the provisions of this Agreement. The appointment by each of the Members of the Manager as its attorney-in-fact shall be deemed to be a power coupled with an interest, in recognition of the fact that each of the Members under this Agreement will be relying upon the power of the Manager to act as contemplated by this Agreement in any filing and other action by it on behalf of the Company, and shall survive and shall not be affected by the subsequent bankruptcy, death, adjudication of incompetence or insanity, disability, incapacity or dissolution of any Person hereby giving the power nor by the Transfer or assignment of all or any part of the Economic Interest of any such Member or other Person. The foregoing power of attorney shall survive the Transfer by a Member of all of its Economic or Membership Interest (upon admission of an Assignee), whether or not the Transferee ultimately executes this Agreement. Notwithstanding the existence of this power of attorney, each Member agrees to join in the execution, acknowledgment, and delivery of the instruments referred to above if requested to do so by the Manager. This power of attorney is a limited power of attorney and does not authorize any Member to act on behalf of any other Member except as described in this Article XI.

ARTICLE XII: ADOPTION OF AMENDMENTS

12.1. In addition to the amendments authorized herein, amendments may be made to this Agreement from time to time by Members who constitute a Super-Majority of the Voting Interests; provided that no such amendment shall, without the consent of the Manager, alter the rights, power, duties or compensation of the Manager or any of its Affiliates interest in Profits and Losses, Available Cash or alter any of the provisions of Article IV or Article IX or this Section 12.1.

12.2. In addition to the amendments otherwise authorized herein, amendments may be made to this Agreement from time to time by the Manager, without the consent of any of the Members: (i) to add to the representations, duties or obligations of the Manager or surrender any right or power granted to the Manager herein, for the benefit of the Members; (ii) to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement which will not be inconsistent with the

34

provisions of this Agreement; (iii) to delete or add any provision of this Agreement required to be deleted or added by the staff of the Securities and Exchange Commission or other Federal agency or by a state "Blue Sky" commissioner or similar official and deemed by the Securities and Exchange Commission, agency, commissioner or official to be for the benefit or protection of the Members, or (iv) to add additional Members.

In addition to the amendments otherwise authorized herein, amendments may be made to this Agreement without the Consent of any Member with respect to the provisions of Article IV of this Agreement in accordance with the provisions of that article that provide for certain amendments to this Agreement.

12.3. In making any amendments, there shall be prepared and filed for recordation by the Manager all documents and certificates required to be prepared and filed under the Act and under the laws of any other jurisdictions under the laws of which the Company is then formed or qualified.

## ARTICLE XIII: GENERAL PROVISIONS

13.1. This Agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this Agreement, and, except as otherwise specifically provided for herein, this Agreement shall not be modified or amended in any respect except by a written instrument executed by all the parties. This Agreement replaces and supersedes all prior written and oral agreements by and among the Members and Managers or any of them.

13.2. This Agreement and any attachments and exhibits hereto may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The exhibits to this Agreement are hereby incorporated into this Agreement.

13.3. This Agreement shall be construed and enforced in accordance with the internal laws of the State of Delaware. If any provision of this Agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this Agreement shall remain in effect. The language of this Agreement shall be construed as a whole according to its fair meaning, and not strictly for or against any party. This Agreement is to be deemed to have been prepared jointly by the Members and if any inconsistencies or ambiguities exist herein they shall not be interpreted or construed against any party as the drafter.

13.4. This Agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

13.5. Whenever used in this Agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this Agreement may require. The word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to."

13.6. The parties to this Agreement shall promptly execute and deliver any and all additional documents, instruments, Notices, and other assurances, and shall do any and all other acts and things, reasonably necessary in connection with the performance of their respective obligations under this Agreement and to carry out the intent of the parties.

35

13.7.  Except as specifically provided in this Agreement, no provision of this Agreement shall be construed to limit in any manner the Members (including, without limitation, the original Manager of the Company, whether acting in his capacity as the Manager or as a Member) in the carrying on their own respective businesses or activities, whether or not such businesses or activities compete with the business of the Company.

13.8.  Except as provided in this Agreement, no provision of this Agreement shall be construed to constitute a Member, in the Member's capacity as such, the agent of any other Member.

13.9.  Each Member represents and warrants to the other Members that the Member has the capacity and authority to enter into this Agreement.

13.10.  The article, section, and paragraph titles and headings contained in this Agreement are inserted as matter of convenience and for ease of reference only and shall be disregarded for all other purposes, including the construction or enforcement of this Agreement or any of its provisions.

13.11.  Except as otherwise specifically provided for herein, this Agreement may be altered, amended, or repealed only by a writing signed by Members representing a Super-Majority of the Class A Units.

13.12.  Time is of the essence of every provision of this Agreement that specifies a time for performance.

13.13.  This Agreement is made solely for the benefit of the parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement, including without limitation the equity holders of any entity that is a Member.

13.14.  Each Unit holder irrevocably submits to the exclusive jurisdiction of the United States District Court for the Central District of California, located in Los Angeles County, California and the state courts of the State of California, sitting in Los Angeles County, California, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby, and agrees that any suit, action or other proceeding shall be filed in the a courthouse located in Santa Monica, California or the closest courthouse to Santa Monica, California where such suit, action or other proceeding may properly be filed. Each Unit holder further agrees that service of any process, summons, notice or document by U.S. certified or registered mail to such Unit holder's respective address set forth on attached Exhibit B shall be effective service of process in any action, suit or proceeding in Los Angeles County, California with respect to any matters to which it has submitted to jurisdiction as set forth above in the immediately preceding sentence. Each Unit holder irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the United States District Court for the Central District of California, located in Los Angeles County, California or the state courts of the State of California, sitting in Los Angeles County, California, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum. If and to the extent that due to the location of the Land in Riverside County, California an action is only permitted to be filed in that county, the foregoing shall not prohibit such filing.

13.15.  In connection with and for purposes of calculating Profits and Losses of the Company and distributions of the Company, all of the following expenses shall, without limitation, be costs and expenses of the Company:

    a.    All costs and expenses incurred, including, without limitation, attorney fees, in connection with the preparation of this Agreement and the completion of the transactions contemplated hereby.

    b.    All costs and expenses incurred, including, without limitation, attorneys fees, in connection with the preparation of the Purchase Agreement and entering into and pursuing the transactions contemplated thereby.

    c.    All costs and expenses incurred, including, without limitation, attorneys fees, in connection with protecting the Land, including, without limitation, satisfying the Perez Judgment and recovering a portion of the Land from beneficiary who received an interest in the Land (or a portion thereof) pursuant to a Trustee's Sale held on December 28, 2012 (as each term is defined in the Purchase Agreement).

    d.    All costs and expenses incurred to, and all charges and billings for legal services from Reid Breitman and any law firm with which he is associated, including without limitation, Corporate Legal Services, LLP. Notwithstanding any charges for which the Company is responsible, neither Reid Breitman nor any law firm that he is associated with will be considered legal counsel for the Company unless and until the Company enters into a written retainer agreement with such law firm specifically stating that the Company is the client under such retainer agreement.

13.16. EACH MEMBER, MANAGER AND UNIT HOLDER ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT THEY HAVE BEEN ADVISED TO CONSULT WITH THEIR OWN ATTORNEY REGARDING THIS AGREEMENT AND THAT EACH HAS DONE SO TO THE EXTENT THAT HE, SHE OR IT CONSIDERS NECESSARY OR HAS WAIVED THEIR RIGHT TO DO SO. IN CONNECTION WITH THE FOREGOING, EACH MEMBER, MANAGER AND UNIT HOLDER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT THE LAW FIRM OF FREDMAN LIEBERMAN LLP, AND ALL ATTORNEYS ASSOCIATED WITH THAT LAW FIRM, REPRESENT REID BREITMAN AND OMER IVANIR ONLY.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Agreement as of the date set forth above.

**Initial Member:**

Lake Mathews Mineral Properties, Ltd,
a California limited partnership

By: Lawrence Holmes Senior Mining, Inc.,
       a California corporation, General Partner

By: _James D. Holmes_
        James D. Holmes,
        President and Secretary

**Company:**

PECAS, LLC,
a Delaware limited liability company

By: _James D. Holmes_
       James D. Holmes, Original Manager

**Additional Member:**

Lake Mathews Holdings, LLC,
a Delaware limited liability company

By:    Poseidon Capital, LLC,
        a California limited liability company,
        Manager

By: _____
       Reid Breitman, Co-Manager

By: _____
       Omer Ivanir, Co-Manager

**GSP:**

George Smith Partners, Inc.,
a California corporation, as Class C Unit
Holder

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

*The foregoing transaction is
hereby approved*

*By:* _Shirley Smith_
       *Shirley Smith, Class C Partner*

38

Original Manager hereby appoints Poseidon Capital, LLC, a California limited liability company as the Manager of the Company and immediately thereafter, subject only to the acceptance of such appointment, Original Manager hereby withdraws and resigns as Manager of the Company:

James D. Holmes, Original Manager

Shirley Smith, Class C member Partner

The undersigned hereby accepts its appoint as Manager of the Company, and hereby becomes a signatory to this Agreement

**Manager:**

Poseidon Capital, LLC,
a California limited liability company,

By: _____
Reid Breitman, Co-Manager

By: _____
Omer Ivanir, Co-Manager

**EXHIBIT "A"**

**CERTIFICATE OF FORMATION**

# Delaware

PAGE  1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF FORMATION OF "PECAS, LLC", FILED IN

THIS OFFICE ON THE NINTH DAY OF JANUARY, A.D. 2013, AT 2:11

O'CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 0134363

DATE: 01-10-13

5272197  8100

130029824

You may verify this certificate online
at corp.delaware.gov/authver.shtml

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 02:14 PM 01/09/2013*
*FILED 02:11 PM 01/09/2013*
*SRV 130029824 - 5272197 FILE*

## CERTIFICATE OF FORMATION
## OF
## PECAS, LLC

This Certificate of Formation of PECAS, LLC, dated as of January 9, 2013, is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act.

FIRST:        The name of the limited liability company formed hereby is:

PECAS, LLC

SECOND:     The address of its registered office in the State of Delaware is 2711 Centerville Road, Suite 400, Wilmington, New Castle County, Delaware, 19808. The name of its registered agent at such address is Corporation Service Company.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

By: /s/ Jim Maxson _____
Authorized Representative

7802873 v01

EXHIBIT "B"

## MEMBERS/ECONOMIC INTEREST HOLDERS

| Member | Units Owned |
|---|---|
| Initial Member: | |
| Lake Mathews Mineral Proeprties, Ltd., <br> a California limited partnership <br> 3845 Midway Avenue <br> Culver City, California 90232 <br> Attention: James D. Holmes | 25 Class B Units |
| Additional Members: | |
| Lake Mathews Holdings, LLC, <br> a Delaware limited liability company <br> 17606 Camino De Yatasto <br> Pacific Palisades, California 90272 <br> Attention: Reid Breitman | 69 Class A Units |
| Poseidon Capital, LLC <br> a Delaware limited liability company <br> 17606 Camino De Yatasto <br> Pacific Palisades, California 90272 <br> Attention: Reid Breitman | 1 Class A Unit |
| Economic Interest Holder: | |
| George Smith Partners, Inc., <br> a California corporation <br> 10250 Constellation Boulevard, Suite 2700 <br> Los Angeles, California 90067 | 5 Class C Units |

## EXHIBIT "C"

## CAPITAL CONTRIBUTIONS

| Unit Holder (Member/Economic Interest Holder) | Contribution | Class A Units | Class B Units | Class C Units | Voting Interest |
|---|---|---|---|---|---|
| Lake Mathews Mineral Proeprties, Ltd., a California limited partnership 3845 Midway Avenue Culver City, California 90232 Attention: James D. Holmes | All Assets of Member, as provided for in the Purchase Agreement, including, without limitation the Land and claims against third parties | | 25 Class B Units | | -0-% |
| Lake Mathews Holdings, LLC,  a Delaware limited liability company 17606 Camino De Yatasto Pacific Palisades, CA 90272 Attention: Reid Breitman | $247,500 | 69 Class A Units | | | 98.57% |
| Poseidon Capital, LLC a Delaware limited liability company 17606 Camino De Yatasto Pacific Palisades, CA 90272 Attention: Reid Breitman | $2,500 | 1 Class A Unit | | | 1.43% |
| George Smith Partners, Inc., a California corporation | $100 | | | 5 Class C Units | -0-% |
| Total | $250,100 | 70 Units | 25 Units | 5 Units | 100% |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "2"

[Debtor's Cross Complaint in Rescission Action]

1   DENNIS PALMIERI
    Counselor and Attorney - SBN 103346

2   P.O. Box 2465
    Malibu, CA, 90265

3   Tel: (310) 457-7000
    E-mail: Callondennis@gmail.com

4   Attorney For Defendant and Cross Complainants

5   Lake Mathews Mineral Properties, Ltd. and
    Lawrence Holmes Senior Mining, Inc.

6

7

8                    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                         IN AND FOR THE COUNTY OF LOS ANGELES

10  PECAS, LLC, A Delaware Limited          ) Cause No.   BC 600724
    Liability Company, and LAKE MATHEWS     ) [Assigned for all purposes to Dept. 17
11                                          ) The Honorable Richard E. Rice]
    HOLDINGS, a Delaware Limited Liability  )
12  Company                                 )
                                            )
13            Plaintiffs                    ) CROSS COMPLAINT FOR
                                            )
14  vs.                                     ) 1. RESCISSION
                                            ) 2. VIOLATION OF CALIFORNIA
15  LAKE MATHEWS MINERAL                    )    BUSINESS AND PROFESSIONS CODE § 17200
    PROPERTIES, LTD, a California           )    UNFAIR COMPETITION FOR AN
16  Limited Partnership, LAWRENCE           )    UNLAWFUL BUSINESS PRACTICE AND
    HOLMES SENIOR MINING, a California      )    FOR AN UNFAIR BUSINESS PRACTICE
17  Corporation, JAMES D. HOLMES, an        ) 3. DECLARATORY RELIEF
    individual, SHIRLEY SMITH, an           )
18  individual, and DOES 1-100, inclusive   )
                                            )
19            Defendants                    )
                                            )
20  _____     )
    LAKE MATHEWS MINERAL                    )
21  PROPERTIES, LTD, a California           )
    Limited Partnership, LAWRENCE           )
    HOLMES SENIOR MINING, INC.             )
22                                          )
            Cross Complainants              )
23                                          )
    PECAS, LLC, LAKE MATHEWS                )
24  HOLDINGS, LLC,  REID BREITMAN,          )
    OMER IVANIR, GARY TENZER               )
25  and DOES 1-100, inclusive               )
                                            )
26          Cross Defendants                )
                                            )
27  _____     )

28  ///

                                        -1-

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JAN 1 5 2016

Sherri R. Carter, Executive Officer/Clerk
By Shaunya Bolden, Deputy

## NATURE OF THE ACTION

1

2      This action is brought by Lake Mathews Mineral Properties, Ltd. ("LMMP") and its general

3 partner, Lawrence Holmes Senior Mining, Inc. ("LHSM") on behalf of its creditors, investors and

4 shareholders, against PECAS, LLC ("PECAS"), Lake Mathews, Holdings, LLC ("Holdings"), Reid

5 Breitman, Omer Ivanir and Gary Tenzer, the principals of PECAS and Holdings. PECAS, Holdings

6 and its principals took material advantage of LMMP's principals when LMMP informed the

7 principles of PECAS and Holdings of LMMP's distressed financial situation, that LMMP had no

8 funds to pay a judgment against LMMP and LHSM in favor of a David Perez in the amount of

9 $225,000.00 coming due on January 24, 2013, and if such funds were not paid, David Perez would be

10 owed $300,000.00 and be able to take all or a majority of LMMP. From such disclosed financial

11 stress, the principles of PECAS unduly influenced the principles of LHSM and  LMMP to transfer all

12 of their assets worth potentially in excess of ½ a billion to a billion dollars to PECAS for its payment

13 of the $225,000.00 to David Perez who demanded $225,000.00 on or before January 25, 2013. For

14 such transfer, LMMP was to receive only 25% of any proceeds which PECAS and Holdings may

15 receive from the asset transferred to it by LMMP. LMMP succumbed to the undue influence based on

16 coercive high pressure that worked on the powerlessness of LMMP's and LHSM's principles in the

17 context of January 24, 2013, and thus the principles of PECAS and Holdings took unfair advantage of

18 the mental stress, necessity and financial distress of LMMP principals in the meaning of Civil Code §

19 1575(2)(3),and unlawfully manipulated them to accept an adhesion contract in which the consent of

20 LMMP's principals was given by mistake, and through duress, menace, fraud, or undue influence,

21 exercised by and with the connivance of the principals of PECAS and Holdings, at a time in which

22 the in-house attorney for LMMP and its general partner was impaired with chronic pain and

23 depression. After a new board of Lawrence Holmes Senior Mining, Inc. ("LHSM"), general partner

24 of LMMP, reviewed the history of the PECAS/LMMP  agreement in August-September, 2015,

25 LMMP seeks relief in Rescission, and on information and belief alleges:

26 ///

27 ///

28 ///

Verified Cross Complaint of Lake Mathews Mineral Properties, Ltd. and Lawrence Holmes Senior Mining, Inc.

**PARTIES**

1. Cross Complainant, LAKE MATHEWS MINERAL PROPERTIES, LTD. ("LMMP") is a California Limited Partnership organized and existing under the laws of the State of California, and having its principal office at 1 World Center, Suite 800, Long Beach, CA, 90831.

2. Cross Complainant, LAWRENCE HOLMES SENIOR MINING, INC. ("LHSM") is a California Corporation and having its principal office at 1 World Center, Suite 800, CA, 90831.

3. Cross Defendant PECAS, LLC, ("PECAS") is alleged to be a Delaware Limited Liability Company, which on February 21, 2013, filed an application to register PECAS a Foreign Limited Liability Company in the State of California which would use the name PECAS PROPERTY HOLDINGS, LLC  in California, and both entities have their principal place of business at 17606 Camino de Yatasto, Pacific Palisades, CA, 90272, and Reid Breitman, Esq. is stated to be the agent for service of process of PECAS and PECAS Property Holdings at the same address. The manager of PECAS is Poseidon Capitol, LLC, ("Poseidon"), stated by the PECAS principles to be both a California and Delaware Limited Liability Company with its principal place of business also at 17606 Camino de Yatasto, Pacific Palisades, CA, 90272. Reid Breitman, Esq. is the agent for service of process of Poseidon at the same address.

5. Cross Defendant LAKE MATHEWS HOLDINGS, LLC. ("Holdings")is alleged to be a Delaware Limited Liability Company, but records appear to show that on August 27, 2015, Lake Mathews Holdings, LLC was filed as a California Limited Liability Company with its principal place of business at 17606 Camino de Yatasto, Pacific Palisades, CA, 90272.

6. Cross Defendant Reid Breitman ("Reid Breitman") is, and at all times relevant herein was, a resident of the State of California, County of Los Angeles, the agent for service of process for Cross Defendant PECAS and co-manager of Poseidon.

7. Cross Defendant Omer Ivanir ("Omer Ivanir") is, and at all times relevant herein, was a resident of the State of California, County of Los Angeles, and the co-manager of Poseidon.

8. Cross Defendant Gary Tenzer ("Gary Tenzer") is, and at all times mentioned herein, was a resident of the State of California, County of Los Angeles.

///

9. At all times mentioned herein, Cross Defendants Reid Breitman, Omer Ivanir, Gary Tenzer, were the founders of Cross Defendants PECAS and Poseidon and Holdings1 and Holdings2, and they specifically authorized, directed and directly participated in the conduct, unconscionable conduct and tortious conduct of which LMMP complains, and specifically knew or reasonably should have known that some of the activity pursuant to the relationship between LMMP and PECAS and Holdings 1 and Holdings 2, was under their control and could injure LMMP and subject LMMP to financial damages, and they negligently failed to take or order appropriate action to avoid the harm LMMP suffered, and any ordinarily prudent person, knowing what Cross Defendants Reid Breitman, Omer Ivanir and Gary Tenzer knew at that time, would not have acted similarly under the circumstances in which Cross Defendants Reid Breitman, Omer Ivanir and Gary Tenzer created PECAS and Holdings 1 and Holdings 2, induced LMMP to contract with PECAS, thus Cross Defendants Reid Breitman, Omer Ivanir, Gary Tenzer, Poseidon and Holdings violated the basic principles of California Civil Code 2343.

10. At this time, LMMP is ignorant of the true names and capacities of the Cross Defendants sued herein as DOES 1 through 100, inclusive, and therefore sues these Cross Defendants by such fictitious names. DOES 1 through 100 inclusive are all persons claiming any legal or equitable interest in the property that is the subject of this action or whose joiner is required to resolve LMMP's claims herein.

11. Each of the defendants designated herein as a fictitiously named Cross Defendants 1- 100 is, in some manner, responsible for the events and happenings referred to and is liable to Plaintiff for monetary damages. LMMP will amend this Verified Cross Complaint to allege the true names and capacities of Does 1- 100 when ascertained. At all times mentioned herein, each of the Cross Defendants, whether individual, corporation, partnership, limited liability company, joint venture, unincorporated association or other business entity of unknown form, and, or, whether named or sued by fictitious name, was the agent, servant, employee and, or, officer, director or partner of each of the other Cross Defendants and in doing the things herein alleged, each of the Cross Defendants were acting within the course and scope of such agency, employment or capacity, with the permission and consent of each of the other Cross Defendants, unless otherwise stated herein. For the purpose of

-4-

1    convenience, all references to named Cross Defendants herein, shall include the DOE Cross

2    Defendants, unless otherwise stated.

3        12. Each of the Cross Defendants, whether individual, corporate, partnership, joint venture,

4    limited liability company, unincorporated association, or other business entity of unknown form,

5    and/or whether named or sued by fictitious name other than DOES 1- 100, is responsible in some

6    manner for the damages suffered by LMMP. LMMP will seek leave of this Court to amend this

7    Verified Cross Complaint to add additional causes of action and appropriate charging allegations

8    when discovery reveals the true nature of the actions of all Cross Defendants, and each of them.

9        **GENERAL ALLEGATIONS**

10        13. Lawrence Holmes dob 1865, the parent of James D. Holmes, came to the United States

11    from Norway with his family as a child and had successful careers, including careers forming a

12    Shakespearean Theater Company, farming, photography, inventing, and real estate development.

13        14. In 1918, Lawrence Holmes, at a cost of several million dollars, acquired land in Riverside

14    County on which to cultivate carob plantations, and constructed two dams forming two natural

15    lakes for their maintenance - two of the five which he planned to create in the canyons. Some of

16    Holmes' land was subdivided and leased to tenants who became small carob plantation owners.

17        15. By 1935 the dams Lawrence Holmes built along with the natural lakes came to the

18    attention of the Metropolitan Water District ("MWD"), as the water course had the distinction to

19    make the surrounding land fertile. MWD then announced its intention to begin an immediate

20    condemnation action of the carob plantations and the lakes before any meaningful hearing on the

21    necessity for this action, and before an objective estimate of the value of the land condemned. The

22    condemnation of the Holmes' land occurred and created the large reservoir on the condemned land,

23    which became Lake Mathews. In the process, the MWD bulldozed 50,000, mature fruit-bearing carob

24    trees, destroyed the dams and the lakes, drove the people living on the plantations from their homes,

25    and destroyed their houses. James D. Holmes was five (5) years of age and living on the family

26    plantation when the MWD condemned the Holmes land and bulldozed the plantations. Lawrence

27    Holmes filed suit against MWD in 1936, in the Superior Court of California, County of Riverside

28    which resulted in the longest trial in the then-history of the State of California - one year and one day.

Verified Cross Complaint of Lake Mathews Mineral Properties, Ltd. and Lawrence Holmes Senior Mining, Inc.

1   The condemnation displaced Lawrence Holmes and his family as they were enthralled in the

2   litigation. A stipulation was entered into in 1937 which awarded $575,000.00 to Lawrence Holmes,

3   the majority of which was consumed in legal costs and fees. On MWD's own initiative, however,

4   MWD also carefully drew a Stipulation which was entered into on April 21, 1937, taking from the

5   jury questions of the value of mining along with the mineral and water rights which had been

6   condemned and which the MWD decided to abandon and return to the Holmes family. The

7   Stipulation was affirmed in the Judgment by the California Supreme Court in *Metropolitan Water*

8   *District v. E. Bennett Adams*, Case No. 26452.

9       16. The MWD Stipulation conveyed back to Lawrence Holmes, in fee simple, three

10  surface parcels to use as platforms for drilling and mining, clearly detailed that Lawrence Holmes

11  was given 800 acres of land 300 feet below the surface of Lake Mathews for purpose of extraction of

12  minerals, expressly agreed to mining operations of those 800 acres, assumed the risk of

13  contamination of water from such mining, assumed the obligation to protect, to the limits of its

14  capacity, those same mining operations from governmental interference which could be avoided or

15  minimized by its construction of required facilities for that purpose, granted the right to construct

16  underground passageways connecting mining areas, waived all rights to water which seeped under

17  the natural surface of 800 acres re-conveyed in connection with the drilling and mining operations

18  which the MWD could not itself recover including all rights to water which might gush indefinitely

19  from the sinking of mines on those lands, and granted easements over MWD's property for private

20  rights-of-way of a specific width as reasonably required for exploitation of the mining, mineral and

21  water rights conveyed.

22       17. Lawrence Holmes died in 1950 and was survived by his son, James D. Holmes and heirs

23  who were given their shares of the estate of Lawrence Holmes.

24       18. In 1985 James D. Holmes formed, with others, Lake Mathews Mineral Properties, Ltd.

25  ("LMMP"), to exploit the mineral and water rights conveyed in the 1937 Stipulation by MWD.

26  LMMP attempted its first core drilling in 1985 but MWD engaged extensive efforts to prevent any

27  drilling, including claims of trespassing, or that drilling was dangerous.

28

1    19. Although a specific dollar value on the mining rights was not expressly stated MWD's

2    1937 Stipulation, it was offered for the consideration of taking from the jury all factual issues in

3    exchange for the rights to exploit all the mineral and water resources on the 800 acres 300 feet below

4    Lake Mathews. In this regard, LMMP has the absolute right to drill and mine in, around and under

5    Lake Mathews and exploit the resources granted by MWD's 1937 Stipulation. Thus, LMMP's rights

6    are not diminished or enlarged by any assessment of the probable value of the mineral, water and fee

7    simple rights conferred. While further core drilling, mining exploration, and the sinking of a few

8    wells are required to determine the definitive value of the rights re-conveyed, nevertheless, the

9    mineral and water rights had appraisals of a potential value in excess of one billion dollars.

10    20. Since the initial drill in 1985, LMMP engaged in continuous efforts to become fully

11    capitalized to enable it to exploit the mining rights reconveyed in MWD's 1937 Stipulation.

12    21. James Holmes personally met with George Smith of George Smith Partners, for the

13    purpose of exploring financing and capitalization of LMMP mining rights. LMMP is informed,

14    believes and alleges that George Smith himself researched LMMP's rights granted by MWD's 1937

15    stipulation and communicated with his clients that investment in LMMP was "the most potentially

16    lucrative investment" he had found in 40 years.

17    22. While LMMP did not consummate a final agreement with GSP at that time, the LMMP

18    project became known to the investment community and through the years up through 2006, various

19    people and entities invested in an effort for LMMP to continue as a going concern.

20    23. In 2006, however, when LMMP attempted to take a core sample pursuant to MWD's 1937

21    Stipulation, the MWD refused to allow LMMP to continue its operations, stating that the mining

22    operations were much too dangerous, and that while the MWD's 1937 Stipulation granted to

23    Lawrence Holmes the right to exploit the mineral and water rights on the 800 acres 300 feet below

24    Lake Mathews, the 1937 Stipulation did not express or infer, directly or indirectly, that the owners of

25    such mineral rights "could" exploit such rights.

26    24. LMMP alleges that MWD engaged in fraud and misrepresentation when they conveyed

27    back to Lawrence Holmes the rights to exploit all the mineral and water rights on the 800 acres at a

28    depth of 300 feet below the surface of Lake Mathews in MWD's 1937 Stipulation, when MWD

-7-

1  unequivocally knew and had discrete knowledge then, in 1937, that they, MWD never intended to

2  allow mining operations on the 800 acres at any depth below Lake Mathews to exploit such mineral

3  and water rights, and that they concealed a fact that they, MWD, refused to define, that the grant of

4  such mineral rights did not intend that the owner of such rights actually "could" exploit the rights

5  reconveyed.

6      25. LMMP lacked financial resources to proceed directly against MWD for fraud,

7  constructive fraud, breach of contract and other various claims.

8      26. Beginning in August, 2006, however,  LMMP's then attorneys negotiated with MWD, a

9  tolling agreement so the statute of limitations to bring such claims would be extended on an annual

10  basis, year to year, based on a continuing agreement to be ratified in writing each year thereafter.

11      27. On January 12, 2007, Lawrence Holmes Senior Mining, Inc. ("LHSM") was formed and

12  James D. Holmes was its President and Chief Executive Officer ("CEO").

13      28. On January 17, 2007, an Amendment and Restated Agreement of Partnership of LMMP

14  was ratified by the limited partners of LMMP, and LHSM was instituted as its General Partner so

15  long as James D. Holmes remained as the CEO. Shirley Smith, Esq. had been the attorney for James

16  D. Holmes for the prior decade and became the Vice President of LHSM. Both James Holmes and

17  Shirley Smith had equity interests in LMMP and LHSM.

18      29. James D. Holmes and Shirley Smith, Esq. sought help from others to run LHSM,

19  including Paul Merritt in or about 2007.

20      30. In 2008, James D. Holmes and his counsel, Shirley Smith, Esq., Vice President of LHSM

21  arranged for loans to them personally from David Perez totaling in two separate loans, $60,000.00 to

22  James D. Holmes and $54,000.00 to Shirley Smith, Esq., also granting David Perez an 8%

23  assignment of partnership interests.

24      31. At the same time, James D. Holmes and Shirley Smith, Esq. negotiated for Isaac

25  Holdings, LLC (a company owned by David Perez), to contract with LMMP to secure from MWD,

26  access to its mineral rights in exchange for 25% percent of LMMP's most senior partnership

27  interests entitling Isaac Holdings, LLC a share in any distribution to LMMP from the proceeds of

28  such mineral rights.

Verified Cross Complaint of Lake Mathews Mineral Properties, Ltd. and Lawrence Holmes Senior Mining, Inc.

32. James D. Holmes and Shirley Smith, Esq. used all their time, energy and resources in an attempt to make LMMP a going concern, but were consumed with the hurdles MWD continually threw in front to them to thwart LMMP efforts, and they were unable to provide back the payments to David Perez.

33. The inability to provide re-payment to David Perez precipitated a disruption in the relationship between LMMP and Isaac Holdings, LLC which discontinued the activity of Isaac Holdings, LLC, to facilitate LMMP's mineral rights granted by MWD's 1937 Stipulation.

34. On June 7, 2010, David Perez and Isaac Holdings, LLC filed suit against James D. Holmes, Shirley Smith, Esq., LMMP and LHSM ("Holmes parties"), in the Superior Court of California, County of Los Angeles, Case No. BC 439127, alleging that the agreements made with James D. Holmes and Shirley Smith which included LMMP and LHSM were repudiated.

35. In or about October 11, 2011, James D. Holmes granted to Paul Merritt one half of all his shares in LMMP for his, Paul Merritt's continuing efforts for LMMP, and appointed Paul Merritt as Vice President and Chief Financial Officer ("CFO") of LHSM.

36. On August 3, 2012, A Stipulation for Entry of Judgment was entered between LMMP and David Perez and Isaac Holdings, LLC, in Case No. BC 439127 ("Perez Judgment"), and the Stipulation required a $300,000.00 payment from LMMP.

37. Nevertheless, the Stipulation for Entry of Judgment stated it could be redeemed if payment of $185,000.00 was made to David Perez on November 26, 2012, or with a payment of $225,000.00 before January 25, 2013, and if full payment is made, David Perez and Isaac Holdings, LLC would deliver back their fully executed original certificates of the assignments of limited partnership interests they were provided to the Holmes parties.

38. Shirley Smith, Esq. asked Paul Merritt, Vice President and CFO of LHSM to arrange for financing to pay off the Perez judgment, and when he attempted to do so, Shirley Smith, Esq. began to mistrust Paul Merritt as he tried to arrange financing.

39. In or about December 26, 2012, James D. Holmes and Shirley Smith, Esq. then met with a bankruptcy attorney, Theodore Stalman, in Century City regarding an Order for Relief seeking a discharge or reorganization of LMMP's debts which was determined to be inappropriate. A meeting

-9-

1  was quickly then arra/nged for that afternoon with Gary Tenzer, the then President of George Smith

2  Partners. James D. Holmes and Shirley Smith, Esq. familiarized Gary Tenzer with the details of the

3  Holmes saga as above described, including the necessity to pay off the Stipulated Judgment in the

4  Perez case, and also disclosed that while Paul Merritt was attempting to pay off the Perez judgment,

5  they were concerned that he was attempting to take over LMMP, and Gary Tenzer represented that he

6  would be in touch with them.

7      40. In or about December 29, 2012, James D. Holmes granted Brian Avery approximately

8  51.28% of the Class C shares in LMMP asking him to help him manage LMMP pursuant to the

9  January 17, 2007 Amendment to LMMP.

10     41. Approximately ten (10) days later, Gary Tenzer met again with James D. Holmes and

11  Shirley Smith, Esq. with the file which had previously been prepared by George Smith Partners, with

12  respect to the research George Smith himself had previously undertaken for investment into LMMP.

13     42. Gary Tenzer discussed with James D. Holmes and Shirley Smith, Esq., the difficulties

14  regarding LMMP's debt pursuant to the Perez judgment, the payment required to be made before

15  12:00 p.m. midnight on January 24, 2013, and their disclosure that Paul Merritt, CFO and Vice

16  President of LHSM and limited partner of LMMP, was attempting to purchase the Perez judgment for

17  $225,000.00 to take full control of LMMP.

18     43. Paul Merritt, the Vice President and CFO of LHSM and limited partner of LMMP, was

19  asked to obtain the funding of $225,000.00 to pay off the Perez judgment before 12:00 p.m. midnight

20  on January 24, 2013. Paul Merritt informed Shirley Smith, Esq., that if he was able to provide such

21  funding from his own resources, he wanted the loan from him for $225,000.00 to be secured through

22  some means as he had no intent to take over LMMP and was making no attempt to do so.

23     44. Despite the assurances that Paul Merritt attempted to provide to James D. Holmes and

24  Shirley Smith, Esq. as to the propriety of his actions in accordance with the Limited Partnership Act,

25  James D. Holmes and Shirley Smith, Esq. continued to disclose to Gary Tenzer that Paul Merritt was

26  acting inimical to the interests of LMMP and it became obvious that LMMP was a mark which could

27  be exploited from the admitted divergence of the principles of LHSM as expressed by James D.

28  Holmes and Shirley Smith, Esq. to Gary Tenzer.

45. On January 9, 2013, a Certificate of Formation for PECAS was filed in the office of the Secretary of State for Delaware.

46. On January 9, 2013, Shirley Smith, Esq. faxed the LMMP share register to Brian Avery showing the shares each limited partner had in LMMP, which also showed that Paul Merritt and James Holmes each had 18.9409 Class A shares in LMMP.

47. On or about January 9, 2013, Paul Merritt continued to attempt to secure arrangements to pay off the Perez Judgment for $225,000.00 to stop the Perez takeover of LMMP assets. The $225,000.00 was to pay off the Perez Judgment before January 25, 2013, or Isaac Holding, LLC would retain its 25% interest in LMMP, David Perez would retain his 8% interest in LMMP and James D. Holmes and Shirley Smith, Esq. and LMMP would still owe David Perez $300,000.00.

48. Paul Merritt also requested that LMMP and, or, LHSM send him written acknowledgment of his 18.9409 Class A shares in LMMP.

49. On January 14, 2013, Shirley Smith, Esq. sent an e-mail to Paul Merritt asking him to raise the $225,000.00 needed to pay off the Perez judgment and he should contact Brian Avery for assistance.

50. On or about January 15, 2013, however, Brian Avery communicated with Paul Merritt representing that, "the attorneys on our side say your shares are unenforceable."

51. On or about January 17, 2013, there was continuous communication between Nitin Shah, the accountant for Paul Merritt, and Brian Avery as to whether LMMP had obtained the $225,000.00 to pay off the Perez judgment and communication between Paul Merritt and Brian Avery that Shirley Smith, Esq. will not reveal to him, Paul Merritt, who she has as a new angel investor working through Brian Avery's office, but the concealment of such data and takeover is and would be wrong.

52. On January 21, 2013, Shirley Smith, Esq. continued to request that Paul Merritt arrange to pay off the $225,000.00 Perez judgment.

53. On January 23, 2013, Paul Merritt, without an agreement from LMMP for repayment, tendered a check in the amount of $225,000.00 to D. Jonathan Hadaya ("Mr. Hadaya"), David Perez's attorney administering the receipt of the required payment to satisfy the Perez Judgment, and the $225,000.00 check was tendered for the benefit of the resolution and settlement of the Perez case.

Verified Cross Complaint of Lake Mathews Mineral Properties, Ltd. and Lawrence Holmes Senior Mining, Inc.

54. The Perez judgement identified the Holmes parties as James D. Holmes, Shirley Smith, LMMP and LHSM and the Perez parties as David Perez and Isaac Holdings, LLC. The Perez judgment stated that a representative of the Holmes parties can pay the $225,000.00 to satisfy the Perez judgment. Paul Merritt was a representative in his status as CFO and Vice President of LHSM. The Perez judgment stated that when the $225,000.00 was timely paid, the Perez parties will provide back to the Holmes parties, all the property they received to secure the loans from David Perez and work of Isaac Holdings, LLC, and transfer back the certificate of partnership interests to the Holmes parties; (not to the payor or representative who paid the $225,000.00 for the Holmes parties).

55. On the evening the $$225,000 was due, January 24, 2013, Gary Tenzer called Shirley Smith, Esq. and James Holmes informing them that Paul Merritt was on his way to San Diego to pay the $225,000 and buy the Perez Judgement, but he, Gary Tenzer and his partners had something that might help and they needed to come to his office before Paul Merritt took over LMMP. In the evening of January 24, 2013, Shirley Smith, Esq. and James Holmes went to the office of Gary Tenzer, and knowing the facts disclosed by Shirley Smith, Esq. to Gary Tenzer, knowing that LMMP faced possible loss of its rights granted in MWD's 1937 stipulation, Gary Tenzer, Reid Breitman and Omer Ivanir offered just $225,000.00 to buy the Perez judgment and demanded in return, ownership of LMMP's rights conveyed in the Stipulation.

56. In the evening of January 24, 2013, Gary Tenzer, Reid Breitman and Omer Ivanir presented James D. Holmes and Shirley Smith, Esq. with a large bundle of documents regarding the formation of PECAS, which included, but were not limited to:

    A. The one page agreement created by Gary Tenzer which stated:

    "Per our discussion at our meeting on Sunday, January 20, 2013, this memo will confirm our agreement regarding compensation to George Smith Partners, Inc. ("GSP") and Gary M. Tenzer ("Tenzer") for arranging the financing with Reid Breitman ("Investor"). LMMP agrees to execute binding agreements with GSP and Tenzer documenting the agreement to effectuate the payment from proceeds of any settlement with the Metropolitan Water District or any other source of case payments to LMMP (or to the new to-be-formed agreement between LMMP and Investor). It is acknowledged that said distribution is subordinated to the return of all costs advanced by Investor with a 10% return on case advanced."

///

| Settlement | Investor | LMMP | GSP | Tenzer |
|---|---|---|---|---|
| $0-$50M | 70% | 25% | 2% | 3% |
| $50M-$100M | 65% | 30% | 2% | 3% |
| $110M-$200M | 45% | 50% | 2% | 3% |
| $200M Plus | 25% | 70% | 2% | 3% |

B. A seven page Asset and Purchase Agreement dated January 23, 2013, with the (i) assets described in the " Description of Property" attached in its Exhibit A, (ii) the Grant Deed attached in its Exhibit B, and tangible and intangible assets, including (iii) the Bill of Sale attached in its  Exhibit C, (iv) permitted exceptions attached in its Exhibit D, (v) the Operating Agreement for Buyer, (vi) in the form attached in its Exhibit E, and an assumption of the Perez Judgment attached in its Exhibit F; and,

A.  The Certificate of Formation of PECAS on January 9, 2013; and,

B.  The three page PECAS Operating Agreement dated January 9, 2013; and,

C. The 39 page PECAS Amended and Restated Operating Agreement dated January 25, 2013; and,

D. Asset and Purchase Agreement and Bill of Sale of LMMP' assets dated January 23, 2013 with multiple pages of title documents; and,

E. The Three Page Approval and Consent of LMMP's Limited Partners dated January 23, 2013; and,

F. Assumption of the Perez Judgment dated January 23, 2013,

G. An agreement dated January 24, 2013, that if LHSM was not reinstated by the Secretary of State (as it had been suspended since December 29, 2010), James D. Holmes would grant to Poseidon and Holdings, 25% of the partnership interests James D. Holmes and LHSM owned in LMMP.

57. The financing was to be $225,000.00 and the agreement was to pay off the Perez Judgment by 12:00 p.m. midnight on January 24, 2013, the identical amount and identical purpose beginning to be facilitated by Paul Merritt.

///

-13-

58. In the January 24, 2013 time frame, no Capitol Accounts statement showing the required percentages of partnership, debits, credits, expenditures, and debts of LMMP has been found to have been created by LMMP, LHSM nor Defendants, and each of them.

59. Cross Defendants, and each of them ("Cross Defendants"), drafted and created the above stated documents ("PECAS documents") to expressly make it appear that James D. Holmes decided to and created all the PECAS documents; and,

A. Actually formed PECAS on January 9, 2013; and,

B. Created the initial PECAS Operating Agreement as of January 9, 2013 with LMMP as the initial member of PECAS, and James D. Holmes was the Original Manager of PECAS; and,

C. Created the 39 page Amended Operating Agreement of PECAS dated January 25, 203, in which Lake Mathews Holdings, LLC, a Delaware Limited Liability Company ("Holdings") was to be the Additional Member of PECAS, and Lake Mathews Holdings, LLC was to provide the financing to resolve the Perez judgment and provide management resources through Poseidon Capitol, LLC, ("Poseidon") which was to be the new manager of PECAS, and Reid Breitman and Omer Ivanir were the co-managers of Poseidon, and GSP was a Class C Unit holder, and LMMP was to transfer one hundred (100%) of its entire assets into PECAS. PECAS and Holdings are effectively PECAS.

60. The PECAS Amended Operating Agreement only gave LMMP a 25% interest in PECAS which entitled LMMP to receive distributions allegedly in the escalating amounts stated in the one page agreement allegedly made on Sunday, January 20, 2013.

61. The PECAS documents expressly prohibited LMMP or its principles from communicating with anyone, including MWD, and expressly granted PECAS the right not to communicate with LMMP and its principles in any way about any effort or decisions PECAS made or was considering with respect to assets transferred by LMMP.

62. LMMP and LHSM are informed, believes and alleges that:

A. Knowing expressly that LHSM had been suspended since December 29, 2010, and knowing the disclosures Shirley Smith, Esq. made to Gary Tenzer regarding Paul Merritt, Cross Defendants acted with the multi nefarious intent of their ingenuity, and pressured James D. Holmes

Verified Cross Complaint of Lake Mathews Mineral Properties, Ltd. and Lawrence Holmes Senior Mining, Inc.

1  and Shirley Smith, Esq. with intended artifice and connivance, to accept the PECAS adhesion

2  contract documents, take it or leave it, and exercised wrongful mental coercion over them in a

3  manner which destroyed their free will in the context of the transaction which resembles menace.

4        B. James D. Holmes and Shirley Smith, Esq. were dominated with the pressure from

5  Cross Defendants with implied threats of being subjected to securities law violations from the Perez

6  complaint, facts which all Cross Defendants knew implicitly.

7        C. All Cross Defendants expressly represented to James D. Holmes, Shirley Smith,

8  Esq. and LMMP on January 24, 2013, that they must read sign all the PECAS documents, and, "take

9  it or leave it", and if they did not sign the documents, their interests in LMMP would be lost, and

10  either Paul Merritt or David Perez would take all or the majority of LMMP.

11        D. All Cross Defendants left James D. Holmes and Shirley Smith, Esq. with no

12  negotiating room, and the pressure exerted on James D. Holmes and Shirley Smith, Esq. was

13  sufficiently coercive to cause them to succumb to the pressure to sign the PECAS documents.

14        E. In this context, LMMP signed the PECAS documents and transferred its assets to

15  PECAS, and Reid Breitman, Esq., Omer Ivanir and Gary Tenzer facilitated a payment of $225,000.00

16  from a consortium of investors and had such funds sent to Mr. Hadaya to pay off the Perez judgment.

17        63. LMMP and LHSM are informed, believes and alleges that:

18        A. The limited partnership certificates of David Perez and Isaac Holdings, LLC were

19  transferred back and became part of PECAS.

20        B. The $225,000.00 Check from Paul Merritt was delivered to Mr. Hadaya in the early

21  afternoon of January 24, 2013 nearly 10 hours before a $225,000.00 payment was provided to Mr.

22  Hadaya by Cross Defendants, Mr. Hadaya would not negotiate Paul Merritt's $225,000.00 check.

23        C. Shirley Smith, Esq. was confused and made a material mistake of fact which was

24  exacerbated by undue influence being exerted upon her through artifice as the disclosures she made

25  to Gary Tenzer of her mistaken belief regarding Paul Merritt rendered LMMP and its asset a mark to

26  be exploited.

27        D. Shirley Smith is now 83 years of age, and in January, 2013, she was 80 years of

28  age. While Shirley Smith, Esq., had a long distinguished career, her advancing years impaired her

-15-

1  with chronic pain which confused her understanding of the legal and factual concepts presented for

2  her to give adequate legal advise to LMMP, LHSM and James D. Holmes who relied on her for all

3  their legal and financial decisions, which all Cross Defendants knew, or reasonably should have

4  known since the first meeting she had with Gary Tenzer in December, 2012.

5          E. In the context of January 24, 2013, James D. Holmes and Shirley Smith, Esq. did

6  not understand the language in the PECAS documents, did not have time to read and understand the

7  legal effect of signing the documents, and did not have the means to employ or consult with other

8  legal counsel, and Shirley Smith, Esq. needed help but could not afford to retain such legal assistance

9  all of which was known by all Cross Defendants since the first meeting with Gary Tenzer in last part

10 of December, 2012.

11         F. The three page Approval and Consent of Limited Partners of LMMP in the PECAS

12 documents prepared by Cross Defendants and each of them, merely referred to the Perez Judgment,

13 and did not contain sufficient express explanations for the limited partners to comprehend or

14 understand that the Perez Judgment was had for the failure of repayment of the personal loans to

15 James D. Holmes and Shirley Smith, Esq.  In this regard, Cross Defendants intentionally

16 misrepresented the facts or at the very least, mislead the limited partners from whom a ratification of

17 the LMMP/PECAS agreement was requested, as to the complete facts of the Perez Judgment. The

18 misleading and, or intentional misrepresentations of the facts to the limited partners of LMMP

19 created a failure of consideration for LMMP in the LMMP/PECAS agreement and vitiates the

20 consent of the limited partners who executed the approval forms, which were dated January 23, 2013,

21 but not executed until early March, 2013.

22         G. The Cross Defendants also falsified the shares of the individual LMMP

23 shareholders requested to execute the approval and consent forms. The Cross Defendants, and each of

24 them made it appear in the approval documents that James D. Holmes had a total of 44.39% of Class

25 A shares in LMMP, completely voiding the shares of Paul Merritt as he was informed by Brian

26 Avery on January 15, 2013, that "the attorneys on our side say your shares are unenforceable." The

27 phrase "the attorneys on our side" referred to the attorneys representing Cross Defendants, and, or,

28 were preparing all the PECAS documents; and, these PECAS documents prepared by Cross

Verified Cross Complaint of Lake Mathews Mineral Properties, Ltd. and Lawrence Holmes Senior Mining, Inc.

1    Defendants were crafted to make it appear that there were sufficient votes of all the share holders to

2    approve and consent to the transfer of LMMP assets to PECAS.

3            H. The Cross Defendants further manipulated the approval and consent form to state

4    that Shirley Smith, Esq. had 28.21% of Class C shares and Randy C. Evers as Trustee of Evers

5    Family Trust had 100% of Class C shares when Brian Avery was given 51.28 % of the Class C shares

6    in LMMP on December 29, 2012.

7            I. Cross Defendants further manipulated the approval and consent form by not sending

8    an approval form to the Klover trust, the trustee of which was Paul Merritt, in which Klover trust

9    loaned $35,000.00 to LMMP in consideration for 1% Class D shares in LMMP.

10            J. Cross Defendants interfered with the rights of the shareholders in LMMP by

11    informing James D. Holmes and Shirley Smith, Esq. that Paul Merritt's 18.9409 Class A shares in

12    LMMP were unenforceable to prevent Paul Merritt from voting against the approval and consent of

13    the LMMP/PECAS agreement, which would have precipitated the conditions under which Mr.

14    Hadaya would have been required to negotiate the $225,000.00 tendered from Paul Merritt rather

15    than the $225,000.00 from the Cross Defendants.

16            K. James D. Holmes and Shirley Smith, Esq. believed that Cross Defendants would

17    immediately proceed legally to secure the mineral and water rights against MWD. By August-

18    October, 2013, Cross Defendants abandoned the tolling agreement which LMMP secured in August,

19    2006, to allow LMMP to proceed against MWD for various fraud claims, and Cross Defendants

20    maintained that while MWD's 1937 Stipulation re-conveyed to Lawrence Holmes the *"rights"* to the

21    mineral and water rights on the 800 acres 300 feet under Lake Mathews, the Stipulation does not say

22    Lawrence Holmes *"could"* mine those mineral rights, completely contrary to the intention and

23    understanding of James D. Holmes and Shirley Smith, Esq. when they signed the PECAS documents.

24    64. In August, 2013, LHSM terminated Paul Merritt as Vice President and CFO of LHSM,

25    and he filed suit against James D. Holmes and LMMP to obtain his shares in LMMP. Paul Merritt's

26    claims were settled on August 14, 2015 and Settlement Agreement recites Paul Merritt for

27    consideration was previously granted a total of 18.9409 limited partnership points/shares in LMMP.

28    ///

-17-

65. On August 16, 2015, James D. Holmes appointed Steven Winstead as Director and Senior Vice President and General Manager of LHSM, David W. Clancy, Jr. as Director and Vice President and Secretary of LHSM, and Terrence O'Hearn as Director and Treasurer and Chief Financial Officer of LHSM. After a review of the documents attesting to the above, LHSM decided to protect the rights of LMMP's creditors, investors and limited partners and sought resolution of the above controversy. Cross Defendants then filed Holdings as a California LLC on August 27, 2015, refused resolution with LMMP on August 28, 2015, and LMMP served a Notice of Rescission on October 8, 2015.

## FIRST CAUSE OF ACTION

### (RESCISSION)

### (by Cross Complainants against all Cross Defendants, and Each of Them)

66. Cross Complainants restate and incorporate by reference hereat, the above paragraphs 1 through 65 as if fully set forth hereat.

67. On or about January 24, 2013, LMMP entered into a contract with PECAS in a series of agreements in which all of LMMP's right, title and interest was transferred into PECAS.

68. Pursuant to the PECAS adhesion contract, LMMP was given a twenty five (25%) interest in PECAS and entitled to a distribution pursuant to the agreement drafted by Gary Tenzer.

69. Cross Complainants have at all times performed the terms of the PECAS agreements in the manner specified by the contracts, but there has been a material failure in the consideration received by Cross Complainants as described above and below. As a result, Cross Complainants have been deprived of the benefits of the bargain and damaged by the loss of its asset, by the refusal of Cross Defendants to extend the tolling agreement and proceed against MWD in a legal action.

70. LMMP served a Notice of Rescission on October 8, 2015, declares a rescission of the PECAS agreements by this Verified Cross Complaint and Civil Code § 1691(b) which terminates the contracts. Cross Defendants refuse to accept the rescission and Cross Complaints seek appropriate relief for rescission and offer to restore to PECAS and its investors who provided the $225,000.00 Check, thus restoring "everything of value" which LMMP had received under the contract.

71. LMMP is entitled to rescind the January 24, 2013 PECAS adhesion contract under Civil Code 1689(b)(1) because its consent to the agreement was given through the advise of Shirley Smith,

-18-

1  Esq., who was suffering from chronic pain, depression and impaired in the meaning of Civil Code §

2  39(a), which was known by all Cross Defendants or reasonably should have been known, although

3  she was not entirely without understanding and had not been judicially determined incompetent.

4      72. LMMP is entitled to rescind the January 24, 2013 PECAS adhesion contract under Civil

5  Code 1689(b)(1) because its consent to the agreement was given by a ***HARMFUL MISTAKE OF***

6  ***MATERIAL FACTS*** in the meaning of Civil Code § 1577, which were not caused by LMMP's

7  neglect of a legal duty, and any neglect to understand the true facts of what PECAS intended in its

8  adhesion contract in which they represented to LMMP to take it or leave it is deemed excusable such

9  that enforcement of the PECAS adhesion contract would be unconscionable in that:

10      A. LMMP and LHSM made a mistake regarding a basic assumption upon which

11  LMMP entered into the agreement with PECAS, such that:

12      (i) PECAS would seek to perfect the rights pursuant to MWD's 1937

13  stipulation in which Cross Defendants would aggressively assert that the owner of the rights "could"

14  mine for the mineral and water rights reconveyed pursuant to MWD's 1937 stipulation; and,

15      (ii) Cross Defendants would either proceed with a legal action against MWD

16  or continue to obtain or extend the tolling agreement which extended the rights to file such action

17  against MWD; and,

18      (iii) Cross Defendants knew that James D. Holmes and Shirley Smith, Esq. did

19  not fully understand and, or comprehend all the documents presented to them for signing on January

20  24, 2013, knew James D. Holmes was relying on the advice of Shirley Smith, Esq. and knew that

21  Shirley Smith, Esq. was shouldering a severe psychological and mental burden which prevented her

22  from fully and completely advising James D. Holmes regarding the legal and factual aspects of the

23  PECAS/LMMP agreement; and,

24      B. These mistakes have a material effect upon the agreed exchange of performances

25  that is adverse to LMMP; and

26      C. LMMP and LHSM do not bear the risk of the mistake; and

27      D. Cross Defendants knew about these unilateral mistakes, did nothing to rectify the

28  mistakes, knew that the agreements and documents they prepared and presented to James D. Holmes

-19-

1  and Shirley Smith, Esq. on January 24, 2013 were adhesion agreements, knew they represented to

2  James D. Holmes and Shirley Smith, Esq. on January 24, 2013 to take it or leave it, knew that James

3  D. Holmes and Shirley Smith, Esq. only had one day to decide, knew that James D. Holmes and

4  Shirley Smith, Esq., did not fully understand the adhesion agreements, but nevertheless, the attorneys

5  representing Cross Defendants took advantage of the mistakes knowing that James D. Holmes and

6  Shirley Smith, Esq. lacked the ability to ascertain the full accuracy with respect to the agreements

7  through the exercise of reasonable diligence and the enforcement of the adhesion contract would be

8  unconscionable in light of the magnitude of the mistake.

9       73. LMMP and LHSM are entitled to rescind the January 24, 2013 PECAS adhesion contract

10  under Civil Code 1689(b)(1) because its consent to the agreement was obtained through ***DURESS*** in

11  that James D. Holmes and Shirley Smith, Esq. were induced into an "illegal business compulsion,"

12  based on the wrongful acts of Cross Defendants as alleged above, that were sufficiently coercive to

13  cause James D. Holmes and Shirley Smith, Esq. to have no reasonable alternative but to succumb to

14  the pressure of Cross Defendants to enter into the PECAS adhesion contract and such duress

15  perpetrated on James D. Holmes and Shirley Smith, Esq. permits LMMP to rescind the PECAS

16  adhesion contract as Cross Defendants took advantage of their knowledge of LMMP reposed in

17  confidence to them by James D. Holmes and Shirley Smith, Esq.

18       74. LMMP and LHSM are entitled to rescind the January 24, 2013 PECAS adhesion contract

19  under Civil Code 1689(b)(1) because its consent to the agreement was obtained through ***MENACE*** in

20  the meaning of Civil Code § 1570(3) in that Cross Defendants used the confidences reposed on them

21  from James D. Holmes and Shirley Smith, Esq. to imply threats to the character of James D. Holmes

22  in such a manner as to exercise wrongful mental coercion over James D. Holmes in a manner that

23  destroyed his free will in the PECAS adhesion contract.

24       75. LMMP and LHSM entitled to rescind the January 24, 2013 PECAS adhesion contract

25  under Civil Code 1689(b)(1) because its consent to the agreement was obtained through ***UNDUE***

26  ***INFLUENCE*** in the meaning of Civil Code § 1575, in that (A) the PECAS adhesion contract gave

27  LMMP a 25% interest in PECAS and LMMP is a beneficiary of PECAS, and is owed a fiduciary

28  duty by Cross Defendants, and (B), James D. Holmes and Shirley Smith, Esq. reposed in Cross

Verified Cross Complaint of Lake Mathews Mineral Properties, Ltd. and Lawrence Holmes Senior Mining, Inc.

1  Defendants, confidence in the facts regarding the history of LMMP, and Cross Defendants intended

2  to and did obtain an unfair advantage over LMMP as Shirley Smith, Esq. was advising James D.

3  Holmes, taking a grossly oppressive and unfair advantage of LMMP's requirements, necessities or

4  distress in light of the undue susceptibility of Shirley Smith, Esq. and James D. Holmes to the over-

5  persuasive influence, in context, of Cross Defendants, from the physical or emotional exhaustion and

6  anguish of Shirley Smith, Esq. and James D. Holmes, resulting in their inability to act with

7  unencumbered volition. In this regard, in the context in which the January 24, 2013 PECAS adhesion

8  contract was created, the agreement is voidable as it was not fair, and subject to rescission.

9        76. LMMP and LHSM are entitled to rescind the January 24, 2013 PECAS adhesion contract

10  under Civil Code 1689(b)(1) because its consent to the agreement was obtained through ***ACTUAL***

11  ***FRAUD*** in the meaning of Civil Code § 1572 in that:

12        A. Cross Defendants suggested as a fact that Paul Merritt was attempting to take over

13  all of LMMP from James D. Holmes and Shirley Smith, Esq., that LHSM could for LMMP enter into

14  the PECAS adhesion contract on January 24, 2013, that Paul Merritt's shares in LMMP were not

15  enforceable, that Cross Defendants would aggressively assert LMMP's mineral, water and mining

16  rights with MWD in which LMMP had the right to engage in mining and could engage in mining and

17  Cross Defendants would extend the tolling agreement or immediately file suit before the tolling

18  agreement expired; and,

19        B. These representations of Cross Defendants were not true and they did not believe

20  them to be true.

21        C. When Cross Defendants made these representations with positive assertions, these

22  representations were made in a manner not warranted by the information of the Cross Defendants.

23        D. All Cross Defendants suppressed facts that Paul Merritt had no intention of taking

24  over LMMP or that his shares in LMMP were enforceable, that Cross Defendants did not intend to

25  extend the tolling agreement and would not file suit against MWD to assert the mining rights.

26        E. The representations of Cross Defendants were made to James D. Holmes and

27  Shirley Smith, Esq. to induce them to have LHSM facilitate and sign the January 24, 2013 PECAS

28  adhesion contract; and,

Verified Cross Complaint of Lake Mathews Mineral Properties, Ltd. and Lawrence Holmes Senior Mining, Inc.

1    F. James D. Holmes and Shirley Smith, Esq. reasonably relied upon the

2    representations of Cross Defendants, and if James D. Holmes and Shirley Smith, Esq. knew the real

3    facts, that Paul Merritt was not intending to take over LMMP, was only acting as a concerned limited

4    partner, had shares which were enforceable, that Cross Defendants were not going to extend the

5    tolling agreement, were not going to file suit against MWD to enforce the rights conveyed in MWD's

6    1937 stipulation in which mining could occur, James D. Holmes and Shirley Smith, Esq. would not

7    have precipitated LHSM to sign the January 24, 2013 PECAS adhesion contract; and,

8    G. LMMP has been materially damaged in that LMMP has transferred all of its right,

9    title and interest in MWD's 1937 stipulation to PECAS pursuant to such deception and concealment

10    by Cross Defendants; and,

11    H. Pursuant to such fraud and deception, LMMP is entitled to a rescission of the

12    January 24, 2013 PECAS adhesion contract.

13    77. LMMP and LHSM are entitled to rescind the January 24, 2013 PECAS adhesion contract

14    under Civil Code 1689(b)(1) because its consent to the agreement was obtained through

15    ***CONSTRUCTIVE FRAUD***, in the meaning of Civil Code § 1573 in that:

16    A. The January 24, 2013 PECAS adhesion contract gave LMMP a 25% interest in

17    PECAS, and as such, Cross Defendants owed LMMP a fiduciary duty; and,

18    B. All Cross Defendants breached their duty by taking advantage of James D. Holmes,

19    LHSM and LMMP when they knew of the burdens of Shirley Smith, Esq., by making false

20    representations about Paul Merritt, and by bludgeoning James D. Holmes and Shirley Smith, Esq.

21    with an adhesion contract, and representing that they could take it or leave one day before the

22    $225,000.00 payment was to be tendered for payment of the Perez judgment; and, thereby gained an

23    advantage by prejudicially misleading James D. Holmes and Shirley Smith, Esq. with respect to the

24    representations all Cross Defendants did make; and,

25    C. James D. Holmes and Shirley Smith, Esq. justifiably relied on the representations

26    of all Cross Defendants with respect to Paul Merritt, and by such reliance, James D. Holmes through

27    LHSM facilitated LMMP's execution of the PECAS adhesion contract thereby damaging LMMP as

28    LMMP transferred all of its assets into PECAS pursuant to such breach of fiduciary duty.

-22-

78. LMMP and LHSM are entitled to rescind the January 24, 2013 PECAS adhesion contract because there was a ***FAILURE OF CONSIDERATION*** in the meaning of Civil Code § 1689(b)(2) in that:

A. Since the Perez judgment was predicated on repayment of the $114,000.00 loans to James D. Holmes and Shirley Smith, Esq., and not loans to LMMP which were known by all Cross Defendants, or which reasonably should have been known to them, and as such, there was no consideration to LMMP due to the fault of Cross Defendants for the obligation of LMMP to transfer all of its assets into PECAS in accordance with the PECAS adhesion contract; and,

B. The consideration that LMMP was to receive thus became entirely void in accordance with Civil Code § 1689(b)(3), and thus the consideration failed in a material respect in light of the facts which were known by Cross Defendants before such consideration was rendered in the meaning of Civil Code § 1689(b)(4).

79. LMMP and LHSM are entitled to rescind the January 24, 2013 PECAS adhesion contract in the meaning of Civil Code § 1689(b)(5) because the PECAS contract, in the context of the events described above was predicated on ***UNLAWFUL*** facts and causes which do not appear in the PECAS adhesion contract terms or conditions, and LMMP is not equally at fault in creating those facts and causes as described above; and, Shirley Smith, Esq., the attorney representing LHSM, LMMP, and James D. Holmes, are in a class intended to be protected by Civil Code § 39(a), and pursuant to such statute, James D. Holmes, LHSM and LMMP are not equally at fault in any violation of any statute alleged against Cross Defendants.

80. LMMP and LHSM are entitled to rescind the January 24, 2013 PECAS adhesion contract in the meaning of Civil Code § 1689(b)(6) because, in the context of the facts, circumstances and events described above, the payment of $225,000.00 by Cross Defendants for an asset which has a possible value of over one billion dollars was unconscionable in the context where Cross Defendants identified LMMP as a mark which could be exploited which they did by their insistence of "take it or leave" and, in this regard, the public interest will be prejudiced by permitting the PECAS adhesion contract to stand.

///

-23-

81. LMMP and LHSM are entitled to rescind the January 24, 2013 PECAS adhesion contract in the meaning of Civil Code § 1689(b)(7) in that pursuant to Civil Code § 1930, LMMP consented to the PECAS adhesion contract for a particular purpose, which included, but which was not limited to Cross Defendants acting to extend the tolling agreement for as long as necessary to ensure that Cross Defendants could proceed in a legal action against MWD to ensure mining operations in accordance with MWD's 1937 stipulation, and to actually proceed against MWD in a legal action to ensure mining operations could proceed, and Cross Defendants did not and will not use the PECAS adhesion contract in this manner, thus Cross Defendants are liable to LMMP for all damages resulting from such use, and LMMP is entitled to treat the PECAS adhesion contract as rescinded.

82. LMMP and LHSM are entitled to rescind the January 24, 2013 PECAS adhesion contract in the meaning of Civil Code § 1689(b)(7) in that pursuant to Civil Code § 2314, the ratification documents of the PECAS adhesion contract which were created by Cross Defendants were deficient and were created with an imperfect knowledge of the material facts of the transaction ratified with respect to the consideration LMMP was being given and the loans of James D. Holmes and Shirley Smith, Esq. being paid off and thus the PECAS adhesion contract may be rescinded by LMMP when made since it was made without such consent of limited partners as is required in a contract.

83. LMMP and LHSM have not waived their rights to rescind the PECAS adhesion contract as LMMP acts through its General Partner, LHSM, and until August, 2015, LMMP and LHSM and James D. Holmes, President and CEO of LHSM were being advised by Shirley Smith, Esq., and she was burdened in the meaning of Civil Code § 39(a). On August 16, 2015, LHSM obtained new directors and officers and after review of all the documents which led up to the PECAS adhesion contract, the new directors and officers of LHSM expedited an intent to rectify the damages to LMMP and its limited partners. In addition, as LMMP has offered to restore all the $225,000.00 the Cross Defendants provided to pay the Perez judgment, thus all Cross Defendants have not been harmed in any prejudicial way by LMMP rescission of the PECAS adhesion contract.

84. As a proximate, LMMP has been damaged by the PECAS adhesion contract, rescission is required, and LMMP is entitled to incidental and consequential damages, costs and attorney fees.

-24-

## SECOND CAUSE OF ACTION

### (Violation of Business and Professions Code § 17200 - Unfair Competition)

### (by Cross Complainants against all Cross Defendants, and Each of Them)

85. LMMP and LHSM restate and incorporate by reference hereat, the above paragraphs 1 through 84 as if fully set forth hereat.

86. LMMP and LHSM are informed, believes and alleges that Cross Defendants violated their rights in accordance with the California Bus. & Pro. Code §17200, et seq, Unfair Competition in that the actions of Cross Defendants and each of them was an ***UNLAWFUL BUSINESS PRACTICE***, in that:

A. While Cross Defendants had the right to conduct their business and affairs and could lawfully contract with LMMP, they had a duty and responsibility to do so within the confines of the law, and with responsible oversight, and by not violating any law, be it civil or criminal, state or federal statute, regulation or case law.

B. Motivated by greed and profit, rather than obligatory attention to legal requirements, however, Cross Defendants created a scheme in which they:

(i) Induced LMMP and LHSM to enter into the PECAS adhesion contract by taking material advantage of the chronic pain Shirley Smith, Esq., was enduring at the time, and she was the attorney for LMMP, LHSM and James D. Holmes at the time of the PECAS adhesion contract, and thereby violated Civil Code § 39(a); and,

(ii) Induced LMMP and LHSM to enter into the PECAS adhesion contract in a manner in which LMMP's consent was not freely given in the meaning of Civil Code § 1566; and,

(iii) Induced LMMP and LHSM to enter into the PECAS adhesion contract in which LMMP's consent was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the Cross Defendants in the meaning of Civil Code § 1689(b)(1); and,

(iv) Induced the limited partners of LMMP to ratify the PECAS adhesion contract when the limited partners were not provided with sufficient facts and in which the limited partners of LMMP lacked full knowledge of material facts in the meaning of Civil Code § 2314.

87. The California legislature clearly targeted the unlawful business practices as one of the highest priorities which justifies a limitation on the manner in which a party such as LMMP may be induced to enter into a contract which is unlawful.

88. LMMP has suffered particular injury from the unlawful business practice of all Cross Defendants as alleged herein as LMMP has transferred all of its assets into PECAS by the unlawful business practice of all Cross Defendants, receiving back only a 25% interest in PECAS, and the loss of LMMP's 100% interest in their assets is a deprivation of a significant property interest.

89. In addition, in doing all the things as LMMP and LHSM have heretofore alleged, Cross Defendants engaged in an ***UNFAIR BUSINESS PRACTICE*** in that LMMP's injury from the violations as expressed herein by Cross Defendants is clearly substantial, LMMP's injury is not outweighed by any countervailing benefits to consumers or competition, and LMMP's injuries could not have reasonably been avoided under all of the foregoing circumstances.

90. LMMP and LHSM are entitled to an injunction to be presented which includes, but is not limited to restitution of its assets transferred to PECAS, and to prevent future wrongful retention of the LMMP assets transferred, or the fruits thereof, plus costs and attorney fees under C.C.P. 1025.5.

### THIRD CAUSE OF ACTION

### (DECLARATORY RELIEF)

**(by Cross Complainants against all Cross Defendants, and Each of Them)**

91. LMMP and LHSM restate and incorporate by reference hereat, the above paragraphs 1 through 90 as if fully set forth hereat.

92. The PECAS adhesion contract contains terms and conditions that any dispute between LMMP and PECAS is to be determined through binding arbitration.

93. An actual controversy now exists between Cross Complainants and all Cross Defendants, and each of them, relating to the legal rights, duties and obligations of the respective parties arising out of the relationship between them in which all Cross Defendants coerced Cross Complainants to execute the PECAS adhesion contract which Cross Complainants maintain is unconscionable and which requires all disputes to be settled through binding arbitration.

///

-26-

94. LMMP and LHSM contend that they rescinded the PECAS adhesion contract as described above for, among other issues, unconscionable conduct on the part of all Cross Defendants, and each of them.

95. LMMP and LHSM further contends that James D. Holmes and Shirley Smith, Esq., did not understand the PECAS documents, and also did not understand the nature of the arbitration provisions in the Amended Operating Agreement which they signed.

96. LMMP and LHSM further contend that the arbitration provisions are void or unenforceable in that such provisions were, procedurally unconscionable in the meaning of Civil Code § 1670.5 for being:

A. Oppressive from the inequality in the bargaining power between the principles of LMMP and the principles of PECAS which eviscerated any real or meaningful negotiations between the principles of LMMP and PECAS as to such arbitration provisions in which there was an absence of a meaningful choice as to such arbitration provisions; and for creating,

B. Surprise in that the supposedly agreed-upon terms of bargain with respect to the arbitration provisions were hidden in prolix of the printed form drafted by PECAS who demanded of LMMP at the last moment, to accept the entire thirty-seven (37) page Amended Operating Agreement of PECAS which contained the arbitration provisions.

97. LMMP and LHSM further contend that the arbitration provisions are void or unenforceable in that such provisions were substantively unconscionable from the overly harsh or one-sided results of the adhesion contract prepared by PECAS and handed to the principles of LMMP in the evening the $225,000.00 payment for the Perez judgment was due, and the take it or leave it form of the adhesion contract drafted by PECAS was procedurally unconscionable.

98. LMMP and LHSM further contend that the documents which the Defendants, and each of them prepared were (A) unconscionable, and (B) the arbitration provisions in the documents regarding resolving disputes was unconscionable and that (C) such unconscionable conduct is grounds for revocation of the agreement to seek arbitration to resolve the dispute as described above, and (D) there is a statutory exception permitting courts to deny petitions to compel arbitration where it is shown that grounds exist for the revocation of the agreement to protect against LMMP's

1  concerns that arbitration would amount to making the arbitration and its process an offensive weapon

2  in the arsenal of Defendants, and each of them, and (E), and the disputes which LMMP is asserting as

3  described above are beyond the scope of the arbitration clause all of which are for a Court to decide

4  pursuant to the Code of Civil Procedure § 1281.2(c).

5       99. LMMP and LHSM further contend that the forum selection clause in ¶ 13.14 of the

6  PECAS Amended and Restated Operating Agreement dated January 25, 2013 is invalid, as the

7  provision is also procedural and substantively unconscionable when it requires that LMMP

8  irrevocably submits to the exclusive jurisdiction of the United States District Court for the Central

9  District of California, and the California State Courts sitting in Los Angeles County, California, for

10 the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction

11 contemplated hereby, and agrees that any suit, action or other proceeding shall he filed in the

12 courthouse located in Santa Monica, California or the closest courthouse to Santa Monica, California.

13      100. All Cross Defendants, and each of them,  deny that they violated the rights of LMMP

14 and LHSM as described above, and maintain that LMMP's and LHSM's dispute with the PECAS

15 adhesion contract requires a binding arbitration.

16      101. LMMP desire a judicial determination and declaration of the respective rights, duties and

17 obligations of LMMP, and all Defendants, and each of them with respect to LMMP being entitled to

18 maintain its action against Defendants, and each of them in Court rather than in arbitration.

19      **WHEREFORE**, Cross Complainants pray for judgment against all Cross Defendants, and

20 each of them as follows:

21      **On the First Causes of Action**:

22      1. For rescission of all the LMMP/PECAS agreements;

23      2. For an injunction in a form to be presented or to be created by the Court;

24      3. For restitution of all of LMMP's assets transferred to Defendants, and each of them;

25      4. For compensator damages according to proof;

26      5. For incidental damages according to proof;

27      6. For consequential damages according to proof;

28      7. For reasonable attorney fees;

Verified Cross Complaint of Lake Mathews Mineral Properties, Ltd. and Lawrence Holmes Senior Mining, Inc.

1    8. For costs of suit;

2    9. For such other and further relief as the Court deems just and proper.

3    **On the Second Cause of Action**:

4    1. For restitution of all the assets LMMP transferred to Defendants, and each of them;

5    2. For an injunction in a form to be presented or to be created by the Court;

6    3. For a penalty according to proof;

7    4. For attorney fees pursuant to California Code of Civil Procedure 1021.5;

8    5. For costs of suit;

9    6. For such other and further relief as the court may deem just, fair and appropriate.

10    **On the Third Cause of Action**

11    1. For a declaration that LMMP is entitled to maintain the within action to resolve its disputes

12    with Cross Defendants, and each of them in Court with Local Venue, and is not required to resolve

13    the disputes in arbitration or in Los Angeles County in either Unites States District Court of any State

14    Court closest to Santa Monica, California.

15    2. For such other and further relief as the Court deems just and proper.

16    Dated: January 12, 2016                    Respectfully filed by:

17

18                                              DENNIS PALMIERI
                                               Counselor and Attorney
19                                             Attorney for Cross Complainant
                                               LAKE MATHEWS MINERAL PROPERTIES, LTD.
20                                             LAWRENCE HOLMES SENIOR MINING, INC.

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

-29-

## VERIFICATION

1

2       I, Steven Winstead, declare that I have read the foregoing Verified Cross Complaint for

3   Rescission, and for a  Violation of California Business & Professions Code § 17200 and for

4   Declaratory Relief, and know the contents therein.

5       I am a Director and the Senior Vice President and General Manage of Lawrence Holmes

6   Senior Mining, Inc. the General Partner of Lake Mathews Mineral Properties, Ltd., the Cross

7   Complainants in this action and I make this verification for that reason.

8       I have read the foregoing document and know its contents. The matters stated in it are true of

9   my own knowledge, except as to those matters which are stated on information and belief, and as to

10  those matters, I believe them to be true.

11      I declare under penalty of perjury, under the laws of the State of California, that the foregoing

12  is true and correct.

13  Dated: January 12, 2016

                                                    Steven Winstead

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

-30-

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I, Dennis Palmieri, declare as follows:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: P.O. Box 2465, Malibu, CA, 90265.

On January 15, 2016 I served the foregoing document described as [Proposed] VERIFIED CROSS COMPLAINT FOR RESCISSION, VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, UNFAIR COMPETITION FOR AN UNLAWFUL BUSINESS PRACTICE AND FOR AN UNFAIR BUSINESS PRACTICE on the interested parties in this action:

[X] by placing a true copy thereof enclosed in a sealed envelope, with postage fully pre-paid thereon to the following persons at the following address:

David J. Myers, Esq.
KUZYK LAW, LLP
17606 Camino de Yatasio
Pacific Palisades, California 90272
Tel: (949) 340-0130
Fx: (310) 997-2110
Email: dmyers@djmyers-lalaw.com
Attorney for Plaintiffs and Cross Defendants

Shirley Smith, Esq.
James D. Holmes
9359 Lincoln Blvd., Suite 4244
Los Angeles, CA, 90045
Tel: (310) 641-1796
Fax: (310) 649-4198
E-mail: Lmmpltd@charter.net

[X] BY MAIL

[X] I deposited such envelope in the mail at Malibu, California. The envelope was mailed with postage thereof fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Malibu, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on January 15, 2016, at Malibu, California.

[X] (State)      I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[ ] (Federal)    I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Dennis Palmieri

D24

**-31-**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **EXHIBIT "3"**

[UCC Search Results]

**CLAS**

WORLDWIDE INFORMATION SERVICES

Better
Intelligence
Better
Decisions™

2020 Hurley Way, Suite 350  Sacramento, CA 95825
Local: (916) 564-7800  Fax: (916) 564-7900  Toll Free: (800) 952-5696

Ask us about UCC eZFILE®

# UCC Search Report

|  |  |
|---|---|
| **Indices Searched:** | UCCs, Federal Tax Liens, State Tax Liens and Judgments |
| **Jurisdiction/Filing Office:** | State of California, Secretary of State, Uniform Commercial Code Division |
| **Effective Index Date:** | Jul 23, 2017 |
| **Search Type:** | Debtor Name |
| **Subject Search Name:** | LAKE MATHEWS MINERAL PROPERTIES |
| **Search Key Entered:** | LAKE MATHEWS MINERAL PROPERTIES |

# Results

Based on a search of the indices of the Uniform Commercial Code Division of the Secretary of State of California, there are no active liens of record other than those set out below. Liens reflected in this report were based on the searcher's individual search parameters, the search key entered, as well asthe searcher's choice of the liens ultimately included or excluded herein.

**Certification can only be obtained through the office of the California Secretary of State.**

|  |  |
|---|---|
| **1. UCC Financing Statement** | **Lapses: 10/16/2018** |
| **Document No. :** | 20137382522770 |
| **Filed :** | 10/16/2013 |
| **File Status :** | Active |
| **Debtor:** | LAKE MATHEWS MINERAL PROPERTIES, LTD. |
|  | 3845 MIDWAY AVENUE |
|  | CULVER CITY CA 90232 |
| **Secured Party:** | BRIDGEPORT MANAGEMENT, INC. |
|  | PMB 732, 18160 COTTONWOOD ROAD |
|  | SUNRIVER OR 97707 |

We assume no liability with respect to the identity of any party named or referred to in this report, nor with respect to the validity, legal effect or priority of any matter shown herein; nor, due to our inability to independently verify the accuracy of this data as provided by government and other sources, do we make any guaranty or representation as to its accuracy.

# Report Parameters

The UCC Revised Article 9 Model Administrative Rules (MARS) provide state filing offices with a set of guidelines for producing a legally compliant UCC lien search report. The search tool used to create this search report was designed to satisfy the requirements under MARS while providing the searcher with increased flexibility.

Flexible search logic generates a more inclusive search report and addresses the inconsistencies in searches performed within states that did not effectively adopt the MARS guidelines. Further, these specially designed broad-based searching features aid in the location of involuntary liens such as Federal and State Tax Liens and Judgment Liens and liens that may not be located in state databases limited to the MARS guidelines for the reporting of UCCs.

--------- END OF REPORT ----------

## UCC FINANCING STATEMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

| A. NAME & PHONE OF CONTACT AT FILER [optional] |
|---|
| Charles Markley |
| 503-295-2668 |

| B. SEND ACKNOWLEDGMENT TO: (Name and Address) | |
|---|---|
| Charles Markley<br>1515 SW Fifth Avenue, Suite 600<br>Portland, OR 97201<br>USA | DOCUMENT NUMBER: 39937810002<br>FILING NUMBER: 13-7382522770<br>FILING DATE: 10/16/2013 15:19<br>IMAGE GENERATED ELECTRONICALLY FOR WEB FILING<br>THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY |

**1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| OR | 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|---|
| | Lake Mathews Mineral Properties, Ltd. | | | | | |
| | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| | | | | | | |

| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|
| 3845 Midway Avenue | Culver City | | CA | 90232 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any | |
|---|---|---|---|---|---|
| | | Ltd. | CA | 198620600011 | □ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

| OR | 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | | SUFFIX |
| | | | | | | |

| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|
| | | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any | |
|---|---|---|---|---|---|
| | | | | | □ NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)**

| OR | 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| | Bridgeport Management, Inc. | | | | |
| | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| PMB 732, 18160 Cottonwood Road | Sunriver | OR | 97707 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

See Attachment(s)

**5. ALT DESIGNATION:** ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

| ☐ 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s)<br>[ADDITIONAL FEE]    [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |
|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

**FILING OFFICE COPY**

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Martin L. Hudler  (951) 303-4400

B. SEND ACKNOWLEDGEMENT TO:    (Name and Address)

Martin L. Hudler
PMB 732
18160 Cottonwood Road
Sunriver OR 97707

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Lake Mathews Mineral Properties, Ltd. | | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| c/o Pat Sherman, 3845 Midway Avenue | Culver City | CA | 90232 | USA |

| | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Bridgeport Management, Inc., a Nevada corporation | | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| PMB 732, 18160 Cottonwood Road | Sunriver | OR | 97707 | |

4. This FINANCING STATEMENT covers the following collateral:

SEE ATTACHED

5. ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR  ☐ SELLER/BUYER  ☐ AG. LIEN  ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable]    7. Check to REQUEST SEARCH REPORT(S) on Debtor(s)  ☐ All Debtors  ☐ Debtor 1  ☐ Debtor 2
[ADDITIONAL FEE]    [optional]

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT (FORM UCC1) – CALIFORNIA (REV. 01/01/08)

**Instructions for National UCC Financing Statement Addendum (Form UCC1Ad)**

9.  Insert name of first Debtor shown on Financing Statement to which this Addendum is related, exactly as shown in Item 1 of Financing Statement.

10.  Miscellaneous: Under certain circumstances, additional information not provided on Financing Statement may be required. Also, some states have non-uniform requirements. Use this space to provide such additional information or to comply with such requirements; otherwise, leave blank.

11.  If this Addendum adds an additional Debtor, complete Item 11 in accordance with Instruction 1 on Financing Statement. To add more than one additional Debtor, either use an additional Addendum form for each additional Debtor or replicate for each additional Debtor the formatting of Financing Statement Item 1 on an 8-1/2 X 11 inch sheet (showing at the top of the sheet the name of the first Debtor shown on the Financing Statement), and in either case give complete information for each additional Debtor in accordance with Instruction 1 on Financing Statement. All additional Debtor information, especially the name, must be presented in proper format exactly identical to the format of Item 1 of Financing Statement.

12.  If this Addendum adds an additional Secured Party, complete Item 12 in accordance with Instruction 3 on Financing Statement. In the case of a total assignment of the Secured Party's interest before the filing of this Financing Statement, if filer has given the name and address of the Total Assignee in Item 3 of the Financing Statement, filer may give the Assignor S/P's name and address in Item 12.

13-15.  If collateral is timber to be cut or as-extracted collateral, or if this Financing Statement is filed as a fixture filing, check appropriate box in Item 13; provide description of real estate in Item 14; and, if Debtor is not a record owner of the described real estate, also provide, in Item 15, the name and address of a record owner. Also provide collateral description in Item 4 of Financing Statement. Also check box 6 on Financing Statement. Description of real estate must be sufficient under the applicable law of the jurisdiction where the real estate is located.

16.  Use this space to provide continued description of collateral, if you cannot complete description in Item 4 of Financing Statement.

17.  If Debtor is a trust or a trustee acting with respect to property held in trust or is a decedent's estate, check the appropriate box.

18.  If Debtor is a transmitting utility or if the Financing Statement relates to a Manufactured-Home Transaction or a Public-Finance Transaction as defined in the applicable Commercial Code, check the appropriate box.

## SECTION 4:

(a) 22% of any gross proceeds (but less any sums paid to David Perez or Isaac Holdings, Inc. ("Claimants") received by or for the account of Debtor from any source in resolution of claims, including claims for inverse condemnation by Debtor against Metropolitan Water District ("MWD") and claims of condemnation by MWD against Debtor.

(b) 22% of any gross proceeds (but less any sums paid to Claimants) received by or for the account of Debtor derived from rents, royalties, profits and other economic return from the property described on Exhibits A and B attached hereto (the "Property") including minerals and water resources), pursuant to any agreement executed during the term of an agreement dated April 22, 2010 between Debtor and Secured Party (the "Agreement").

(c) 20% of any gross proceeds (but less any sums paid to Claimants) received by or for the account of Debtor derived from rents, royalties, profits and other economic return from the Property (including minerals and water resources), pursuant to any agreement executed with Debtor after the term of the Agreement with a party with which Secured Parted negotiated with or who, during the term of the Agreement, examined or was introduced to the Property by any means.

511188288

## LEGAL DESCRIPTION

The land referred to herein is situated in the State of California,
County of Riverside, Unincorporated Area, described as follows:

PARCEL 1:

THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE SOUTHWEST
QUARTER AND THE NORTH HALF OF THE NORTHWEST QUARTER OF THE
SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 4 SOUTH, RANGE 6 WEST,
SAN BERNARDINO BASE AND MERIDIAN, IN THE RANCH EL SOBRANTE DE
SAN JACINTO, AS SHOWN BY SECTIONIZED SURVEY OF SAID RANCHO
RECORDED IN BOOK 7 PAGE 10, OF MAPS, RECORDS OF SAN BERNARDINO
COUNTY;

EXCEPTING THEREFROM ALL INTEREST IN AND TO ALL MINERAL AND
MINING RIGHTS APPURTENANT TO SAID REAL PROPERTY AS SAID RIGHTS
WERE ABANDONED BY THE METROPOLITAN WATER DISTRICT OF SOUTHERN
CALIFORNIA IN CASE NOS. 26462 AND 27011, RECORDS OF THE
RIVERSIDE COUNTY SUPERIOR COURT AND AS REFERRED TO IN THE FINAL
ORDER OF CONDEMNATION, RECORDED FEBRUARY 28, 1942 IN BOOK 534
PAGE 231 OF OFFICIAL RECORDS, AS CONVEYED TO LAKE MATHEWS
MINERAL PROPERTIES, LTD., A LIMITED PARTNERSHIP BY DEED RECORDED
FEBRUARY 10, 1983 AS INSTRUMENT NO. 26467 OF OFFICIAL RECORDS.

PARCEL 2:

ALL OF THAT PORTION OF THE SOUTHEAST QUARTER OF THE NORTHEAST
QUARTER OF THE SOUTHEAST QUARTER AND OF THE SOUTHEAST QUARTER
OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE
SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 4 SOUTH, RANGE 6
WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE RANCH EL
SOBRANTE DE SAN JACINTO, AS SHOWN BY SECTIONIZED SURVEY OF SAID
RANCHO RECORDED IN BOOK 7 PAGE 10, OF MAPS, RECORDS OF SAN
BERNARDINO COUNTY, WHICH LIES ABOVE THE 1,200 FOOT ELEVATION
ABOVE SEA LEVEL;

EXCEPTING THEREFROM ALL INTEREST IN AND TO ALL MINERAL AND
MINING RIGHTS APPURTENANT TO SAID REAL PROPERTY AS SAID RIGHTS
WERE ABANDONED BY THE METROPOLITAN WATER DISTRICT OF SOUTHERN
CALIFORNIA IN CASE NOS. 26462 AND 27011, RECORDS OF THE
RIVERSIDE COUNTY SUPERIOR COURT AND AS REFERRED TO IN THE FINAL
ORDER OF CONDEMNATION, RECORDED FEBRUARY 28, 1942 IN BOOK 534
PAGE 231 OF OFFICIAL RECORDS, AS CONVEYED TO LAKE MATHEWS
MINERAL PROPERTIES, LTD., A LIMITED PARTNERSHIP BY DEED RECORDED
FEBRUARY 10, 1983 AS INSTRUMENT NO. 26467 OF OFFICIAL RECORDS.

PARCEL 3:

Continued on next page

-2-

Ex A

511188288

THAT PORTION OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 4
SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND MERIDIAN, AS SHOWN
BY SECTIONIZED SURVEY OF SAID RANCHO RECORDED IN BOOK 7 PAGE
10, OF MAPS, RECORDS OF SAN BERNARDINO COUNTY. DESCRIBED AS
FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID SECTION; THENCE SOUTH
0°32'55" WEST ALONG THE WEST LINE OF SAID NORTHWEST QUARTER,
1,531.21 FEET TO A POINT DISTANCE NORTHWESTERLY 100 FEET
MEASURED AT A RIGHT ANGLE FROM THE PROLONGATION OF THE CENTER
LINE OF THE MATHEWS RESERVOIR SPILLWAY, SAID CENTER LINE HAVING
A BEARING OF SOUTH 69°57'09" WEST; THENCE NORTH 65°57'09" EAST
ALONG A LINE PARALLEL WITH AND DISTANT NORTHWESTERLY 100 FEET,
MEASURED AT A RIGHT ANGLE FROM SAID PROLONGATION OF THE CENTER
LINE OF THE EXISTING MATHEWS RESERVOIR SPILLWAY 715 FEET;
THENCE NORTH 11°32'15" EAST 1,012.83 FEET; THENCE NORTH
9°39'15" WEST 298.13 FEET TO THE NORTHERLY LINE OF SAID
NORTHWEST QUARTER; THENCE SOUTH 89°59'02" WEST ALONG THE
NORTHERLY LINE OF SAID NORTHWEST QUARTER 809.60 FEET TO THE
POINT OF BEGINNING.

TOGETHER WITH AN EASEMENT FOR INGRESS AND EGRESS FROM THE ABOVE
DESCRIBED PARCEL OVER A STRIP(S) OF LAND 60 FEET IN WIDTH BEING
DESCRIBED AS ALL THAT PORTION OF THE NORTH 60 FEET OF SAID
SECTION 12 HEREINABOVE DESCRIBED LYING BETWEEN THE EASTERLY
LINE OF THE ABOVE DESCRIBED PARCEL AND THE WESTERLY LINE OF
TAYLOR STREET AS CONVEYED TO THE COUNTY OF RIVERSIDE, BY DEED
RECORDED AUGUST 2, 1946 IN BOOK 760 PAGE 76 OF OFFICIAL RECORDS;

EXCEPTING THEREFROM ALL INTEREST IN AND TO ALL MINERAL AND
MINING RIGHTS APPURTENANT TO SAID REAL PROPERTY AS SAID RIGHTS
WERE ABANDONED BY THE METROPOLITAN WATER DISTRICT OF SOUTHERN
CALIFORNIA IN CASE NOS. 26462 AND 27011, RECORDS OF THE
RIVERSIDE COUNTY SUPERIOR COURT AND AS REFERRED TO IN THE FINAL
ORDER OF CONDEMNATION, RECORDED FEBRUARY 28, 1942 IN BOOK 534
PAGE 231 OF OFFICIAL RECORDS, AS CONVEYED TO LAKE MATHEWS
MINERAL PROPERTIES, LTD., A LIMITED PARTNERSHIP BY DEED RECORDED
FEBRUARY 10, 1983 AS INSTRUMENT NO. 26467 OF OFFICIAL RECORDS.

End of Legal Description

Continued on next page

-3-

511188300A

## LEGAL DESCRIPTION

The land referred to herein is situated in the State of California,
County of Riverside, Unincorporated Area, described as follows:

PARCEL 1: (SECTION 11) (PARCEL 1 OF SUPERIOR COURT CASE #27011)

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

THE EAST HALF OF SOUTHEAST QUARTER THE SOUTHWEST QUARTER OF
SOUTHEAST QUARTER THE SOUTH HALF OF NORTHWEST QUARTER OF
SOUTHEAST QUARTER THE SOUTHEAST QUARTER OF NORTHEAST QUARTER OF
SOUTHWEST QUARTER AND THE NORTHEAST QUARTER OF SOUTHEAST QUARTER
OF SOUTHWEST QUARTER OF SECTION 11, TOWNSHIP 4 SOUTH, RANGE 6
WEST, SAN BERNARDINO BASE AND MERIDIAN.

PARCEL 262:

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

THE SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER
OF SECTION 6, TOWNSHIP 4 SOUTH, RANGE 5 WEST, SAN BERNARDINO
BASE AND MERIDIAN;

EXCEPTING THEREFROM THE NORTH 9/10 THEREOF.

THE WEST HALF OF THE NORTHWEST QUARTER AND THE SOUTHEAST QUARTER
OF NORTHWEST QUARTER OF SECTION 7, TOWNSHIP 4 SOUTH, RANGE 5
WEST, SAN BERNARDINO BASE AND MERIDIAN.

THE NORTH HALF AND THE NORTH HALF OF SOUTH HALF OF SECTION 12,
TOWNSHIP 4 SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND
MERIDIAN;

EXCEPTING THEREFROM THOSE PARCELS IN SAID SECTION 12 DESCRIBED
AS PARCELS 264, 265 AND 271 HEREIN.

REFERENCE IS HEREBY MADE TO SAID DOCUMENT FOR FURTHER AND OTHER
PARTICULARS.

PARCEL 363:

Continued on next page

-2-



511188300A

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

THE SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF SECTION 12,
TOWNSHIP 4 SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND
MERIDIAN.

PARCEL 264:

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

THE WEST HALF OF NORTHEAST QUARTER OF NORTHEAST QUARTER OF
SOUTHWEST QUARTER OF SECTION 12, TOWNSHIP 4 SOUTH, RANGE 6
WEST, SAN BERNARDINO BASE AND MERIDIAN.

PARCEL 265:

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

ALL THAT PORTION OF THE SOUTHWEST QUARTER OF SOUTHWEST QUARTER
OF NORTHEAST QUARTER OF SECTION 12, TOWNSHIP 4 SOUTH , RANGE 6
WEST, SAN BERNARDINO BASE AND MERIDIAN, DESCRIBED IN THAT
CERTAIN DEED FROM LAWRENCE HOLMES, ET UX, TO THEODORE L.
COFFIN, ET AL, RECORDED FEBRUARY 13, 1932 IN BOOK 63 PAGE 598
OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF EAST ONE ACRE OF NORTH TWO
ACRES OF EAST HALF OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF
NORTHEAST QUARTER OF SAID SECTION; THENCE WESTERLY ON THE
NORTHERLY LINE OF SAID SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF
NORTHEAST QUARTER OF SAID SECTION, 132 FEET; THENCE SOUTHERLY
AND PARALLEL WITH THE WESTERLY LINE OF THE NORTHEAST QUARTER OF
SAID SECTION, 330 FEET TO THE SOUTHERLY LINE OF THE NORTH HALF
OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF NORTHEAST QUARTER
OF SAID SECTION; THENCE EASTERLY ON SAID SOUTHERLY LINE, 231
FEET TO A POINT 66 FEET WESTERLY FROM THE SOUTHEAST CORNER OF
THE NORTH HALF OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF
NORTHEAST QUARTER OF SAID SECTION; THENCE NORTHWESTERLY ON THE
SOUTHWESTERLY LINE OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN

Continued on next page

-3-

511188300A

DEED TO GEORGE K. HANEY AND LULU HANEY, HIS WIFE, RECORDED
AUGUST 18, 1930 IN BOOK 871 PAGE 141, OF DEEDS, RECORDS OF
RIVERSIDE COUNTY, CALIFORNIA, TO THE SOUTHERLY LINE OF THE EAST
ONE ACRE OF NORTH TWO ACRES OF EAST HALF OF SOUTHWEST QUARTER OF
SOUTHWEST QUARTER OF NORTHEAST QUARTER OF SAID SECTION; THENCE
WESTERLY ALONG SAID SOUTHERLY LINE TO THE SOUTHWEST CORNER OF
SAID EAST ONE ACRE; THENCE NORTHERLY 264 FEET, MORE OR LESS, TO
THE POINT OF BEGINNING; ALSO, THE WESTERLY RECTANGULAR 132 FEET
OF THE NORTHERLY RECTANGULAR 65 FEET OF THE EASTERLY 297 FEET
OF SOUTH HALF OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF
NORTHEAST QUARTER OF SAID SECTION 12.

End of Legal Description

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "4"

[Proof of Claim filed by Bridgeport Management, Inc.]



FILED

OCT 07 2016

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

**Fill in this information to identify the case:**

Debtor 1    Lake Mathews Mineral Properties, LTD

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Central District of California, Los Angles Div

Case number   2:16-bk-16363-NB

## Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Bridgeport Management, Inc.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor  Bridgeport Management, LLC

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Charles R. Markley
Name

1515 SW 5th Avenue, Suite 600
Number    Street

Portland,          OR      97201
City               State   ZIP Code

Contact phone (503) 295-2668

Contact email charles.markley@greenemarkley.com

Where should payments to the creditor be sent? (if different)

Charles R. Markley
Name

1515 SW 5th Avenue, Suite 600
Number    Street

Portland          OR      97201
City               State   ZIP Code

Contact phone (503) 295-2668

Contact email same

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
         MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**   $ *Unknown*
*See attached*

**Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Services performed

**9. Is all or part of the claim secured?**

☐ No

☑ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other. Describe:   22% of gross proceeds received by Debtor from MWD.

**Basis for perfection:**   Filed UCC-1

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:   $_____

Amount of the claim that is secured:   $_____

Amount of the claim that is unsecured:   $_____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $_____

Annual Interest Rate (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ |

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  10/04/2016
　　　　　　　　　MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Charles R Markley |
|---|---|
|  | First name　　　　　Middle name　　　　　Last name |
| Title | Attorney at law |
| Company | Greene & Markley, P.C. |
|  | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 1515 SW 5th Avenue, Suite 600 |
|  | Number　　　Street |
|  | Portland　　　　　　　　OR　　　97201 |
|  | City　　　　　　　　　State　　ZIP Code |
| Contact phone | (503) 295-2668 　　　Email charles.markley@greenemarkley.co |

## AGREEMENT

This is an Agreement between Lake Mathews Mineral Properties, Ltd, a California limited partnership, and its general partner, Lawrence Holmes Senior Mining, Inc., a California corporation, and their affiliates or assignees ("LMMP") and Bridgeport Management, LLC, an Oregon limited liability company ("Bridgeport").

The parties acknowledge that LMMP owns or has the right to own certain real property located in Riverside County, California described on Exhibit "A" attached hereto, adjacent to Lake Mathews, and LMMP has certain and specific property rights, mineral rights, water resource rights and other rights and interests (the "Rights) granted to it through the predecessors of LMMP on and under an adjoining approximate 800 acres, described on Exhibit "B" attached hereto, which Rights were granted a Court-approved Stipulation. A dispute has arisen or may arise between LMMP and Metropolitan Water District of Southern California, a California governmental entity (the "MWD") giving rise to claims, including claims for inverse condemnation by LMMP against the MWD and claims of condemnation by the MWD against LMMP (the "Dispute"). Bridgeport's personnel have experience in litigation, claims by and against the MWD, and Bridgeport is willing to provide its services to LMMP in connection with management of the Property, resolution of the Dispute and other business matters of LMMP, which will require the services of Bridgeport.

NOW, THEREFORE, in consideration of the mutual promises contained herein, the parties agree as follows:

1. _Services._ Subject to the direction of LMMP, Bridgeport shall be the Real Property Asset Manager for LMMP and the Property, and shall provide the following services, with the advice of legal counsel as needed:

(a) Initiate, direct, supervise and be the chief participant on behalf of LMMP in any negotiations to resolve the Dispute, whether with the MWD or any other party.

(b) With the advice and consent of LMMP, engage legal counsel on such terms as are reasonable to provide legal services to resolve the Dispute and represent LMMP as may be required from time to time.

(c) Engage, direct and supervise the services of appraisers, engineers, surveyors, accountants, and other professionals and experts reasonably necessary to resolve the Dispute, and conduct other business of LMMP as specified herein.

Page 1 - AGREEMENT

EXHIBIT 1
PAGE 1 OF 8



UCC   ACCOUNTS   HELP   BRIEFCASE   LOGOUT

Filing Number Inquiry

This Secured Party Search was performed on 10/03/2016 17:03 with the following search parameters:
**SECURED PARTY NAME:  BRIDGEPORT MANAGEMENT, INC.**
**City, State, Country:  [Not Specified]**

| View | Filing Number | Filing Type | Filing Date | Pages | Lapse Date |
|------|---------------|-------------|-------------|-------|------------|
| ⌕ | 13-7382522770 | **Financing Statement** | **10/16/2013 15:19** | **8** | **10/16/2018** |

| Debtor - Organization | LAKE MATHEWS MINERAL PROPERTIES, LTD. | 3845 MIDWAY AVENUE, CULVER CITY, CA, USA 90232 |
|---|---|---|
| Secured Party - Organization | BRIDGEPORT MANAGEMENT, INC. | PMB 732, 18160 COTTONWOOD ROAD, SUNRIVER, OR, USA 97707 |

Cancel

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

| A. NAME & PHONE OF CONTACT AT FILER [optional] |
|---|
| Charles Markley |
| 503-295-2668 |

| B. SEND ACKNOWLEDGMENT TO: (Name and Address) |
|---|
| Charles Markley |
| 1515 SW Fifth Avenue, Suite 600 |
| Portland, OR 97201 |
| USA |

DOCUMENT NUMBER: 39937810002
FILING NUMBER: 13-7382522770
FILING DATE: 10/16/2013 15:19
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Lake Mathews Mineral Properties, Ltd. | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3845 Midway Avenue | Culver City | CA | 90232 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | Ltd. | CA | 198620600011  ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Bridgeport Management, Inc. | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| PMB 732, 18160 Cottonwood Road | Sunriver | OR | 97707 | USA |

**4. This FINANCING STATEMENT covers the following collateral:**

See Attachment(s)

**5. ALT DESIGNATION:** ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

| ☐ 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum (if applicable) | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]  [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |
|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

FILING OFFICE COPY

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Martin L. Hudler    (951) 303-4400

B. SEND ACKNOWLEDGEMENT TO:    (Name and Address)

Martin L. Hudler
PMB 732
18160 Cottonwood Road
Sunriver OR 97707

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** – insert only one debtor name (1a or 1b) – do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | | |
| Lake Mathews Mineral Properties, Ltd. | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| c/o Pat Sherman, 3845 Midway Avenue | Culver City | CA | 90232 | USA |
| 1d. ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** – insert only one debtor name (2a or 2b) – do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2d. ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) – insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME | | | | |
| Bridgeport Management, Inc., a Nevada corporation | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| PMB 732, 18160 Cottonwood Road | Sunriver | OR | 97707 | |

**4.** This FINANCING STATEMENT covers the following collateral:

SEE ATTACHED

5. ALTERNATIVE DESIGNATION (if applicable) ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum    [if applicable]    7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]    [optional]    ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY – NATIONAL UCC FINANCING STATEMENT (FORM UCC1) – CALIFORNIA (REV. 01/01/08)

### Instructions for National UCC Financing Statement Addendum (Form UCC1Ad)

9.    Insert name of first Debtor shown on Financing Statement to which this Addendum is related, exactly as shown in item 1 of Financing Statement.

10.    Miscellaneous: Under certain circumstances, additional information not provided on Financing Statement may be required. Also, some states have non-uniform requirements. Use this space to provide such additional information or to comply with such requirements; otherwise, leave blank.

11.    If this Addendum adds an additional Debtor, complete item 11 in accordance with instruction 1 on Financing Statement. To add more than one additional Debtor, either use an additional Addendum form for each additional Debtor or replicate for each additional Debtor the formatting of Financing Statement item 1 on an 8-1/2 X 11 inch sheet (showing at the top of the sheet the name of the first Debtor shown on the Financing Statement), and in either case give complete information for each additional Debtor in accordance with instruction 1 on Financing Statement. All additional Debtor information, especially the name, must be presented in proper format exactly identical to the format of item 1 of Financing Statement.

12.    If this Addendum adds an additional Secured Party, complete item 12 in accordance with instruction 3 on Financing Statement. In the case of a total assignment of the Secured Party's interest before the filing of this Financing Statement, if filer has given the name and address of the Total Assignee in item 3 of the Financing Statement, filer may give the Assignor S/P's name and address in item 12.

13-15.    If collateral is timber to be cut or as-extracted collateral, or if this Financing Statement is filed as a fixture filing, check appropriate box in item 13; provide description of real estate in item 14; and, if Debtor is not a record owner of the described real estate, also provide, in item 15, the name and address of a record owner. Also provide collateral description in item 4 of Financing Statement. Also check box 6 on Financing Statement. Description of real estate must be sufficient under the applicable law of the jurisdiction where the real estate is located.

16.    Use this space to provide continued description of collateral, if you cannot complete description in item 4 of Financing Statement.

17.    If Debtor is a trust or a trustee acting with respect to property held in trust or is a decedent's estate, check the appropriate box.

18.    If Debtor is a transmitting utility or if the Financing Statement relates to a Manufactured-Home Transaction or a Public-Finance Transaction as defined in the applicable Commercial Code, check the appropriate box.

SECTION 4:

(a) 22% of any gross proceeds (but less any sums paid to David Perez or Isaac Holdings, Inc. ("Claimants") received by or for the account of Debtor from any source in resolution of claims, including claims for inverse condemnation by Debtor against Metropolitan Water District ("MWD") and claims of condemnation by MWD against Debtor.

(b) 22% of any gross proceeds (but less any sums paid to Claimants) received by or for the account of Debtor derived from rents, royalties, profits and other economic return from the property described on Exhibits A and B attached hereto (the "Property") including minerals and water resources), pursuant to any agreement executed during the term of an agreement dated April 22, 2010 between Debtor and Secured Party (the "Agreement").

(c) 20% of any gross proceeds (but less any sums paid to Claimants) received by or for the account of Debtor derived from rents, royalties, profits and other economic return from the Property (including minerals and water resources), pursuant to any agreement executed with Debtor after the term of the Agreement with a party with which Secured Parted negotiated with or who, during the term of the Agreement, examined or was introduced to the Property by any means.

511188288

## LEGAL DESCRIPTION

The land referred to herein is situated in the State of California, County of Riverside, Unincorporated Area, described as follows:

PARCEL 1:

THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER AND THE NORTH HALF OF THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 4 SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE RANCH EL SOBRANTE DE SAN JACINTO, AS SHOWN BY SECTIONIZED SURVEY OF SAID RANCHO RECORDED IN BOOK 7 PAGE 10, OF MAPS, RECORDS OF SAN BERNARDINO COUNTY;

EXCEPTING THEREFROM ALL INTEREST IN AND TO ALL MINERAL AND MINING RIGHTS APPURTENANT TO SAID REAL PROPERTY AS SAID RIGHTS WERE ABANDONED BY THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA IN CASE NOS. 26462 AND 27011, RECORDS OF THE RIVERSIDE COUNTY SUPERIOR COURT AND AS REFERRED TO IN THE FINAL ORDER OF CONDEMNATION, RECORDED FEBRUARY 28, 1942 IN BOOK 534 PAGE 231 OF OFFICIAL RECORDS, AS CONVEYED TO LAKE MATHEWS MINERAL PROPERTIES, LTD., A LIMITED PARTNERSHIP BY DEED RECORDED FEBRUARY 10, 1983 AS INSTRUMENT NO. 26467 OF OFFICIAL RECORDS.

PARCEL 2:

ALL OF THAT PORTION OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER AND OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 4 SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE RANCH EL SOBRANTE DE SAN JACINTO, AS SHOWN BY SECTIONIZED SURVEY OF SAID RANCHO RECORDED IN BOOK 7 PAGE 10, OF MAPS, RECORDS OF SAN BERNARDINO COUNTY, WHICH LIES ABOVE THE 1,200 FOOT ELEVATION ABOVE SEA LEVEL;

EXCEPTING THEREFROM ALL INTEREST IN AND TO ALL MINERAL AND MINING RIGHTS APPURTENANT TO SAID REAL PROPERTY AS SAID RIGHTS WERE ABANDONED BY THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA IN CASE NOS. 26462 AND 27011, RECORDS OF THE RIVERSIDE COUNTY SUPERIOR COURT AND AS REFERRED TO IN THE FINAL ORDER OF CONDEMNATION, RECORDED FEBRUARY 28, 1942 IN BOOK 534 PAGE 231 OF OFFICIAL RECORDS, AS CONVEYED TO LAKE MATHEWS MINERAL PROPERTIES, LTD., A LIMITED PARTNERSHIP BY DEED RECORDED FEBRUARY 10, 1983 AS INSTRUMENT NO. 26467 OF OFFICIAL RECORDS.

PARCEL 3:

Continued on next page

-2-

Ex A

511188288

THAT PORTION OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 4
SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND MERIDIAN, AS SHOWN
BY SECTIONIZED SURVEY OF SAID RANCHO RECORDED IN BOOK 7 PAGE
10, OF MAPS, RECORDS OF SAN BERNARDINO COUNTY. DESCRIBED AS
FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID SECTION; THENCE SOUTH.
0°32'55" WEST ALONG THE WEST LINE OF SAID NORTHWEST QUARTER,
1,531.21 FEET TO A POINT DISTANCE NORTHWESTERLY 100 FEET
MEASURED AT A RIGHT ANGLE FROM THE PROLONGATION OF THE CENTER
LINE OF THE MATHEWS RESERVOIR SPILLWAY, SAID CENTER LINE HAVING
A BEARING OF SOUTH 69°57'09" WEST; THENCE NORTH 65°57'09" EAST
ALONG A LINE PARALLEL WITH AND DISTANT NORTHWESTERLY 100 FEET,
MEASURED AT A RIGHT ANGLE FROM SAID PROLONGATION OF THE CENTER
LINE OF THE EXISTING MATHEWS RESERVOIR SPILLWAY 715 FEET;
THENCE NORTH 11°32'15" EAST 1,012.83 FEET; THENCE NORTH
9°39'15" WEST 298.13 FEET TO THE NORTHERLY LINE OF SAID
NORTHWEST QUARTER; THENCE SOUTH 89°59'02" WEST ALONG THE
NORTHERLY LINE OF SAID NORTHWEST QUARTER 809.60 FEET TO THE
POINT OF BEGINNING.

TOGETHER WITH AN EASEMENT FOR INGRESS AND EGRESS FROM THE ABOVE
DESCRIBED PARCEL OVER A STRIP(S) OF LAND 60 FEET IN WIDTH BEING
DESCRIBED AS ALL THAT PORTION OF THE NORTH 60 FEET OF SAID
SECTION 12 HEREINABOVE DESCRIBED LYING BETWEEN THE EASTERLY
LINE OF THE ABOVE DESCRIBED PARCEL AND THE WESTERLY LINE OF
TAYLOR STREET AS CONVEYED TO THE COUNTY OF RIVERSIDE, BY DEED
RECORDED AUGUST 2, 1946 IN BOOK 760 PAGE 76 OF OFFICIAL RECORDS;

EXCEPTING THEREFROM ALL INTEREST IN AND TO ALL MINERAL AND
MINING RIGHTS APPURTENANT TO SAID REAL PROPERTY AS SAID RIGHTS
WERE ABANDONED BY THE METROPOLITAN WATER DISTRICT OF SOUTHERN
CALIFORNIA IN CASE NOS. 26462 AND 27011, RECORDS OF THE
RIVERSIDE COUNTY SUPERIOR COURT AND AS REFERRED TO IN THE FINAL
ORDER OF CONDEMNATION, RECORDED FEBRUARY 28, 1942 IN BOOK 534
PAGE 231 OF OFFICIAL RECORDS, AS CONVEYED TO LAKE MATHEWS
MINERAL PROPERTIES, LTD., A LIMITED PARTNERSHIP BY DEED RECORDED
FEBRUARY 10, 1983 AS INSTRUMENT NO. 26467 OF OFFICIAL RECORDS.

End of Legal Description

Continued on next page

-3-

511188300A

## LEGAL DESCRIPTION

The land referred to herein is situated in the State of California,
County of Riverside, Unincorporated Area, described as follows:

PARCEL 1: (SECTION 11) (PARCEL 1 OF SUPERIOR COURT CASE #27011)

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

THE EAST HALF OF SOUTHEAST QUARTER THE SOUTHWEST QUARTER OF
SOUTHEAST QUARTER THE SOUTH HALF OF NORTHWEST QUARTER OF
SOUTHEAST QUARTER THE SOUTHEAST QUARTER OF NORTHEAST QUARTER OF
SOUTHWEST QUARTER AND THE NORTHEAST QUARTER OF SOUTHEAST QUARTER
OF SOUTHWEST QUARTER OF SECTION 11, TOWNSHIP 4 SOUTH, RANGE 6
WEST, SAN BERNARDINO BASE AND MERIDIAN.

PARCEL 262:

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

THE SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER
OF SECTION 6, TOWNSHIP 4 SOUTH, RANGE 5 WEST, SAN BERNARDINO
BASE AND MERIDIAN;

EXCEPTING THEREFROM THE NORTH 9/10 THEREOF.

THE WEST HALF OF THE NORTHWEST QUARTER AND THE SOUTHEAST QUARTER
OF NORTHWEST QUARTER OF SECTION 7, TOWNSHIP 4 SOUTH, RANGE 5
WEST, SAN BERNARDINO BASE AND MERIDIAN.

THE NORTH HALF AND THE NORTH HALF OF SOUTH HALF OF SECTION 12,
TOWNSHIP 4 SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND
MERIDIAN;

EXCEPTING THEREFROM THOSE PARCELS IN SAID SECTION 12 DESCRIBED
AS PARCELS 264, 265 AND 271 HEREIN.

REFERENCE IS HEREBY MADE TO SAID DOCUMENT FOR FURTHER AND OTHER
PARTICULARS.

PARCEL 363:

Continued on next page

-2-

Ex B

511188300A

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

THE SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF SECTION 12,
TOWNSHIP 4 SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND
MERIDIAN.

PARCEL 264:

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

THE WEST HALF OF NORTHEAST QUARTER OF NORTHEAST QUARTER OF
SOUTHWEST QUARTER OF SECTION 12, TOWNSHIP 4 SOUTH, RANGE 6
WEST, SAN BERNARDINO BASE AND MERIDIAN.

PARCEL 265:

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

ALL THAT PORTION OF THE SOUTHWEST QUARTER OF SOUTHWEST QUARTER
OF NORTHEAST QUARTER OF SECTION 12, TOWNSHIP 4 SOUTH , RANGE 6
WEST, SAN BERNARDINO BASE AND MERIDIAN, DESCRIBED IN THAT
CERTAIN DEED FROM LAWRENCE HOLMES, ET UX, TO THEODORE L.
COFFIN, ET AL, RECORDED FEBRUARY 13, 1932 IN BOOK 63 PAGE 598
OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF EAST ONE ACRE OF NORTH TWO
ACRES OF EAST HALF OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF
NORTHEAST QUARTER OF SAID SECTION; THENCE WESTERLY ON THE
NORTHERLY LINE OF SAID SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF
NORTHEAST QUARTER OF SAID SECTION, 132 FEET; THENCE SOUTHERLY
AND PARALLEL WITH THE WESTERLY LINE OF THE NORTHEAST QUARTER OF
SAID SECTION, 330 FEET TO THE SOUTHERLY LINE OF THE NORTH HALF
OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF NORTHEAST QUARTER
OF SAID SECTION; THENCE EASTERLY ON SAID SOUTHERLY LINE, 231
FEET TO A POINT 66 FEET WESTERLY FROM THE SOUTHEAST CORNER OF
THE NORTH HALF OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF
NORTHEAST QUARTER OF SAID SECTION; THENCE NORTHWESTERLY ON THE
SOUTHWESTERLY LINE OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN

-3-

Continued on next page

511188300A

DEED TO GEORGE K. HANEY AND LULU HANEY, HIS WIFE, RECORDED
AUGUST 18, 1930 IN BOOK 871 PAGE 111, OF DEEDS, RECORDS OF
RIVERSIDE COUNTY, CALIFORNIA, TO THE SOUTHERLY LINE OF THE EAST
ONE ACRE OF NORTH TWO ACRES OF EAST HALF OF SOUTHWEST QUARTER OF
SOUTHWEST QUARTER OF NORTHEAST QUARTER OF SAID SECTION; THENCE
WESTERLY ALONG SAID SOUTHERLY LINE TO THE SOUTHWEST CORNER OF
SAID EAST ONE ACRE; THENCE NORTHERLY 264 FEET, MORE OR LESS, TO
THE POINT OF BEGINNING; ALSO, THE WESTERLY RECTANGULAR 132 FEET
OF THE NORTHERLY RECTANGULAR 65 FEET OF THE EASTERLY 297 FEET
OF SOUTH HALF OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF
NORTHEAST QUARTER OF SAID SECTION 12.

End of Legal Description

-4-

(d)    Communicate with and direct all such professionals and experts in the efficient rendering of services to economically resolve the Dispute and conduct other ongoing business of LMMP.

(e)    Communicate with and report to LMMP on a frequent basis with all pertinent information concerning the status of the Dispute and resolution thereof, as well as all other ongoing and new business matters of LMMP.

(f)    Provide for, approve and supervise the preparation of any settlement agreement between LMMP and the MWD or any others resolving the dispute.

(g)    Provide for, approve and supervise the filing of court pleadings and other documents reasonably required to litigate and resolve the Dispute promptly and efficiently.

(h)    Manage the Property to provide for its economic development and operation, including negotiation, performance of due diligence, and causing to be drafted other agreements affecting the Property, including leases, development of water resources, sale of minerals, or other ventures to derive economic benefit from the Property.

2.    <u>Limited Authority</u>.    Notwithstanding any provision of this Agreement, Bridgeport shall not have authority to:

(a)    Consent on behalf of LMMP to any settlement agreement resolving the Dispute, in whole or in part.

(b)    Receive in the name of Bridgeport any portion of any proceeds resolving the Dispute, except such sums as are due Bridgeport on account of this Agreement, in which case Bridgeport may deposit such sums in its account.

(c)    Engage or terminate the services of legal counsel providing services to LMMP.

(d)    Except as otherwise agreed by the parties, endorse any check or draft payable to LMMP.

(e)    Take any action contrary to the written direction of LMMP.

(f)    Take any action or engage in any activity in contravention, circumvention of, or prohibited by that certain "Amended General Partnership

Page 2 - AGREEMENT

EXHIBIT ___1___
PAGE ___2___ OF ___8___

Agreement" of LMMP.

3.    Operating Revenues.    In order to fund litigation costs of the Dispute, development of the economic resources of LMMP, and other operations of LMMP:

(a)    Bridgeport shall review, negotiate, procure and advise LMMP to the best of its ability, concerning loan proposals and or offers to admit equity partners or investors, which is to be secured by the Property from one or more potential lenders or equity partners or investors for such sums estimated to be sufficient to fund the above purposes and the operation of LMMP's business as determined by LMMP and Bridgeport. Upon approval of the terms by LMMP, which shall not be unreasonably withheld, Bridgeport shall supervise the closing of the loan, the funding from equity partners or investors, the proceeds of which shall be deposited into a segregated bank account of LMMP or Integrated Resources, Inc., Fiduciary Trust Account at Bank of the West, Livingston, California. LMMP shall disburse from the LMMP account as referenced below in paragraph 3 (b), up to $15,000.00 per month representing payment or reimbursement to LMMP for its expenses, and disburse to Bridgeport and others as specified below in paragraph 3 (b).

(b)    Within four business days from the effective date of this Agreement, Bridgeport will cause to be loaned to LMMP $25,000.00 (less payments received), which will at all times be secured by the Property, under commercially reasonable terms. Furthermore, Bridgeport will procure one or more lenders to loan LMMP an additional $75,000.00, which is to be further secured by the Property, which is to be disbursed monthly at a rate of $25,000.00 per month beginning thirty (30) days from the effective date of this Agreement. $10,000.00 of such funds shall be paid to Bridgeport monthly as an advance against its expenses pursuant to Section 5 herein, and said loan(s) shall be repaid from the first capital event of LMMP after the effective date of this Agreement. Capital event shall be described as proceeds from a sale of LMMP's assets, loan proceeds, refinance proceeds, equity proceeds or any other capital event, including but not limited to settlement of the Dispute.

4.    Compensation.    LMMP shall pay or cause to be paid Bridgeport for its services hereunder:

(a)    22% of any gross proceeds (but less any sums paid to David Perez or Isaac Holdings, Inc.) received by or for the account of LMMP from any source in resolution of the Dispute. In the event such proceeds are received by LMMP after the term of this Agreement, Bridgeport shall be due an amount equal to 10% of such Bridgeport's compensation for each month of the term of this Agreement, commencing on the date of mutual execution of this Agreement. For example, if this Agreement is

Page 3 - AGREEMENT

EXHIBIT ___(___

PAGE _3_ OF _8_

terminated at the end of the third month, Bridgeport will be due 3 x 10% of the 22%, for a total of 6.6%. Thus, at the end of 10 months, Bridgeport will be fully vested in the 22%. The parties agree that such compensation is a reasonable estimate of the sum which Bridgeport should be paid under such circumstances, the exact amount of which is difficult to estimate at the date of execution of this Agreement.

(b)     22% of any gross proceeds (but less any sums paid to David Perez or Isaac Holdings, Inc.) received by or for the account of LMMP derived from rents, royalties, profits and other economic return from the Property (including minerals and water resources), pursuant to any agreement executed during the term of this Agreement.

(c)     20% of any gross proceeds (but less any sums paid to David Perez or Isaac Holdings, Inc.) received by or for the account of LMMP derived from rents, royalties, profits and other economic return from the Property (including minerals and water resources), pursuant to any agreement executed with LMMP after the term of this Agreement with a party with which Bridgeport negotiated with or who, during the term of this Agreement, examined or was introduced to the Property by any means.

(d)     Such sums shall be due Bridgeport as and when received by or on behalf of LMMP.

(e)     Bridgeport is granted a security interest in such proceeds and is authorized to file or record such financing statements as it deems necessary. Bridgeport is authorized to direct any payor to pay such compensation directly to Bridgeport, whether paid immediately or due over time.

5.     Expenses.     LMMP shall pay or cause to be paid Bridgeport for its reasonable direct expenses incurred by Bridgeport, including travel, in execution of its services hereunder.

(a)     "Expenses" does not include office, insurance, salaries of management level personnel of Bridgeport, or other overhead expenses of Bridgeport not directly related to the Dispute or management of the Property.

(b)     Bridgeport is entitled to a monthly advance against expenses in the amount of $10,000.00 commencing and due on the first day of the month following mutual execution of this Agreement. Such monthly sum shall be paid exclusively from the funds obtained pursuant to Section 3 of this Agreement, and shall not be a personal obligation of LMMP. Such monthly sum shall be credited against the compensation due Bridgeport pursuant to Section 4 of this Agreement. Upon request, Bridgeport shall provide a reasonable accounting of such expenses.

Page 4 - AGREEMENT

EXHIBIT  1
PAGE  4  OF  8

6.    Term: The services of Bridgeport shall continue until termination of this Agreement by either party in accordance with the terms hereof.

7.    Nature of Relationship. This Agreement does not constitute a partnership, joint venture, fiduciary or any other relationship either expressly or by implication or understanding. Bridgeport is not authorized to practice law and will therefore not itself provide any legal services pursuant to this Agreement.

8.    Termination: The services of Bridgeport may only be terminated by LMMP for cause, which means gross neglect of duties or conviction of any crime involving moral turpitude.

9.    Default: No party shall be in default under this Agreement unless the other party shall have provided written notice specifying in detail the nature of the default and a 30-day opportunity to cure. Any such default shall be deemed cured if resolved during such 30-day period or, if the default cannot practically be cured within such period, if the

party in default commences such action during the period as is necessary to cure the default.

10.    Miscellaneous.

(a)    Neither this Agreement nor any of the Rights, interests, or obligations under this Agreement may be assigned by any party without the prior written consent of the other parties, which consent will not be unreasonably withheld.

(b)    This Agreement may be amended only by an instrument in writing executed by all the parties, which writing must refer to this Agreement.

(c)    Each party agrees (i) to execute and deliver such other documents and (ii) to do and perform such other acts and things, as any other party may reasonably request, to carry out the intent and accomplish the purposes of this Agreement. The persons executing this Agreement intend that their respective signatures bind the parties hereto, and to the fullest extent of the law all affiliates or other entities necessary to make this Agreement effective for the purposes stated herein.

(d)    This Agreement will be governed by and construed in accordance with the laws of California, provided that if this Agreement or any provision of this Agreement shall be invalid under California law, but not invalid under Oregon law,

Page 5 - AGREEMENT

EXHIBIT    1
PAGE 5 OF 8

Oregon law shall prevail on such issue and the Agreement and/or provision shall be deemed valid.

(e)     If any arbitration, or suit, action, interim or provisional relief, is instituted to interpret or enforce the provisions of this Agreement, to rescind this Agreement, or otherwise with respect to the subject matter of this Agreement, the party prevailing on an issue will be entitled to recover with respect to such issue, in addition to costs, reasonable attorney fees incurred in the preparation, prosecution, or defense of such arbitration, suit, or action as determined by the arbitrator or trial court or in any bankruptcy court, and if any appeal is taken from such decision, reasonable attorney fees as determined on appeal.

(f)     Any dispute, controversy, or claim arising out of or relating to this Agreement, whether tort, contract or otherwise (including disputes with or between principals of the parties) will be settled exclusively and finally by arbitration. Unless the parties otherwise agree, the arbitration will be in accordance with the rules of the American Arbitration Association. Judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction, and the resolution of the disputed matter as determined by the arbitrator will be binding on the parties. There will be one arbitrator who will be a business lawyer or will have such alternate qualifications that are mutually agreeable to the parties. Any arbitration will be conducted in San Francisco, California. A party may, without inconsistency with this Agreement, seek from a court any interim or provisional relief that may be necessary to protect the rights or property of that party. The arbitrator will have only the authority to award a remedy or relief that an Oregon court could order, including specific performance of any obligation created under this Agreement, the issuance of an injunction, or the imposition of sanctions for abuse or frustration of the arbitration process, except that the arbitrator will not have authority to award punitive damages or any other amount for the purpose of imposing a penalty as opposed to compensating for actual damage suffered or loss incurred.

(g)     If any provision of this Agreement is invalid or unenforceable in any respect for any reason, it will not affect the validity and enforceability of any other remaining provisions of this Agreement and this Agreement will not be in any other way impaired. Any provision found to be illegal or unenforceable shall if possible be deemed modified to make such provision legal and enforceable.

(h)     This Agreement (including the documents and instruments referred to in this Agreement) constitutes the entire agreement and understanding of the parties with respect to the subject matter of this Agreement and supersedes all prior understandings and agreements, whether written or oral, among the parties with respect to such subject matter.

Page 6 - AGREEMENT

EXHIBIT   1
PAGE   6 OF 8

11.    Effective Date. This Agreement shall be effective on the date of the last signature below of the parties.

12.    Assignment. Bridgeport represents and warrants that Bridgeport Management, LLC is managed by its two members, both of which shall be managers. Martin L. Hudler has an undivided 60% membership interest and is a manager. Brandon M. Hudler has the remaining 40% undivided membership interest and is a manager. Martin L. Hudler has the sole and absolute right to assign all or part of his membership interest, which may include his managerial rights and duties in Bridgeport to any entity or company, in which Martin L. Hudler continues to maintain the majority membership interest and the same or greater managerial control over said new entity. Further, Brandon M. Hudler has the sole and absolute right to assign all or part of his membership interest, which may include his managerial rights and duties, in Bridgeport to any entity or company, in which Brandon M. Hudler continues to maintain the majority membership interest and the same or greater managerial control over said new entity.

Bridgeport Management, LLC
("Bridgeport")

By: _____        Date: 4/27/10
      Martin L. Hudler, Manager

Bridgeport Management, LLC
("Bridgeport")

By: _____        Date: 4/22/10
      Brandon M. Hudler, Manager

Lake Mathews Mineral Properties, Ltd.

By: _____        Date: 4/22/10
      James D. Holmes, President of
      Lawrence Holmes Senior Mining, Inc.,
      As: General Partner of Lake Mathews Mineral Properties, Ltd.

Page 7 - AGREEMENT

EXHIBIT 1
PAGE 7 OF 8

Lake Mathews Mineral Properties, Ltd.
("LMMP")

By: _____ Date: _4/24/10_
    Randall G. Evers, *TRUSTEE, EVERS FAMILY TRUST*
    Lake Mathews Mineral Properties, LTD - Class, "C" Partner


Approved as to form and content:

Shirley Smith, Esq.
Personal Counsel to James D. Holmes


By: _____      4/22/'10
    Shirley Smith, Esq.


\5814\ Bridgeport-Holmes Agreement 4.22. docx


Page 8 - AGREEMENT

EXHIBIT ____1____
PAGE __8__ OF __8__

# FIRST AMENDMENT TO AGREEMENT

THIS IS AN AMENDMENT to that certain Agreement dated April 22, 2010 (the "Agreement"), by and between Lake Mathews Mineral Properties, Ltd., a California limited partnership, by and through its general partner Lawrence Holmes Senior Mining, Inc., a California corporation, and their affiliates or assignees ("LMMP"), and Bridgeport Management, LLC, an Oregon limited liability company ("Bridgeport").

The parties acknowledge that Bridgeport has or soon will have merged with Bridgeport Management, Inc., a Nevada corporation, resulting in the transfer of the Agreement to that corporation. The parties wish to recognize that transfer and therefore agree as follows:

1.     The parties recognize and acknowledge that Bridgeport Management, Inc., a Nevada corporation (the "Corporation"), is hereby substituted in full stead and position to that of Bridgeport in respect to the Agreement. Henceforth, the Corporation shall perform all obligations of Bridgeport and be solely entitled to all Bridgeport's benefits under the Agreement.

2.     The parties also recognize and acknowledge that Exhibit A and Exhibit B to be attached to the Agreement but inadvertently omitted are attached hereto.

3.     Notwithstanding any other provision of the Agreement, including Section 3.a., all payments shall be sent to LMMP at such address as LMMP specifies in writing from time to time.

4.     All other terms and conditions of the Agreement not specifically modified by this Amendment remain in full force and effect, according to their literal terms.

Bridgeport Management, LLC

By: _____     Date: 5-4-10
Martin L. Hudler, Manager

By: _____     Date: 05/04/10
Brandon M. Hudler, Manager

///

///

PAGE 1 FIRST AMENDMENT TO AGREEMENT

EXHIBIT 2
PAGE 1 OF 7

Bridgeport Management, Inc.

By: _____     Date: 5-4-10
     Martin L. Hudler, President


By: _____     Date: 05/04/10
     Brandon M. Hudler, Vice President


Lake Mathews Mineral Properties, Ltd.


By _James D. Holmes_____     Date: 5/4/10
     James D. Holmes, President of
     Lawrence Holmes Senior Mining, Inc.,
     As: General Partner of Lake Mathews Mineral Properties, Ltd.


Lake Mathews Mineral Properties, Ltd.


By: _____     Date:_____
     Randall G. Evers,
     Lake Mathews Mineral Properties, LTD - Class, "C" Partner


Approved as to form and content:

Shirley Smith, Esq.
Personal Counsel to James D. Holmes


By: _____     5/4/10
     Shirley Smith, Esq.


PAGE 2  FIRST AMENDMENT TO AGREEMENT                    EXHIBIT 2
                                                        PAGE 2 OF 7

511188288

# LEGAL DESCRIPTION

The land referred to herein is situated in the State of California, County of Riverside, Unincorporated Area, described as follows:

PARCEL 1:

THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER AND THE NORTH HALF OF THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 4 SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE RANCH EL SOBRANTE DE SAN JACINTO, AS SHOWN BY SECTIONIZED SURVEY OF SAID RANCHO RECORDED IN BOOK 7 PAGE 10, OF MAPS, RECORDS OF SAN BERNARDINO COUNTY;

EXCEPTING THEREFROM ALL INTEREST IN AND TO ALL MINERAL AND MINING RIGHTS APPURTENANT TO SAID REAL PROPERTY AS SAID RIGHTS WERE ABANDONED BY THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA IN CASE NOS. 26462 AND 27011, RECORDS OF THE RIVERSIDE COUNTY SUPERIOR COURT AND AS REFERRED TO IN THE FINAL ORDER OF CONDEMNATION, RECORDED FEBRUARY 28, 1942 IN BOOK 534 PAGE 231 OF OFFICIAL RECORDS, AS CONVEYED TO LAKE MATHEWS MINERAL PROPERTIES, LTD., A LIMITED PARTNERSHIP BY DEED RECORDED FEBRUARY 10, 1983 AS INSTRUMENT NO. 26467 OF OFFICIAL RECORDS.

PARCEL 2:

ALL OF THAT PORTION OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER AND OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 11, TOWNSHIP 4 SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE RANCH EL SOBRANTE DE SAN JACINTO, AS SHOWN BY SECTIONIZED SURVEY OF SAID RANCHO RECORDED IN BOOK 7 PAGE 10, OF MAPS, RECORDS OF SAN BERNARDINO COUNTY, WHICH LIES ABOVE THE 1,200 FOOT ELEVATION ABOVE SEA LEVEL;

EXCEPTING THEREFROM ALL INTEREST IN AND TO ALL MINERAL AND MINING RIGHTS APPURTENANT TO SAID REAL PROPERTY AS SAID RIGHTS WERE ABANDONED BY THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA IN CASE NOS. 26462 AND 27011, RECORDS OF THE RIVERSIDE COUNTY SUPERIOR COURT AND AS REFERRED TO IN THE FINAL ORDER OF CONDEMNATION, RECORDED FEBRUARY 28, 1942 IN BOOK 534 PAGE 231 OF OFFICIAL RECORDS, AS CONVEYED TO LAKE MATHEWS MINERAL PROPERTIES, LTD., A LIMITED PARTNERSHIP BY DEED RECORDED FEBRUARY 10, 1983 AS INSTRUMENT NO. 26467 OF OFFICIAL RECORDS.

PARCEL 3:

Continued on next page

-2-

Ex A

EXHIBIT 2
PAGE 3 OF 7

511188288

THAT PORTION OF THE NORTHWEST QUARTER OF SECTION 12, TOWNSHIP 4
SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND MERIDIAN, AS SHOWN
BY SECTIONIZED SURVEY OF SAID RANCHO RECORDED IN BOOK 7 PAGE
10, OF MAPS, RECORDS OF SAN BERNARDINO COUNTY. DESCRIBED AS
FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID SECTION; THENCE SOUTH
0°32'55" WEST ALONG THE WEST LINE OF SAID NORTHWEST QUARTER,
1,531.21 FEET TO A POINT DISTANCE NORTHWESTERLY 100 FEET
MEASURED AT A RIGHT ANGLE FROM THE PROLONGATION OF THE CENTER
LINE OF THE MATHEWS RESERVOIR SPILLWAY, SAID CENTER LINE HAVING
A BEARING OF SOUTH 69°57'09" WEST; THENCE NORTH 65°57'09" EAST
ALONG A LINE PARALLEL WITH AND DISTANT NORTHWESTERLY 100 FEET,
MEASURED AT A RIGHT ANGLE FROM SAID PROLONGATION OF THE CENTER
LINE OF THE EXISTING MATHEWS RESERVOIR SPILLWAY 715 FEET;
THENCE NORTH 11°32'15" EAST 1,012.83 FEET; THENCE NORTH
9°39'15" WEST 298.13 FEET TO THE NORTHERLY LINE OF SAID
NORTHWEST QUARTER; THENCE SOUTH 89°59'02" WEST ALONG THE
NORTHERLY LINE OF SAID NORTHWEST QUARTER 809.60 FEET TO THE
POINT OF BEGINNING.

TOGETHER WITH AN EASEMENT FOR INGRESS AND EGRESS FROM THE ABOVE
DESCRIBED PARCEL OVER A STRIP(S) OF LAND 60 FEET IN WIDTH BEING
DESCRIBED AS ALL THAT PORTION OF THE NORTH 60 FEET OF SAID
SECTION 12 HEREINABOVE DESCRIBED LYING BETWEEN THE EASTERLY
LINE OF THE ABOVE DESCRIBED PARCEL AND THE WESTERLY LINE OF
TAYLOR STREET AS CONVEYED TO THE COUNTY OF RIVERSIDE, BY DEED
RECORDED AUGUST 2, 1946 IN BOOK 760 PAGE 76 OF OFFICIAL RECORDS;

EXCEPTING THEREFROM ALL INTEREST IN AND TO ALL MINERAL AND
MINING RIGHTS APPURTENANT TO SAID REAL PROPERTY AS SAID RIGHTS
WERE ABANDONED BY THE METROPOLITAN WATER DISTRICT OF SOUTHERN
CALIFORNIA IN CASE NOS. 26462 AND 27011, RECORDS OF THE
RIVERSIDE COUNTY SUPERIOR COURT AND AS REFERRED TO IN THE FINAL
ORDER OF CONDEMNATION, RECORDED FEBRUARY 28, 1942 IN BOOK 534
PAGE 231 OF OFFICIAL RECORDS, AS CONVEYED TO LAKE MATHEWS
MINERAL PROPERTIES, LTD., A LIMITED PARTNERSHIP BY DEED RECORDED
FEBRUARY 10, 1983 AS INSTRUMENT NO. 26467 OF OFFICIAL RECORDS.

End of Legal Description

Continued on next page

-3-

EXHIBIT 2
PAGE 4 OF 7

511188300A

## LEGAL DESCRIPTION

The land referred to herein is situated in the State of California, County of Riverside, Unincorporated Area, described as follows:

PARCEL 1: (SECTION 11) (PARCEL 1 OF SUPERIOR COURT CASE #27011)

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

THE EAST HALF OF SOUTHEAST QUARTER THE SOUTHWEST QUARTER OF SOUTHEAST QUARTER THE SOUTH HALF OF NORTHWEST QUARTER OF SOUTHEAST QUARTER THE SOUTHEAST QUARTER OF NORTHEAST QUARTER OF SOUTHWEST QUARTER AND THE NORTHEAST QUARTER OF SOUTHEAST QUARTER OF SOUTHWEST QUARTER OF SECTION 11, TOWNSHIP 4 SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND MERIDIAN.

PARCEL 262:

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

THE SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF SECTION 6, TOWNSHIP 4 SOUTH, RANGE 5 WEST, SAN BERNARDINO BASE AND MERIDIAN;

EXCEPTING THEREFROM THE NORTH 9/10 THEREOF.

THE WEST HALF OF THE NORTHWEST QUARTER AND THE SOUTHEAST QUARTER OF NORTHWEST QUARTER OF SECTION 7, TOWNSHIP 4 SOUTH, RANGE 5 WEST, SAN BERNARDINO BASE AND MERIDIAN.

THE NORTH HALF AND THE NORTH HALF OF SOUTH HALF OF SECTION 12, TOWNSHIP 4 SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND MERIDIAN;

EXCEPTING THEREFROM THOSE PARCELS IN SAID SECTION 12 DESCRIBED AS PARCELS 264, 265 AND 271 HEREIN.

REFERENCE IS HEREBY MADE TO SAID DOCUMENT FOR FURTHER AND OTHER PARTICULARS.

PARCEL 263:

-2-

Continued on next page

*Ex B*

EXHIBIT __2__
PAGE __5__ OF __7__

511188300A

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

THE SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF SECTION 12,
TOWNSHIP 4 SOUTH, RANGE 6 WEST, SAN BERNARDINO BASE AND
MERIDIAN.

PARCEL 264:

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

THE WEST HALF OF NORTHEAST QUARTER OF NORTHEAST QUARTER OF
SOUTHWEST QUARTER OF SECTION 12, TOWNSHIP 4 SOUTH, RANGE 6
WEST, SAN BERNARDINO BASE AND MERIDIAN.

PARCEL 265:

THAT PORTION OF THE FOLLOWING DESCRIBED PROPERTY LYING DEEPER
THAN 300 FEET BELOW THE NATURAL SURFACE OF THE GROUND AND THE
EXCLUSIVE RIGHT TO MINE ANY AND ALL MINERALS CONTAINED WITHIN
SAID LAND AT A DEPTH LOWER THAN 300 FEET BELOW THE NATURAL
SURFACE OF THE FOLLOWING DESCRIBED PROPERTY:

ALL THAT PORTION OF THE SOUTHWEST QUARTER OF SOUTHWEST QUARTER
OF NORTHEAST QUARTER OF SECTION 12, TOWNSHIP 4 SOUTH , RANGE 6
WEST, SAN BERNARDINO BASE AND MERIDIAN, DESCRIBED IN THAT
CERTAIN DEED FROM LAWRENCE HOLMES, ET UX, TO THEODORE L.
COFFIN, ET AL, RECORDED FEBRUARY 13, 1932 IN BOOK 63 PAGE 598
OF OFFICIAL RECORDS OF RIVERSIDE COUNTY, CALIFORNIA, AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF EAST ONE ACRE OF NORTH TWO
ACRES OF EAST HALF OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF
NORTHEAST QUARTER OF SAID SECTION; THENCE WESTERLY ON THE
NORTHERLY LINE OF SAID SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF
NORTHEAST QUARTER OF SAID SECTION, 132 FEET; THENCE SOUTHERLY
AND PARALLEL WITH THE WESTERLY LINE OF THE NORTHEAST QUARTER OF
SAID SECTION, 330 FEET TO THE SOUTHERLY LINE OF THE NORTH HALF
OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF NORTHEAST QUARTER
OF SAID SECTION; THENCE EASTERLY ON SAID SOUTHERLY LINE, 231
FEET TO A POINT 66 FEET WESTERLY FROM THE SOUTHEAST CORNER OF
THE NORTH HALF OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF
NORTHEAST QUARTER OF SAID SECTION; THENCE NORTHWESTERLY ON THE
SOUTHWESTERLY LINE OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN
Continued on next page

-3-

EXHIBIT 2

PAGE 6 OF 7

511188300A

DEED TO GEORGE K. HANEY AND LULU HANEY, HIS WIFE, RECORDED
AUGUST 18, 1930 IN BOOK 871 PAGE 141, OF DEEDS, RECORDS OF
RIVERSIDE COUNTY, CALIFORNIA, TO THE SOUTHERLY LINE OF THE EAST
ONE ACRE OF NORTH TWO ACRES OF EAST HALF OF SOUTHWEST QUARTER OF
SOUTHWEST QUARTER OF NORTHEAST QUARTER OF SAID SECTION; THENCE
WESTERLY ALONG SAID SOUTHERLY LINE TO THE SOUTHWEST CORNER OF
SAID EAST ONE ACRE; THENCE NORTHERLY 264 FEET, MORE OR LESS, TO
THE POINT OF BEGINNING; ALSO, THE WESTERLY RECTANGULAR 132 FEET
OF THE NORTHERLY RECTANGULAR 65 FEET OF THE EASTERLY 297 FEET
OF SOUTH HALF OF SOUTHWEST QUARTER OF SOUTHWEST QUARTER OF
NORTHEAST QUARTER OF SAID SECTION 12.

End of Legal Description

Continued on next page

-4-

EXHIBIT 2
PAGE 7 OF 7

## SECOND AMENDMENT TO AGREEMENT

THIS IS AN AMENDMENT (the "Amendment") to that certain Agreement dated April 22, 2010, by and between Lake Mathews Mineral Properties, Ltd., a California limited partnership, by and through its general partner Lawrence Holmes Senior Mining, Inc., a California corporation, and their affiliates or assignees ("LMMP"), and Bridgeport Management, Inc., a Nevada corporation ("BMI"), as amended (the "Agreement").

The parties acknowledge the following:

* Since April 22, 2010, BMI has loaned LMMP $29,500.00 pursuant to Section 3(b) of the Agreement, and LMMP has paid BMI $10,000.00 pursuant to the same Section. As of September 22, 2010 there is thus $30,000.00 accrued and owing to BMI pursuant to the same Section, together with the loan of $29,500.00. Further, LMMP is owed $30,500.00, which represents the balance owed from the initial $75,000.00 that was to be advanced by BMI to LMMP.

* BMI has punctually performed all obligations which it is and has been required to perform under the Agreement and is not and has not been in default of the Agreement in any material respect.

* Since April 22, 2010, BMI has worked to the best of its ability to procure loan proposals to be secured by the Property. Thus far, the title to the Property has not been in the name of LMMP without exception, preventing the closing of loans secured by the Property, and such loans have not been consummated. BMI has now procured a lender to loan LMMP between $325,000.00 and $500,000.00. The terms and conditions of the loan are acceptable to LMMP (the "Loan") as it relates to the $325,000.00 loan. Loan is to be closed utilizing the services of Fidelity National Title Company, 1300 Dove Street, Suite 310, Newport Beach, CA 92660 ("Escrow"). As part of the Loan transaction, $1,500.00 is required to be paid for loan documentation and $4,000.00 is to be paid to or on behalf of LMMP for its uses and purposes.

NOW THEREFORE, in consideration of the mutual promises contained herein, the parties agree as follows:

1.    Concurrent with mutual execution of this Amendment, BMI shall loan to LMMP $5,500.00 pursuant to Section 3(b). LMMP directs BMI to disburse such sum by paying the lender, NXT Equities, $1,500.00, and by depositing $4,000.00 in the personal account of James D. Holmes: Citi Bank – Account Number 40048667154 – Routing Number 322271724. Repayment of the loan is due on demand.

PAGE 1  SECOND AMENDMENT TO AGREEMENT

EXHIBIT __3__

PAGE _1_ OF _5_

2.      At or before the closing of the Loan, LMMP will pay BMI the following sums:

| | |
|---|---|
| $29,500 | Prior sums owed to BMI by LMMP |
| 4,000 | Loan from BMI concurrent with this Amendment |
| 1,500 | Loan from BMI concurrent with this Amendment |
| 20,000 | Advance to BMI for expenses per Section 3(b) for Sept. and Oct. 2010. |
| 30,000 | Advance against BMI expenses per Section 3(b) through 8/21/10 |
| $85,000 | Total Due BMI |

3.      The parties will mutually instruct the Escrow to do the following at the closing of the Loan:

(a)     Pay all required closing costs for the Loan.

(b)     Pay the law firm of Palmieri, Tyler, Wiener, Wilhelm & Waldron LLP, $3,231.00.

(c)     Pay the Total Due BMI of $85,000.00 as per the instructions attached hereto as Exhibit A.

(d)     Pay the remaining balance of the Loan as shown on Exhibit A attached hereto.

4.      LMMP hereby acknowledges that BMI has fully and completely performed all obligations under the Agreement on its part to be performed and is not and has not been in default of the Agreement in any material respect.

5.      All other terms and conditions of the Agreement not specifically modified by this Amendment remain in full force and effect, according to their literal terms.

[SIGNATURES ON FOLLOWING PAGE]

EXHIBIT 3
PAGE 2 OF 5

PAGE 2  SECOND AMENDMENT TO AGREEMENT

09/28/2010  11:33    562--494-3421    FEDEX OFFICE    1005    PAGE  04

Bridgeport Management, Inc.

By: _____    Date: _9/25/10___
    Martin L. Hudler, President

Lake Mathews Mineral Properties, Ltd.

By _James D. Holmes_    Date: _9-28-10___
    James D. Holmes, President of
    Lawrence Holmes Senior Mining, Inc.,
    As: General Partner of Lake Mathews Mineral Properties, Ltd.

Lake Mathews Mineral Properties, Ltd.

By: _____    Date: _Sept 28th 2010_
    Randall G. Evers,
    Lake Mathews Mineral Properties, LTD - Class, "C" Partner

**Approved as to form and content:**

_____
    Shirley Smith, Esq.
    Legal counsel to James D. Holmes

PAGE 3  SECOND AMENDMENT TO AGREEMENT

EXHIBIT _3_
PAGE _3_ OF _5_

## IRREVOCABLE MUTUAL ESCROW INSTRUCTIONS

Fidelity National Title Company (the "Escrow") is hereby irrevocably instructed to release the loan proceeds from the lending transaction between NXT Equities as lender and Lake Mathews Mineral Properties, Ltd ("LMMP") as borrower as follows:

1.   To LMMP by wire transferring the loan proceeds, less the sums referred to herein, to Integrated Resources, Inc., Fiduciary Trust Account at Bank of the West, Livingston, California.  The wire transfer instructions are to be furnished by LMMP.

2.   To Bridgeport Management, Inc. $85,000 by wire transferring such sum to:

*Beneficiary Bank:*              Pacific Coast Bankers Bank
*Routing Number:*              121042484
*Beneficiary Account Name:*     Northwest Bank
*Beneficiary Account Number:*   123206956
*³Reference: **BRIDGEPORT MANAGEMENT INC  1010009262***

Bridgeport Management, Inc.

By: _____        Date: __9/28/11____
      Martin L. Hudler, President

Lake Mathews Mineral Properties, Ltd.

By: _____        Date: __9-28-10____
      James D. Holmes, President of
      Lawrence Holmes Senior Mining, Inc.,
      As: General Partner of Lake Mathews Mineral Properties, Ltd.

Lake Mathews Mineral Properties, Ltd.

By: _____        Date: __Sept 28th 2010____
      Randall G. Evers,
      Lake Mathews Mineral Properties, LTD - Class, "C" Partner

                                          EXHIBIT  3
PAGE 4  SECOND AMENDMENT TO AGREEMENT            PAGE  4  OF  5

09/28/2010  11:33     562--494-3421          FEDEX OFFICE    1005          PAGE  06

///

Approved as to form and content:

Shirley Smith, Esq.
Personal Counsel to James D. Holmes


Shirley Smith, Esq.


PAGE 5  SECOND AMENDMENT TO AGREEMENT

EXHIBIT ___3___
PAGE _5_ OF _5_

09/28/2010 TUE 11:38 [TX/RX NO 5411] ☑006

# EXHIBIT "5"

[Debtor's Amended Schedule D]

**Fill in this information to identify the case:**

Debtor name   **Lake Mathews Mineral Properties, LTD**

United States Bankruptcy Court for the:   CENTRAL DISTRICT OF CALIFORNIA

Case number (if known)   **2:16-bk-16363-NB**

☐ Check if this is an
amended filing

## Official Form 206D
## Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

   ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

   ☑ Yes. Fill in all of the information below.

**Part 1:**   **List Creditors Who Have Secured Claims**

**2. List in alphabetical order all creditors** who have secured claims. If a creditor has more than one secured claim, list the creditor separately for each claim.

| | Column A<br>**Amount of claim**<br>Do not deduct the value of collateral. | Column B<br>**Value of collateral that supports this claim** |
|---|---|---|

| 2.1 | **Adam Telanoff, Esq.** | | | |
|---|---|---|---|---|

**2.1 Adam Telanoff, Esq.**
Creditor's Name

**9737 Lurline Ave.
Chatsworth, CA 91311**
Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**

**Last 4 digits of account number**

**Describe debtor's property that is subject to a lien**
**800 acres of land, 300 feet below surface of Lake Mathews in Riverside County**

**Describe the lien**
**Contract**

**Is the creditor an insider or related party?**
☑ No
☐ Yes

**Is anyone else liable on this claim?**
☐ No
☑ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**As of the petition filing date, the claim is:**
Check all that apply
☑ Contingent
☑ Unliquidated
☐ Disputed

Amount of claim: **Unknown**
Value of collateral: **Unknown**

**Do multiple creditors have an interest in the same property?**
☐ No
☑ Yes. Specify each creditor, including this creditor and its relative priority.
**1. Adam Telanoff, Esq.
2. Anita Jones for A. Jones Investors
3. Ann Bitterman
4. Baker & McKenzie, LLC
5. Danielia Wingham
6. Ernst Muusse
7. Frank Cardinale
8. Jackson Cox
9. Klover Trust
10. Martin Hudler & Bridgeport Mngmnt.
11. Matt Washin
12. Palmieri, Tyler, Winer, Wilhelm
13. George & Pamela Smith Living Trust**

| 2.2 | **Anita Jones for A. Jones Investors** | Describe debtor's property that is subject to a lien | **$0.00** | **Unknown** |
|---|---|---|---|---|

| Debtor | **Lake Mathews Mineral Properties, LTD** | Case number (if known) | **2:16-bk-16363-NB** |
|---|---|---|---|
| | Name | | |

| Creditor's Name | Three surface parcels, right to mine 800 acres of land, 300 feet below surface of Lake Mathews in Riverside County.  The real property in the unincorporated area of the County of Riverside, State of California, described as APN: 278-190-002 | |
|---|---|---|

**Creditor's mailing address**

**Describe the lien**
**33.33% omterest in Holmes Lake Mathews, LLC**

**Is the creditor an insider or related party?**
■ No
☐ Yes

Creditor's email address, if known

**Is anyone else liable on this claim?**
☐ No
■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Date debt was incurred**
**Address unknown**
**Last 4 digits of account number**

**As of the petition filing date, the claim is:**
Check all that apply
■ Contingent
■ Unliquidated
☐ Disputed

**Do multiple creditors have an interest in the same property?**
☐ No
■ Yes. Specify each creditor, including this creditor and its relative priority.
**Specified on line 2.1**

---

| 2.3 | **Ann Bitterman** | Describe debtor's property that is subject to a lien | $115,000.00 | Unknown |
|---|---|---|---|---|
| | Creditor's Name | Three surface parcels, right to mine 800 acres of land, 300 feet below surface of Lake Mathews in Riverside County.  The real property in the unincorporated area of the County of Riverside, State of California, described as APN: 278-190-002 | | |

**Coral Gables**
**405 Biltmore Way**
**Coral Gables, FL 33134**
Creditor's mailing address

**Describe the lien**
**Contract 7% of Gross Profits of LMMP**

**Is the creditor an insider or related party?**
■ No
☐ Yes

Creditor's email address, if known

**Is anyone else liable on this claim?**
☐ No
■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Date debt was incurred**

**Last 4 digits of account number**

**As of the petition filing date, the claim is:**
Check all that apply
■ Contingent
■ Unliquidated
☐ Disputed

**Do multiple creditors have an interest in the same property?**
☐ No
■ Yes. Specify each creditor, including this creditor and its relative priority.
**Specified on line 2.1**

---

| 2.4 | **Baker & McKenzie, LLC** | Describe debtor's property that is subject to a lien | Unknown | Unknown |
|---|---|---|---|---|
| | Creditor's Name | | | |

**300 East Randolph Street, Ste 5000**
**Chicago, IL 60601**
Creditor's mailing address

**Describe the lien**
**Contract**

**Is the creditor an insider or related party?**
■ No
☐ Yes

Creditor's email address, if known

---

| Debtor | **Lake Mathews Mineral Properties, LTD** | | Case number (if know) | **2:16-bk-16363-NB** |
|---|---|---|---|---|
| | Name | | | |

| | |
|---|---|
| **Date debt was incurred** | **Is anyone else liable on this claim?** |
| | ☐ No |
| **Last 4 digits of account number** | ■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) |

| | |
|---|---|
| **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:**<br>Check all that apply |
| ☐ No | ■ Contingent |
| ■ Yes. Specify each creditor, including this creditor and its relative priority. | ■ Unliquidated |
| **Specified on line 2.1** | ■ Disputed |

---

| 2.5 | **Danielia Wingham** | | **Describe debtor's property that is subject to a lien** | $10,278.22 | Unknown |
|---|---|---|---|---|---|
| | Creditor's Name | | **Three surface parcels, right to mine 800 acres of land, 300 feet below surface of Lake Mathews in Riverside County. The real property in the unincorporated area of the County of Riverside, State of California, described as APN: 278-190-002** | | |

**3435 Ocean Park Blvd., No 107-43
Santa Monica, CA 90405**

Creditor's mailing address

**Describe the lien**
**Contract**

**Is the creditor an insider or related party?**
■ No
☐ Yes

Creditor's email address, if known

**Is anyone else liable on this claim?**
☐ No

**Date debt was incurred**

■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Last 4 digits of account number**

| | |
|---|---|
| **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:**<br>Check all that apply |
| ☐ No | ■ Contingent |
| ■ Yes. Specify each creditor, including this creditor and its relative priority. | ■ Unliquidated |
| **Specified on line 2.1** | ☐ Disputed |

---

| 2.6 | **Ernst Muusse** | | **Describe debtor's property that is subject to a lien** | $20,443.01 | Unknown |
|---|---|---|---|---|---|
| | Creditor's Name | | **Three surface parcels, right to mine 800 acres of land, 300 feet below surface of Lake Mathews in Riverside County. The real property in the unincorporated area of the County of Riverside, State of California, described as APN: 278-190-002** | | |

**3435 Ocean Park Blvd., No. 107-43
Santa Monica, CA 90405**

Creditor's mailing address

**Describe the lien**
**Contract / 10% of gross profit of LMMP**

**Is the creditor an insider or related party?**
■ No
☐ Yes

Creditor's email address, if known

**Is anyone else liable on this claim?**
☐ No

**Date debt was incurred**

■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Last 4 digits of account number**

| | |
|---|---|
| **Do multiple creditors have an interest in the same property?** | **As of the petition filing date, the claim is:**<br>Check all that apply |

---

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

| Debtor | **Lake Mathews Mineral Properties, LTD** | Case number (if know) | **2:16-bk-16363-NB** |
|---|---|---|---|
| | Name | | |

☐ No

☑ Yes. Specify each creditor,
including this creditor and its relative
priority.
**Specified on line 2.1**

☑ Contingent

☐ Unliquidated

☑ Disputed

---

| 2.7 | **Frank Cardinale** | | Describe debtor's property that is subject to a lien | | **$6,000.00** | **Unknown** |
|---|---|---|---|---|---|---|

Creditor's Name

**Three surface parcels, right to mine 800 acres
of land, 300 feet below surface of Lake
Mathews in Riverside County.  The real
property in the unincorporated area of the
County of Riverside, State of California,
described as APN: 278-190-002**

**1300 Bristol Street N. Ste
100
Newport Beach, CA 92660**

Creditor's mailing address

Describe the lien
**Contract**

Is the creditor an insider or related party?

☑ No

☐ Yes

Creditor's email address, if known

Is anyone else liable on this claim?

☐ No

☑ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an
interest in the same property?**

☐ No

☑ Yes. Specify each creditor,
including this creditor and its relative
priority.
**Specified on line 2.1**

As of the petition filing date, the claim is:
Check all that apply

☑ Contingent

☑ Unliquidated

☐ Disputed

---

| 2.8 | **George & Pamela Smith
Living Trust** | | Describe debtor's property that is subject to a lien | | **$0.00** | **Unknown** |
|---|---|---|---|---|---|---|

Creditor's Name

**Three surface parcels, right to mine 800 acres
of land, 300 feet below surface of Lake
Mathews in Riverside County.  The real
property in the unincorporated area of the
County of Riverside, State of California,
described as APN: 278-190-002**

Creditor's mailing address

Describe the lien
**16.67% interest in Holmes Lake Mathews,
LLC**

Is the creditor an insider or related party?

☑ No

☐ Yes

Creditor's email address, if known

Is anyone else liable on this claim?

☐ No

**Date debt was incurred**

☑ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Address unknown**

**Last 4 digits of account number**

**Do multiple creditors have an
interest in the same property?**

☐ No

☑ Yes. Specify each creditor,
including this creditor and its relative
priority.
**Specified on line 2.1**

As of the petition filing date, the claim is:
Check all that apply

☑ Contingent

☑ Unliquidated

☐ Disputed

---

| 2.9 | **Jackson Cox** | Describe debtor's property that is subject to a lien | **$10,000.00** | **Unknown** |
|---|---|---|---|---|

---

| Debtor | Lake Mathews Mineral Properties, LTD | Case number (if known) | 2:16-bk-16363-NB |
|---|---|---|---|
| | Name | | |

| Creditor's Name | | | |
|---|---|---|---|

**c/o Walter J. Sawacki, Esq.**
**2430 Ocean View Ave;, Ste**
**305**
**Los Angeles, CA 90057**

Creditor's mailing address

Three surface parcels, right to mine 800 acres of land, 300 feet below surface of Lake Mathews in Riverside County. The real property in the unincorporated area of the County of Riverside, State of California, described as APN: 278-190-002

Describe the lien
**Contract**

Is the creditor an insider or related party?
■ No
☐ Yes

Creditor's email address, if known

Is anyone else liable on this claim?
☐ No
■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
☐ No
■ Yes. Specify each creditor, including this creditor and its relative priority.
**Specified on line 2.1**

As of the petition filing date, the claim is:
Check all that apply
■ Contingent
■ Unliquidated
☐ Disputed

---

| 2.1 0 | **Klover Trust** | Describe debtor's property that is subject to a lien | $35,000.00 | Unknown |
|---|---|---|---|---|
| | Creditor's Name | | | |

**c/o Frank Cardinale, Esq.**
**1300 Bristol Street N., Ste**
**100**
**Newport Beach, CA 92660**

Creditor's mailing address

Three surface parcels, right to mine 800 acres of land, 300 feet below surface of Lake Mathews in Riverside County. The real property in the unincorporated area of the County of Riverside, State of California, described as APN: 278-190-002

Describe the lien
**Contract**

Is the creditor an insider or related party?
■ No
☐ Yes

Creditor's email address, if known

Is anyone else liable on this claim?
☐ No
■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
☐ No
■ Yes. Specify each creditor, including this creditor and its relative priority.
**Specified on line 2.1**

As of the petition filing date, the claim is:
Check all that apply
■ Contingent
■ Unliquidated
☐ Disputed

---

| 2.1 1 | **Martin Hudler & Bridgeport Mngmnt.** | Describe debtor's property that is subject to a lien | $250,000.00 | Unknown |
|---|---|---|---|---|
| | Creditor's Name | | | |

**c/o Charles R Markley**
**Greene & Markely PC**
**1515 SW 5th Ave.#600**
**Portland, OR 97201**

Creditor's mailing address

Three surface parcels, right to mine 800 acres of land, 300 feet below surface of Lake Mathews in Riverside County. The real property in the unincorporated area of the County of Riverside, State of California, described as APN: 278-190-002

Describe the lien

---

Official Form 206D          Additional Page of **Schedule D: Creditors Who Have Claims Secured by Property**          page 5 of 8

| Debtor | **Lake Mathews Mineral Properties, LTD** | Case number (if know) | **2:16-bk-16363-NB** |
|---|---|---|---|
| | Name | | |

| | | |
|---|---|---|
| | **Contract / 22% of gross receipts due from MWD** | |
| | Is the creditor an insider or related party? | |
| Creditor's email address, if known | ■ No | |
| | ☐ Yes | |
| | Is anyone else liable on this claim? | |
| **Date debt was incurred** | ☐ No | |
| | ■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) | |
| **Last 4 digits of account number** | | |
| **Do multiple creditors have an interest in the same property?** | As of the petition filing date, the claim is: Check all that apply | |
| ☐ No | ■ Contingent | |
| ■ Yes. Specify each creditor, including this creditor and its relative priority. | ■ Unliquidated | |
| | ■ Disputed | |
| **Specified on line 2.1** | | |

---

| 2.1 2 | **Matt Washin** | Describe debtor's property that is subject to a lien | **$32,500.00** | **Unknown** |
|---|---|---|---|---|
| | Creditor's Name | **Three surface parcels, right to mine 800 acres of land, 300 feet below surface of Lake Mathews in Riverside County. The real property in the unincorporated area of the County of Riverside, State of California, described as APN: 278-190-002** | | |
| | **c/o Walter J Sawacki, Esq. 2430 Ocean View Ave., Ste 305 Los Angeles, CA 90057** | | | |
| | Creditor's mailing address | **Describe the lien** | | |
| | | **Contract** | | |
| | | Is the creditor an insider or related party? | | |
| | Creditor's email address, if known | ■ No | | |
| | | ☐ Yes | | |
| | | Is anyone else liable on this claim? | | |
| | **Date debt was incurred** | ☐ No | | |
| | | ■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H) | | |
| | **Last 4 digits of account number** | | | |
| | **Do multiple creditors have an interest in the same property?** | As of the petition filing date, the claim is: Check all that apply | | |
| | ☐ No | ■ Contingent | | |
| | ■ Yes. Specify each creditor, including this creditor and its relative priority. | ■ Unliquidated | | |
| | | ☐ Disputed | | |
| | **Specified on line 2.1** | | | |

---

| 2.1 3 | **Palmieri, Tyler, Winer, Wilhelm** | Describe debtor's property that is subject to a lien | **$382,683.99** | **Unknown** |
|---|---|---|---|---|
| | Creditor's Name | **Three surface parcels, right to mine 800 acres of land, 300 feet below surface of Lake Mathews in Riverside County. The real property in the unincorporated area of the County of Riverside, State of California, described as APN: 278-190-002** | | |
| | **& Waldron, LLC 1900 Main Steet, Suite 700 Irvine, CA 92614-7328** | | | |
| | Creditor's mailing address | **Describe the lien** | | |
| | | **Contract** | | |
| | | Is the creditor an insider or related party? | | |
| | Creditor's email address, if known | ■ No | | |
| | | ☐ Yes | | |
| | | Is anyone else liable on this claim? | | |
| | **Date debt was incurred** | ☐ No | | |

---

| Debtor | **Lake Mathews Mineral Properties, LTD** | Case number (if known) | **2:16-bk-16363-NB** |
|---|---|---|---|
| | Name | | |

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
☐ No
■ Yes. Specify each creditor, including this creditor and its relative priority.
**Specified on line 2.1**

**As of the petition filing date, the claim is:**
Check all that apply
■ Contingent
■ Unliquidated
☐ Disputed

☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

---

| 2.1 4 | **The Planning Group, LLC an Arizona** | | $1,080,000.00 | Unknown |
|---|---|---|---|---|

Creditor's Name

**Altair LLC, an Arizona LLC 800 N. Gainey Center Dr., Ste 176 Scottsdale, AZ 85258**

Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**
☐ No
■ Yes. Specify each creditor, including this creditor and its relative priority.
**Specified on line 2.1**

**Describe debtor's property that is subject to a lien**
**Three surface parcels, right to mine 800 acres of land, 300 feet below surface of Lake Mathews in Riverside County.  The real property in the unincorporated area of the County of Riverside, State of California, described as APN: 278-190-002**

**Describe the lien**
**Contract**
**Is the creditor an insider or related party?**
■ No
☐ Yes
**Is anyone else liable on this claim?**
■ No
■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**As of the petition filing date, the claim is:**
Check all that apply
■ Contingent
■ Unliquidated
■ Disputed

---

| 2.1 5 | **William Domke** | | $155,000.00 | Unknown |
|---|---|---|---|---|

Creditor's Name

**12927 Venice Blvd. Los Angeles, CA 90066**

Creditor's mailing address

Creditor's email address, if known

**Date debt was incurred**

**Last 4 digits of account number**

**Do multiple creditors have an interest in the same property?**

**Describe debtor's property that is subject to a lien**
**Three surface parcels, right to mine 800 acres of land, 300 feet below surface of Lake Mathews in Riverside County.  The real property in the unincorporated area of the County of Riverside, State of California, described as APN: 278-190-002**

**Describe the lien**

**Is the creditor an insider or related party?**
■ No
☐ Yes
**Is anyone else liable on this claim?**
☐ No
■ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)

**As of the petition filing date, the claim is:**
Check all that apply

---

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com    Best Case Bankruptcy

| Debtor | **Lake Mathews Mineral Properties, LTD** | Case number (if know) | **2:16-bk-16363-NB** |
|---|---|---|---|
| | Name | | |

☐ No

☑ Yes. Specify each creditor, including this creditor and its relative priority.

**Specified on line 2.1**

☑ Contingent
☑ Unliquidated
☐ Disputed

---

3.  **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.**    $2,096,905.22

---

**Part 2:    List Others to Be Notified for a Debt Already Listed in Part 1**

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to be notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|
| | | |

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "6"

[Claims Register for Debtor's Bankruptcy Case]

# Central District of California
# Claims Register

### 2:16-bk-16363-NB Lake Mathews Mineral Properties, LTD **Converted** 03/02/2017

| | | |
|---|---|---|
| **Judge:** Neil W. Bason | **Chapter:** 7 | |
| **Office:** Los Angeles | **Last Date to file claims:** | |
| **Trustee:** Elissa Miller (TR) | **Last Date to file (Govt):** | |

| | | |
|---|---|---|
| *Creditor:* (37111909)<br>INTERNAL REVENUE SERVICE<br>300 North Los Angeles Street<br>M/S 5022<br>Los Angeles, CA 90012 | **Claim No: 1**<br>*Original Filed Date*: 05/27/2016<br>*Original Entered Date*: 05/27/2016 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Maria D Hill<br>*Modified:* |

| Amount claimed: | $303.71 | |
|---|---|---|
| Secured claimed: | $0.00 | |
| Priority claimed: | $303.71 | |

| *History:* | | | |
|---|---|---|---|
| Details | 1-1 | 05/27/2016 | Claim #1 filed by INTERNAL REVENUE SERVICE, Amount claimed: $303.71 (Hill, Maria ) |

*Description:*

*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (37133016)<br>Franchise Tax Board<br>Bankruptcy Section MS A340<br>PO Box 2952<br>Sacramento, CA 95812-2952 | **Claim No: 2**<br>*Original Filed Date*: 06/06/2016<br>*Original Entered Date*: 06/06/2016 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Jennifer Farrell<br>*Modified:* |

| Amount claimed: | $4896.31 | |
|---|---|---|
| Priority claimed: | $3279.62 | |

| *History:* | | | |
|---|---|---|---|
| Details | 2-1 | 06/06/2016 | Claim #2 filed by Franchise Tax Board, Amount claimed: $4896.31 (Farrell, Jennifer ) |

*Description:*

*Remarks:*

| | | |
|---|---|---|
| *Creditor:* (37181783)<br>KELLY MCCOY, PLC<br>340 E PALM LANE STE 300<br>PHOENIX AZ 85004 | **Claim No: 3**<br>*Original Filed Date*: 06/28/2016<br>*Original Entered Date*: 06/29/2016 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Sarah Cowan<br>*Modified:* |

| Amount claimed: | $11267.17 | |
|---|---|---|

| *History:* | | | |
|---|---|---|---|
| Details | 3-1 | 06/28/2016 | Claim #3 filed by KELLY MCCOY, PLC, Amount claimed: $11267.17 (Cowan, Sarah ) |

*Description:*

*Remarks:*

| Creditor:      (37087169)<br>William Domke<br>12927 Venice Blvd.<br>Los Angeles, CA 90066 | Claim No: 4<br>*Original Filed Date*: 08/15/2016<br>*Original Entered Date*: 08/16/2016 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Sarah Cowan<br>*Modified:* |
|---|---|---|

Amount claimed: $155000.00
Secured claimed: $155000.00

*History:*

| Details | 4-1 | 08/15/2016 | Claim #4 filed by William Domke, Amount claimed: $155000.00 (Cowan, Sarah ) |
|---|---|---|---|

*Description:*

*Remarks:*

---

| Creditor:      (37282491)<br>Marty Clesceri<br>3761 Eve Circle Apt. K<br>Mira Loma, CA 91752 | Claim No: 5<br>*Original Filed Date*: 08/16/2016<br>*Original Entered Date*: 08/16/2016 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Sonny Milano<br>*Modified:* |
|---|---|---|

Amount claimed: $10007.55

*History:*

| Details | 5-1 | 08/16/2016 | Claim #5 filed by Marty Clesceri, Amount claimed: $10007.55 (Milano, Sonny ) |
|---|---|---|---|

*Description:* (5-1) Paralegal Services

*Remarks:*

---

| Creditor:      (37284858)<br>Palmieri, Tyler, Wiener, Wilhelm &<br>Waldron LLP<br>1900 Main Street, Suite 700<br>Irvine, CA 92614 | Claim No: 6<br>*Original Filed Date*: 08/17/2016<br>*Original Entered Date*: 08/17/2016 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Don Fisher<br>*Modified:* |
|---|---|---|

Amount claimed: $382684.00

*History:*

| Details | 6-1 | 08/17/2016 | Claim #6 filed by Palmieri, Tyler, Wiener, Wilhelm & Waldron LLP, Amount claimed: $382684.00 (Fisher, Don ) |
|---|---|---|---|

*Description:* (6-1) Unpaid professional fees

*Remarks:*

---

| Creditor:      (37298970)<br>Matthew Ryan Walshin<br>3040 Byron St<br>San Diego, CA 92106 | Claim No: 7<br>*Original Filed Date*: 08/23/2016<br>*Original Entered Date*: 08/25/2016 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Sonny Milano<br>*Modified:* |
|---|---|---|

Amount claimed: $32500.00

*History:*

| Details | 7-1 | 08/23/2016 | Claim #7 filed by Matthew Ryan Walshin, Amount claimed: $32500.00 (Milano, Sonny ) |
|---|---|---|---|

*Description:* (7-1) Money Loaned

*Remarks:*

---

| Creditor:      (37087158) | Claim No: 8 | *Status:* |
|---|---|---|

Frank Cardinale
1300 Bristonl Street N. Ste 100
Newport Beach, CA 92660

*Original Filed Date*: 08/26/2016
*Original Entered Date*: 08/29/2016

*Filed by:* CR
*Entered by:* Vera Serrano
*Modified:*

| Amount | claimed: | $6000.00 | | |

*History:*

| Details | | 8-1 | 08/26/2016 | Claim #8 filed by Frank Cardinale, Amount claimed: $6000.00 (Serrano, Vera ) |

*Description:*

*Remarks:*

---

*Creditor:*    (37310769)
BRIAN AVERY
829 MAPLE ST
SANTA MONICA CA 90405

**Claim No: 9**
*Original Filed Date:* 08/29/2016
*Original Entered Date:* 08/31/2016

*Status:*
*Filed by:* CR
*Entered by:* Sarah Cowan
*Modified:*

*No amounts claimed*

*History:*

| Details | | 9-1 | 08/29/2016 | Claim #9 filed by BRIAN AVERY, Amount claimed: (Cowan, Sarah ) |

*Description:*

*Remarks:*

---

*Creditor:*    (37087154)
Danielia Wingham
3435 Ocean Park Blvd., No 107-43
Santa Monica, CA 90405

**Claim No: 10**
*Original Filed Date:* 08/29/2016
*Original Entered Date:* 08/31/2016

*Status:*
*Filed by:* CR
*Entered by:* Sarah Cowan
*Modified:*

| Amount | claimed: | $10000.00 | | |

*History:*

| Details | | 10-1 | 08/29/2016 | Claim #10 filed by Danielia Wingham, Amount claimed: $10000.00 (Cowan, Sarah ) |

*Description:*

*Remarks:*

---

*Creditor:*    (37087151)    History
Adam Telanoff, Esq.
1834 12th St
Santa Monica CA 90404

**Claim No: 11**
*Original Filed Date:* 08/31/2016
*Original Entered Date:* 08/31/2016

*Status:*
*Filed by:* CR
*Entered by:* Adam Telanoff
*Modified:*

| Amount | claimed: | $1000000.00 | | |

*History:*

| Details | | 11-1 | 08/31/2016 | Claim #11 filed by Adam Telanoff, Esq., Amount claimed: $1000000.00 (Telanoff, Adam ) |

*Description:* (11-1) Attorney's Fees

*Remarks:*

---

*Creditor:*    (37316318)

**Claim No: 12**

*Status:*

*History:*

| Details | | 12-1 | 09/01/2016 | Claim #12 filed by Pecas, LLC, Amount claimed: $0.00 (Vermillion, Melissa ) |

*Description:*

*Remarks:* (12-1) See Attached Adversary Complaint

| Pecas, LLC<br>c/o Kuzyk Law, LLP<br>1417 Via Anita<br>Pacific Palisades, CA 90272 | Original Filed Date: 09/01/2016<br>Original Entered Date: 09/01/2016 | Filed by: CR<br>Entered by: Melissa A Vermillion<br>Modified: |

| Amount | claimed: | $0.00 | | |||
| Secured | claimed: | $0.00 | | |||

History:

| Details | 12-1 | 09/01/2016 | Claim #12 filed by Pecas, LLC, Amount claimed: $0.00 (Vermillion, Melissa ) |

Description:

Remarks: (12-1) See Attached Adversary Complaint

| Creditor:     (37322120)<br>David Friedland<br>1723 Sexton View Ln<br>Sebastopol CA 95472 | Claim No: 13<br>Original Filed Date: 08/30/2016<br>Original Entered Date: 09/06/2016 | Status:<br>Filed by: CR<br>Entered by: Jacqueline Jarquin<br>Modified: |

| Amount | claimed: | $5103.15 | | |||

History:

| Details | 13-1 | 08/30/2016 | Claim #13 filed by David Friedland, Amount claimed: $5103.15 (Jarquin, Jacqueline ) |

Description:

Remarks:

| Creditor:     (37323405)<br>Naomi Samuel<br>188 Greenfield Ave<br>San Rafael CA 94901 | Claim No: 14<br>Original Filed Date: 09/01/2016<br>Original Entered Date: 09/07/2016 | Status:<br>Filed by: CR<br>Entered by: Vera Serrano<br>Modified: |

| Amount | claimed: | $1250.00 | | |||

History:

| Details | 14-1 | 09/01/2016 | Claim #14 filed by Naomi Samuel, Amount claimed: $1250.00 (Serrano, Vera ) |

Description:

Remarks:

| Creditor:     (37323419)<br>Paul Merritt<br>PO Box 9145<br>Laguna CA 92652 | Claim No: 15<br>Original Filed Date: 09/01/2016<br>Original Entered Date: 09/07/2016<br>Last Amendment Filed: 09/26/2016<br>Last Amendment Entered: 09/28/2016 | Status:<br>Filed by: CR<br>Entered by: Sonny Milano<br>Modified: |

| Secured | claimed: | $240000.00 | | |||

History:

| Details | 15-1 | 09/01/2016 | Claim #15 filed by Paul Merritt, Amount claimed: $240000.00 (Collins, Kim S. ) |
| Details | 15-2 | 09/26/2016 | Amended Claim #15 filed by Paul Merritt, Amount claimed: (Milano, Sonny ) |

Description: (15-2) SERVICES PERFORMED

Remarks:

| Creditor:     (37087157)<br>Ernst Muusse | Claim No: 16<br>Original Filed Date: 09/01/2016 | Status:<br>Filed by: CR |

3435 Ocean Park Blvd., No. 107-43
Santa Monica, CA 90405

| *Original Entered Date*: 09/07/2016 | *Entered by:* Kim S. Collins |
| --- | --- |
| | *Modified:* |

Amount claimed: $20584.93

*History:*

| Details | 16-1 | 09/01/2016 | Claim #16 filed by Ernst Muusse, Amount claimed: $20584.93 (Collins, Kim S. ) |
| --- | --- | --- | --- |

*Description:*

*Remarks:*

---

| *Creditor:*      (37323592)<br>Jim Matson<br>PO Box 174<br>Tecopah CA 92389 | **Claim No: 17**<br>*Original Filed Date*: 09/01/2016<br>*Original Entered Date*: 09/07/2016 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Kim S. Collins<br>*Modified:* |
| --- | --- | --- |

Amount claimed: $5082.88

*History:*

| Details | 17-1 | 09/01/2016 | Claim #17 filed by Jim Matson, Amount claimed: $5082.88 (Collins, Kim S. ) |
| --- | --- | --- | --- |

*Description:*

*Remarks:*

---

| *Creditor:*      (37323599)<br>Robert F Bell<br>Executor of the estate of Richard Bell<br>PO Box 110<br>Tecumseh MI 49286-0110 | **Claim No: 18**<br>*Original Filed Date*: 09/01/2016<br>*Original Entered Date*: 09/07/2016 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Kim S. Collins<br>*Modified:* 09/07/2016 |
| --- | --- | --- |

Amount claimed: $5185.07

*History:*

| Details | 18-1 | 09/01/2016 | Claim #18 filed by Robert F Bell, Amount claimed: $5185.07 (Collins, Kim S. ) |
| --- | --- | --- | --- |

*Description:*

*Remarks:*

---

| *Creditor:*      (37323635)<br>Shawn Pestell<br>503 Watertrough Rd<br>Sebastopol, CA 95472 | **Claim No: 19**<br>*Original Filed Date*: 09/01/2016<br>*Original Entered Date*: 09/07/2016 | *Status:*<br>*Filed by:* CR<br>*Entered by:* Sonny Milano<br>*Modified:* 09/07/2016 |
| --- | --- | --- |

Amount claimed: $5108.33

*History:*

| Details | 19-1 | 09/01/2016 | Claim #19 filed by Shawn Pestell, Amount claimed: $5108.33 (Milano, Sonny ) |
| --- | --- | --- | --- |

*Description:* (19-1) MONEY LOANED

*Remarks:*

| Creditor: (37323635) Shawn Pestell 503 Watertrough Rd Sebastopol, CA 95472 | Claim No: 20 Original Filed Date: 09/01/2016 Original Entered Date: 09/07/2016 | Status: Withdraw 76 Filed by: CR Entered by: Sonny Milano Modified: |
|---|---|---|

Amount claimed: $5108.33

**History:**

| Details | 20-1 | 09/01/2016 | Claim #20 filed by Shawn Pestell, Amount claimed: $5108.33 (Milano, Sonny ) |
|---|---|---|---|
| | 76 | 09/14/2016 | Withdrawal of Claim(s): 20; filed by Shaun Pestell . (Milano, Sonny) Status: Withdraw |

Description: (20-1) MONEY LOANED

Remarks:

---

| Creditor: (37323650) Jackson Curtis Cox 242 Cold Creek Lane Afton VA 22920 | Claim No: 21 Original Filed Date: 09/01/2016 Original Entered Date: 09/07/2016 | Status: Filed by: CR Entered by: Kim S. Collins Modified: |
|---|---|---|

Amount claimed: $10299.04

**History:**

| Details | 21-1 | 09/01/2016 | Claim #21 filed by Jackson Curtis Cox, Amount claimed: $10299.04 (Collins, Kim S. ) |
|---|---|---|---|

Description:

Remarks:

---

| Creditor: (37323681) Klover Investment Trust Paul Merritt as Trustee PO Box 9145 Laguna CA 92652 | Claim No: 22 Original Filed Date: 09/01/2016 Original Entered Date: 09/07/2016 Last Amendment Filed: 09/26/2016 Last Amendment Entered: 09/28/2016 | Status: Filed by: CR Entered by: Sonny Milano Modified: |
|---|---|---|

No amounts claimed

**History:**

| Details | 22-1 | 09/01/2016 | Claim #22 filed by Klover Investment Trust, Amount claimed: $35000.00 (Serrano, Vera ) |
|---|---|---|---|
| Details | 22-2 | 09/26/2016 | Amended Claim #22 filed by Klover Investment Trust, Amount claimed: (Milano, Sonny ) |

Description: (22-2) CAPITAL CONTRIBUTION

Remarks:

---

| Creditor: (37323692) Nitin H Shah 23295 Caminito Marcial Laguna Hills, CA 92653 | Claim No: 23 Original Filed Date: 08/30/2016 Original Entered Date: 09/07/2016 | Status: Filed by: CR Entered by: Jacqueline Jarquin Modified: |
|---|---|---|

Amount claimed: $108000.00

**History:**

| Details | 23-1 | 08/30/2016 | Claim #23 filed by Nitin H Shah, Amount claimed: $108000.00 (Jarquin, Jacqueline ) |
|---|---|---|---|

Description:

Remarks:

---

| Creditor: (37323659) | Claim No: 24 | Status: |
|---|---|---|

Steven Johnson
PO Box 294
Occidental CA 90405

*Original Filed Date*: 09/01/2016
*Original Entered Date*: 09/07/2016

*Filed by:* CR
*Entered by:* Kim S. Collins
*Modified:*

| Amount | claimed: | $30618.08 | | |

*History:*

| Details | | 24-1 | 09/01/2016 | Claim #24 filed by Steven Johnson, Amount claimed: $30618.08 (Collins, Kim S. ) |

*Description:*

*Remarks:*

---

*Creditor:*        (37323419)
Paul Merritt
PO Box 9145
Laguna CA 92652

**Claim No: 25**
*Original Filed Date*: 09/01/2016
*Original Entered Date*: 09/07/2016
*Last Amendment Filed*: 09/26/2016
*Last Amendment Entered*: 09/28/2016

*Status:*
*Filed by:* CR
*Entered by:* Sonny Milano
*Modified:*

| Amount | claimed: | $16700.00 | | |

*History:*

| Details | | 25-1 | 09/01/2016 | Claim #25 filed by Paul Merritt, Amount claimed: $16700.00 (Tom, Bock ) |
| Details | | 25-2 | 09/26/2016 | Amended Claim #25 filed by Paul Merritt, Amount claimed: $16700.00 (Milano, Sonny ) |

*Description:*

*Remarks:*

---

*Creditor:*        (37324538)
Walter Subke
12880 W Ballad Dr
Sun City Wat AZ 85375

**Claim No: 26**
*Original Filed Date*: 09/01/2016
*Original Entered Date*: 09/07/2016

*Status:*
*Filed by:* CR
*Entered by:* Vera Serrano
*Modified:*

*No amounts claimed*

*History:*

| Details | | 26-1 | 09/01/2016 | Claim #26 filed by Walter Subke, Amount claimed: (Serrano, Vera ) |

*Description:* (26-1) Unknown amount.

*Remarks:*

---

*Creditor:*        (37324603)
Shirley Smith, Esq.
9359 Lincoln Blvd Ste 4244
L.A., CA 90045

**Claim No: 27**
*Original Filed Date*: 09/01/2016
*Original Entered Date*: 09/07/2016

*Status:*
*Filed by:* CR
*Entered by:* Kim S. Collins
*Modified:*

*No amounts claimed*

*History:*

| Details | | 27-1 | 09/01/2016 | Claim #27 filed by Shirley Smith, Esq., Amount claimed: (Collins, Kim S. ) |

*Description:*

*Remarks:* (27-1) Amount claimed not specified. See claim for details

| Creditor:          (37324625)<br>James D. Holmes<br>c/o Shirley Smith, Esq.<br>9359 Lincoln Blvd Ste 4244<br>L.A.,CA 90045 | Claim No: 28<br>Original Filed Date: 09/01/2016<br>Original Entered Date: 09/07/2016 | Status:<br>Filed by: CR<br>Entered by: Kim S. Collins<br>Modified: |
|---|---|---|

No amounts claimed

History:

| Details | | 28-1 | 09/01/2016 | Claim #28 filed by James D. Holmes, Amount claimed: (Collins, Kim S. ) |
|---|---|---|---|---|

Description:

Remarks: (28-1) Amount not specified....see claim for details

| Creditor:          (37323419)<br>Paul Merritt<br>PO Box 9145<br>Laguna CA 92652 | Claim No: 29<br>Original Filed Date: 09/07/2016<br>Original Entered Date: 09/07/2016 | Status:<br>Filed by: CR<br>Entered by: Kim S. Collins<br>Modified: |
|---|---|---|

No amounts claimed

History:

| Details | | 29-1 | 09/07/2016 | Claim #29 filed by Paul Merritt, Amount claimed: (Collins, Kim S. ) |
|---|---|---|---|---|

Description:

Remarks: (29-1) Amount not specified...See claim for details

| Creditor:          (37386910)<br>Bridgeport Management, Inc.<br>c/o Charles R. Markley<br>1515 SW 5th Avenue, Suite 600<br>Portland, OR 97201 | Claim No: 30<br>Original Filed Date: 10/07/2016<br>Original Entered Date: 10/11/2016 | Status:<br>Filed by: CR<br>Entered by: Sonny Milano<br>Modified: |
|---|---|---|

No amounts claimed

History:

| Details | | 30-1 | 10/07/2016 | Claim #30 filed by Bridgeport Management, Inc., Amount claimed: (Milano, Sonny ) |
|---|---|---|---|---|

Description: (30-1) SERVICES PERFORMED

Remarks:

| Creditor:          (37401267)<br>Ann Bitterman<br>3721 S Le Jeune Rd<br>Coconut Grove FL 33146 | Claim No: 31<br>Original Filed Date: 09/01/2016<br>Original Entered Date: 10/18/2016 | Status:<br>Filed by: CR<br>Entered by: Sharon Sampson<br>Modified: |
|---|---|---|

Amount claimed: $180000.00

History:

| Details | | 31-1 | 09/01/2016 | Claim #31 filed by Ann Bitterman, Amount claimed: $180000.00 (Sampson, Sharon ) |
|---|---|---|---|---|

Description:

Remarks:

| Creditor:          (37651795)<br>United States Trustee<br>(ADMINISTRATIVE)<br>915 Wilshire Blvd, Suite 1850 | Claim No: 32<br>Original Filed Date: 03/06/2017<br>Original Entered Date: 03/06/2017 | Status:<br>Filed by: CR<br>Entered by: Dare Law<br>Modified: |
|---|---|---|

Los Angeles, CA 90017
(213) 894-6811

| Admin | claimed: | $650.37 | | |
|---|---|---|---|---|

| History: | | | |
|---|---|---|---|
| Details | 32-1 | 03/06/2017 | Claim #32 filed by United States Trustee, Admin claimed: $650.37 (Law, Dare ) |

| Description: (32-1) United States Trustee Quarterly Fees |
|---|

| Remarks: |
|---|

# Claims Register Summary

**Case Name:** Lake Mathews Mineral Properties, LTD
**Case Number:** 2:16-bk-16363-NB
**Chapter:** 7
**Date Filed:** 05/13/2016
**Total Number Of Claims:** 32

| Total Amount Claimed* | $2005698.55 |
|---|---|
| Total Amount Allowed* | |

*Includes general unsecured claims

**The values are reflective of the data entered. Always refer to claim documents for actual amounts.**

| | Claimed | Allowed |
|---|---|---|
| **Secured** | $395000.00 | |
| **Priority** | $3583.33 | |
| **Administrative** | $650.37 | |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/31/2017 18:22:50 | | |
| **PACER Login:** | lnbyb1700:4835325:4871380 | **Client Code:** 8092 |
| **Description:** | Claims Register | **Search Criteria:** 2:16-bk-16363-NB Filed or Entered From: 7/11/2010 Filed or Entered To: 1/2/2018 |
| **Billable Pages:** | 3 | **Cost:** 0.30 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled: **CHAPTER 7 TRUSTEE'S MOTION FOR ORDER: (A) AUTHORIZING SALE OF ASSETS OF THE DEBTOR'S BANKRUPTCY ESTATE, FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (B) APPROVING OVERBID PROCEDURES; AND (C) APPROVING COMPROMISE OF CONTROVERSY; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF ELISSA D. MILLER AND JULIET Y. OH IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 1, 2017**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Franklin C Adams    franklin.adams@bbklaw.com,**
  **arthur.johnston@bbklaw.com;lisa.spencer@bbklaw.com**
- **Michael Jay Berger    michael.berger@bankruptcypower.com,**
  **yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com**
- **Dare Law    dare.law@usdoj.gov,**
  **Kenneth.G.Lau@usdoj.gov;Alvin.mar@usdoj.gov;hatty.yip@usdoj.gov**
- **Charles R Markley    cmarkley@williamskastner.com, norah.cartier@greenemarkley.com**
- **Elissa Miller (TR)    CA71@ecfcbis.com,**
  **MillerTrustee@Sulmeyerlaw.com;C124@ecfcbis.com**
- **Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com**
- **Giovanni Orantes    go@gobklaw.com, gorantes@orantes-**
  **law.com,cmh@gobklaw.com,gobklaw@gmail.com,go@ecf.inforuptcy.com**
- **Cassandra J Richey    ecfcca@ecf.courtdrive.com**
- **Melanie Scott    melanie.scott@usdoj.gov**
- **David Samuel Shevitz    david@shevitzlawfirm.com,**
  **shevitzlawfirm@ecf.courtdrive.com;r48785@notify.bestcase.com**
- **Adam Telanoff    adam.telanoff@gmail.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**

**2. SERVED BY UNITED STATES MAIL**: On **August 1, 2017**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 1, 2017**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                    **F 9013-3.1.PROOF.SERVICE**

1

**_Served via Attorney Service_**

2

Hon. Neil W. Bason
United States Bankruptcy Court

3

Edward R. Roybal Federal Building
255 E. Temple Street, Ctrm 1545
Los Angeles, CA 90012

4

5

**_Served via Email:_**

6

David Clancy:  davidclancy267@gmail.com
Lawrence Homes Senior Mining LLC:  lhomestrust@gmail.com

7

Steven Winstead:  lhomestrust@gmail.com
Merritt Paul:  merrittmaster@yahoo.com

8

Frank Cardinale:  frank@card-law.com
Dennis Palmieri:  callondennis@gmail.com

9

Charles Markley:  Charles.markley@greenemarkley.com
Terrence Terry O'Hearn:  terrrrbear@gmail.com
Martin L. Hudler:  martin@strategiccapitalholdings.com

10

11

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

12

13

| August 1, 2017 | Stephanie Reichert | /s/ Stephanie Reichert |
| *Date* | *Type Name* | *Signature* |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                      **F 9013-3.1.PROOF.SERVICE**

| | | |
|---|---|---|
| *Debtor*<br>Lake Mathews Mineral Properties, LTD<br>100 Oceangate, 12th Floor<br>Long Beach, CA 90802 | *Attorneys for Debtor*<br>Michael Jay Berger<br>9454 Wilshire Boulevard, 6th Floor<br>Beverly Hills, CA 90212-2937 | United States Trustee (LA)<br>915 Wilshire Boulevard, Suite 1850<br>Los Angeles, CA 90017-3560 |
| Employment Development Dept.<br>Bankruptcy Group MIC 92E<br>PO Box 826880<br>Sacramento, CA 94280-0001 | Franchise Tax Board<br>Bankruptcy Section MS: A-340<br>PO Box 2952<br>Sacramento, CA 95812-2952 | Internal Revenue Service<br>Centralized Insolvency Operations<br>PO Box 7346<br>Philadelphia, PA 19101-7346 |
| L.A. County Tax Collector<br>Bankruptcy Unit<br>POBox 54110<br>Los Angeles, CA 90054-0110 | Los Angeles City Clerk<br>PO Box 53200<br>Los Angeles, CA 90053-0200 | Official Committee of Unsecured Creditors<br>c/o Daniela Haskara<br>3435 Ocean Park Boulevard<br>Suite 107-43<br>Santa Monica, CA 90405-3301 |
| PECAS, LLC.<br>c/o Prober & Raphael, A Law Corp.<br>PO Box 4365<br>Woodland Hills, CA 91365-4365 | Pecas, LLC<br>c/o Prober & Raphael, A Law Corporation<br>20750 Ventura Boulevard, Suite 100<br>Woodland Hills, CA 91364-6207 | Securities & Exchange Commission<br>444 South Flower St., Suite 900<br>Los Angeles, CA 90071-2934 |
| Adam Telanoff, Esq.<br>1834 12th Street<br>Santa Monica, CA 90404-4602 | Ann Bitterman<br>3721 S. Le Jeune Road<br>Coconut Grove, FL 33146-2809 | Ann Bitterman<br>Coral Gables<br>405 Biltmore Way<br>Coral Gables, FL 33134-5770 |
| Brian Avery<br>829 Maple Street<br>Santa Monica, CA 90405-3909 | Baker & McKenzie, LLC<br>300 East Randolph Street, Suite 5000<br>Chicago, IL 60601-6342 | Bridgeport Management, Inc.<br>c/o Charles R. Markley<br>1515 SW 5th Avenue, Suite 600<br>Portland, OR 97201-5449 |
| Danielia Wingham<br>3435 Ocean Park Blvd., No 107-43<br>Santa Monica, CA 90405-3301 | David Friedland<br>1723 Sexton View Lane<br>Sebastopol, CA 95472-9436 | David J. Myers, Esq.<br>Kuzyk Law, LLP<br>19900 MacArthur Boulevard, Suite 1150<br>Irvine, CA 92612-8433 |
| Dennis Palmieri<br>PO Box 2465<br>Malibu, CA 90265-7465 | Ernst Muusse<br>3435 Ocean Park Boulevard, No. 107-43<br>Santa Monica, CA 90405-3301 | Frank Cardinale<br>on Behalf of Interested Party Paul Merritt<br>1300 Bristol Street North, Suite 100<br>Newport Beach, CA 92660-2989 |
| Jackson Cox<br>c/o Walter J. Sawacki, Esq.<br>377 Pawnee Trail<br>Winter Springs, FL 32708-5159 | Jackson Curtis Cox<br>242 Cold Creek Lane<br>Afton, VA 22920-3008 | James D. Holmes<br>c/o Shirley Smith, Esq.<br>9359 Lincoln Boulevard, Suite 4244<br>Los Angeles, CA 90045-7103 |
| Jim Matson<br>PO Box 174<br>Tecopah, CA 92389-0174 | Kelly McCoy, PLC<br>340 E. Palm Lane<br>The Brookstone, Suite 300<br>Phoenix, AZ 85004-4610 | Klover Investment Trust<br>Paul Merritt as Trustee<br>PO Box 9145<br>Laguna, CA 92652-7139 |

Klover Trust
c/o Frank Cardinale, Esq.
1300 Bristol Street North, Suite 100
Newport Beach, CA 92660-2989

Law Offices of David J. Myers
19900 MacArthur Blvd., Suite 1150
Irvine, CA 92612-8433

Lawrence Holmes Senior Mining, Inc.
100 Oceangate, Suite 1200
Long Beach, CA 90802-4324

Martin Hudler & Bridgeport Management
c/o Charles R. Markley
Greene & Markely PC
1515 SW 5th Avenue, Suite 600
Portland, OR 97201-5492

Marty Clesceri
3761 Eve Circle, Apt. K
Mira Loma, CA 91752-1263

Matt Washin
c/o Walter J. Sawacki, Esq.
377 Pawnee Trail
Winter Springs, FL 32708-5159

Matthew Ryan Walshin
3040 Byron Street
San Diego, CA 92106-2615

Naomi Samuel
188 Greenfield Avenue
San Rafael, CA 94901-2623

Nitin H. Shah
23295 Caminito Marcial
Laguna Hills, CA 92653-1621

Pecas LLC; Pecas Property Holdings, LLC
c/o Kuzyk Law, LLP
1417 Via Anita
Pacific Palisades, CA 90272-2357

Palmieri, Tyler, Wiener, Wilhelm &
Waldron, et al.
1900 Main Street, Suite 700
Irvine, CA 92614-7328

Paul Merritt
PO Box 9145
Laguna, CA 92652-7139

Robert F. Bell
Executor of the estate of Richard Bell
PO Box 110
Tecumseh, MI 49286-0110

Shawn Pestell
503 Watertrough Road
Sebastopol, CA 95472-3913

Shirley Smith, Esq.
James D. Holmes
9359 Lincoln Boulevard, Suite 4244
Los Angeles, CA 90045-7103

Steven Johnson
PO Box 294
Occidental, CA 95465-0294

The Planning Group, LLC an Arizona
Altair LLC, an Arizona LLC
800 N. Gainey Center Drive, Suite 176
Scottsdale, AZ 85258

Walter Subke
12880 W. Ballad Drive
Sun City Wat, AZ 85375

William Domke
12927 Venice Blvd.
Los Angeles, CA 90066-3509

Adam Telanoff, Esq.
9737 Lurline Ave.
Chatsworth, CA 91311

Giovanni Orantes
The Orantes Law Firm, A Professional
Corporation
3435 Wilshire Boulevard, Suite 2920
Los Angeles, CA 90010-2015

Bridgeport Management, Inc.
PMB 732
18160 Cottonwood Road
Sunriver, OR 97707

Jackson Cox
c/o Walter J. Sawacki, Esq.
2430 Ocean View Ave;, Ste 305
Los Angeles, CA 90057

State of California
Franchise Tax Board
PO Box 942857
Sacramento, CA 94257